CHRISTOPHER P.  BLAXLAND SB# 188554
Law Offices of Christopher P. Blaxland
1334 Park View Avenue, Suite 100
Manhattan Beach, CA 90266
(310) 937-7270
Email: cpblaxland@earthlink.net

TERESA STRALEY
Teresa Straley Law
SBN 248299
5556 South Centinela Avenue, Suite 8
Los Angeles, California 90066
Telephone:   (310) 339-8815
Teresa@tstraleylaw.com

Attorneys for Plaintiff
GARY CRAIG HADDOCK

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CRAIG HADDOCK, an individual, | CASE NO. 2:14-cv-06452-PSG-FFM<br>Honorable Philip S. Gutierrez |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| vs. | JURY TRIAL DEMANDED |
| Countrywide Bank, N.A., Countrywide Home Loans, Inc; Countrywide Financial Corporation; Bank of America, N.A.; BAC Home Loan Servicing, L.P.; Bank of America Corp.; BAC Field Services Corporation BAC Tax Services Corporation; | |
| [Caption Continued On Following Page] | |

1  Banc Of America Insurance Services, Inc; )
2  Bank of America  Reinsurance )
   Corporation; The Bank of New York )
3  Mellon fka The Bank of New York as )
   Trustee for the Holders of CWALT, Inc., )
4  Alternative Loan Trust 2007-OA4 )
5  Mortgage Pass-through Certificates, Series )
   2007-OA4; NB Holdings, Inc.; ReconTrust )
6  Company, N.A.; Balboa Insurance )
7  Company; Balboa Insurance Services Inc. )
   Meritplan Insurance Company; )
8  Newport Insurance Company; Newport )
9  Management Corporation; QBE INC; QBE )
   Insurance Corporation; Qbe First )
10 Insurance Agency; Select Portfolio )
11 Servicing, Inc. (a Utah Corporation for )
   loan servicing); Select Portfolio Servicing, )
12 Inc.,(a Utah Corporation/Collection )
13 Agency) )
                                                  )
14                                                )
                        Defendants.               )
15                                                )
16                                                )
17                                                )
18                                                )
19 _____)

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A, et al.*, Case No. 2:14-cv-06452-PSG-FFM

### NATURE OF THE ACTION

1.     This case arises from three loans that Plaintiff, Gary Craig Haddock, refinanced with Countrywide Bank, N.A. ("Countrywide") each secured by real property. As the complaint makes clear, notwithstanding the fact that Gary continued to make the payments required by the loans, he was plunged into default and charged for fees, penalties and interest as well as other payments for force placed insurance policies, misapplied payments and inaccurate accounting. Defendants misled Gary with promises to resolve the problems but instead never followed through with those resolutions. Then, in the middle of what Gary thought to be resolutions, the loan servicing was transferred. The accounting inaccuracies, default statuses, misleading statements were also transferred with Gary's loans and continued with the new servicer.  During the entire time, Defendants furnished inaccurate account information, knowing that the accounts were in dispute, with statements that things would be resolved re the credit.  It was only as a result of these totally unjustified additional payments that Gary is alleged to have fallen behind in his payments. Throughout this saga Gary has paid, attempted to pay, and currently pays his loan payments in amounts properly due on his loans.

2.     Based on the Defendants' conduct as described herein, Plaintiff asserts claims against Defendants for violation of California's Unfair Competition Law, Business and Professional 22 Code § 17200 et. seq. ("UCL"); Breach of Contract; Accounting; Fraud; Misrepresentation (Intentional & Negligent); Breach of Good Faith & Fair Dealing; Violation of California and Federal Credit Statutes; RESPA; Estoppel; Unjust Enrichment.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction under 28 U.S.C. § 1331 as the complaint contains claims arising under the laws of the United States. The Court also has supplemental jurisdiction over related claims pursuant to 28 U.S.C § 1367 (a). Venue is proper in this district under 28 U.S.C. § 1391 (b) because defendants regularly

conduct business in this district and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

### PLAINTIFF

4.      PLAINTIFF GARY HADDOCK (GARY) is, and at all times herein mentioned was, a resident of Los Angeles County, California, citizen of the State of California, and a "person" pursuant to the California *Business and Professions Code* § 17204. Gary owned the three properties in this matter since the mid 1980's and refinanced the properties with the original lender, Countrywide, N.A.

### DEFENDANTS

5.      The Defendants are listed in three categories: The BANA Defendants, (BANA);  The Insurance Company Defendants, (BALBOAS); and the New Loan Servicer, (SPS). Gary reserves the right to amend this complaint regarding the named Defendants.

### THE BANA DEFENDANTS

6.      Defendant COUNTRYWIDE, N.A. (CWNA): a national association Gary's Original Lender pursuant to the 2007 "Agreements" with its principal place of business headquartered in Calabasas, California. In 2006 and 2007, Countrywide Home Loans transitioned its mortgage loan production business into CWN.A.  As Countrywide Financial stated in its Form 10-K for 2007, by the end of 2007, nearly all mortgage loan production occurred in CWNA rather than Countrywide Home Loans. Virtually all of CWNA's residential loans were sub-prime, option arm, negative amortization loans, which CWNA sold to mortgage-backed security pools but allegedly never assigned and or transferred the security instruments according to the

terms of the pooling and servicing agreements[1]. CWNA, later merged into Bank of America Home Loans, LP., effective on or about April 27, 2009.

7.    Defendant COUNTRYWIDE HOME LOANS, INC.,(CHL) ., a wholly-owned subsidiary of Countrywide Financial Corporation, is a corporation organized under the laws of the State of New York with its principal place of business in Calabasas, California. CHL was the original servicer for the three loans. CHL originated and serviced residential home mortgage loans by itself or through its subsidiaries. After the merger with Bank of America on July 1, 2008, CHL operated under the trade name "Bank of America Home Loans", LP.  CHL was a Defendant in several notable government causes of action that are relevant to this case: (1) California v Countrywide, et al (2008) Case #LC083076; (2) Federal Trade Commission (FTC) v. Countrywide, Bank of America Home Loans (2010) Case # CV10 4193 RSWL SSx resulting in  a 2010 consent order and a 2012 consent order. CHL was a Defendant in the 2012 Global Financial Settlement. Compliance with the FTC's second consent order was dependent on the 2012 Global Financial Settlement. [See EXHIBITS 41 A,B,& C: FTC Complaint, FTC First Consent Order, FTC Second Consent order; Global Settlement Consent Order, Case # 12-CV-00361-JDB]

8.    Defendant COUNTRYWIDE FINANCIAL CORPORATION, (CFC) is a corporation organized under the laws of the State of Delaware with its principal executive offices in Calabasas, California.  Countrywide Financial Corporation, itself and through its subsidiaries, engaged in mortgage lending and other real estate finance-related businesses, including mortgage lending, securities dealing, and insurance underwriting.  It was the corporate parent of all of the Countrywide Defendants.  Pursuant to a transaction completed on July 1, 2008, Countrywide

---

[1] Deposition testimony by Linda De Martini, August 11, 2009: In Re Kemp Bankruptcy No. 08-18700  Kemp v. Countrywide Home Loans, Inc.; Adversary No. 08-02448 regarding loans originated by Countrywide, it was the business practice of Countrywide to , "I don't believe that they're always executed exactly when the transfer takes place.  I believe that it often times it happens after the fact." P. 20, lines 1-3.

Financial was merged into a subsidiary of Bank of America Corporation.  As of April 27, 2009, Countrywide Financial ceased operating under the brand name Countrywide.  Now combined with Bank of America's pre-existing mortgage and home loan business, Countrywide Financial's main businesses operate as Bank of America Home Loans, a division of Bank of America.

9.     Defendant BANK OF AMERICA, N.A., (BANA) is a federally-insured financial institution and Bank of America's principal banking subsidiary.  As explained more fully below, BANA participated in Bank of America's acquisition of substantially all of Countrywide Financial through a series of transactions that commenced on July 1, 2008. Together with Bank of America Corporation, it is a successor-in-interest to Countrywide. BANA is a named Defendant in the Office of Comptroller of the Currency (OCC) 2011 action and the 2012 Global Settlement, BAHLP merged with BANA in July 2011.[2] Defendants Bank of America Corporation, Bank of America, N.A., and NB Holdings Corporation participated in Bank of America's acquisition of substantially all of Countrywide Financial Corporation through a series of acquisitions and shares that commenced July 1, 2008.  They are the successors-in-interest to the Countrywide Defendants.

10.     Defendant BAC HOME LOANS SERVICING, LP (BAHL) (formerly known as Countrywide Home Loans Servicing, LP), is a subsidiary of Bank of America Corporation, is a limited partnership with its principal place of business in Calabasas, California. BAC Home Loans Servicing services mortgage loans and provides mortgage services, including conducting foreclosures on mortgages, on behalf of holders of residential mortgages and mortgage loan asset-backed certificates.

---

[2] See Office of the Comptroller of the Currency June 24, 2011 Approval of merger between BAC Home Loans Servicing L.P. and Bank of America, N.A. One of the reasons for the merger presumably was because BANA was not in the jurisdiction of the Federal Trade Commission second consent order, so the merger provided an end run for Bank of America to be released from the FTC's second consent order.

1 | Defendant BANK OF AMERICA HOME LOANS SERVICING, LP may be the same

2 | entity as BAC Home Loans Servicing, LP.

3 |     11.    Defendant BANK OF AMERICA CORPORATION is one of the world's

4 | largest financial institutions, serving individual consumers, small-and-middle-market

5 | businesses, large corporations and governments with a full range of banking,

6 | investing, asset management and other financial and risk management products and

7 | services.  It is a Delaware corporation with substantial business operations and offices

8 | at the Bank of America Tower at One Bryant Park, New York, New York 10036. The

9 | majority of Defendants named in this action are subsidiaries of Bank of America

10 | Corporation.   Also referred to as Bank of America Corp., Countrywide Financial

11 | merged with Bank of America Corp. on July 1, 2008. Bank of America Corp. is a

12 | successor-in-interest to Countrywide and has thus assumed liability for the conduct of

13 | Countrywide alleged herein. In March 2009, Bank of America's assets were 16.4

14 | percent of the United States' Gross Domestic Product, (GDP).

15 |     12.    Defendant BANC OF AMERICA INSURANCE SERVICES,

16 | INC.(BAIS) is a non-bank subsidiary of Bank of America, N.A. Upon information

17 | and belief, Banc of American Insurance Services, Inc. is the Bank of America entity

18 | through which force-placed insurance policies and commissions are funneled.

19 |     13.    Defendant BANK OF AMERICA REINSURANCE

20 | CORPORATION,(BAR) (a Vermont Corporation) is a wholly owned subsidiary of

21 | Bank of America. BAR insures policies issued by Balboa Insurance Group, including

22 | policies issued by Merit and Newport.

23 |     14.    Defendant THE BANK OF NEW YORK MELLON FKA THE BANK

24 | OF NEW YORK AS TRUSTEE FOR THE HOLDERS OF CWALT, INC.,

25 | ALTERNATIVE LOAN TRUST 2007-OA4 MORTGAGE PASS-THROUGH

26 | CERTIFICATES, SERIES 2007-OA4; It is alleged that Gary's loans were assigned to

27 | this investor, but the authenticity of the assignments are questionable. All four

28 | assignments described further herein were robosigned; two of the four notaries are no

longer active; one of the inactive notaries served time in California State Prison for felonies including embezzlement and forgery.

15.     Defendant BAC TAX SERVICES CORPORATION, (BATS) or known as BAC Tax Services Corporation is a California Corporation and a subsidiary of Bank of America Corporation located in Simi Valley, California. BATS was formed in California and is currently an active corporation. BATS provided and continues to provide alleged tax analysis services and allegedly higher fees for its alleged services.

16.     Defendant BAC FIELD SERVICES CORP. is a California corporation and was formerly known as Countrywide Field Services Corporation. BAC Field Services Corp. operates as a subsidiary of NB Holdings Corporation.

17.     Defendant NB HOLDINGS CORPORATION (NBH) is a Delaware corporation with its principal offices in Charlotte, North Carolina, and is a subsidiary of Bank of America Corporation. It is a named Defendant in this case because it may be the actual investor of Gary's loans. Gary reserves the right to amend this complaint regarding the named Defendants.

18.     Defendant RECONTRUST COMPANY, N.A.(RECON): The original trustee pursuant to the original Security Agreements. As trustee it not only provided default and foreclosure notices, services, it also provided information regarding the identity of the loan investor-note holder.  Besides trustee, RECON is also the agent for the alleged investor trustee for the CWALT Alternative Loan Trust, Series 2007-A04 Bank of New York, Bank of New York Mellon Trustee, the alleged investor of Gary's loans.  Per the2007 Security Agreements, RECON stated its principal place of business as 225 West Hillcrest Dr., MSN TO-02, Thousand Oaks, CA 91360 and Simi Valley. RECON is a wholly owned subsidiary of Bank of America Corp. .

**THE FORCE PLACED INSURANCE COMPANIES: (THE BALBOAS)**

19.     Defendant BALBOA INSURANCE COMPANY is a California corporation with its headquarters in Irvine, California and was formerly a subsidiary of Defendant Bank of America. Balboa provided both insurance tracking services and

force-placed insurance policies to lenders, including Bank of America, nationwide. Balboa provided force-placed insurance policies on real estate located throughout the United States, including California. The relationship between Bank of America and its former subsidiary, Balboa Insurance Company, was a non-competitive and exclusive relationship whereby both parties benefitted at the expense of the consumer by forcing consumers to pay for high cost force-placed insurance policies which included in the premium costs not attributable to the insurance but rather costs of servicing the loan. The excessively inflated price of the Balboa Insurance Company force-placed insurance policy did not represent the actual cost of providing the insurance, but instead represented and encompassed fees, commissions, "rebates" (or kickbacks) and other consideration for "faux" services purportedly provided by Bank of America, N.A. and BACHLS and Balboa Insurance Company. Bank of America sold virtually all of its insurance assets and liabilities to QBE Insurance Group on June 2, 2011. The sale included "long term distribution agreements with Bank of America in connection with the lender-placed" insurance program.

20.     Defendant BALBOA INSURANCE SERVICES INC. is a North Carolina corporation located at 401 North Tryon St, Charlotte, NC 28202;

21.     Defendant MERITPLAN INSURANCE COMPANY (MERIT) is a California corporation located in Irvine, CA. Merit issued many of the FPI policies which forced Gary into default and foreclosure.

22.     Defendant NEWPORT INSURANCE COMPANY, (NEWPORT) an Arizona corporation with corporate offices in Irvine, CA. Newport issued or underwrote some of the force placed insurance policies at issue in this case.

23.     Defendant QBE INSURANCE CORPORATION is a Pennsylvania corporation and is licensed in all fifty states and the District of Columbia.  QBE Insurance Corporation is a wholly- owned subsidiary of QBE Reinsurance Corporation, a Delaware corporation.  QBE Insurance Corporation writes force-placed

insurance policies through numerous sub-agencies, including QBE First Insurance Agency and QBE Specialty Insurance Company.

24.     Defendant QBE FIRST INSURANCE AGENCY is a wholly owned subsidiary of QBE Financial Institution Risk Services, Inc., which is a wholly owned subsidiary of QBE Holdings, Inc.  QBE First assumed servicing and administrative functions in connection with force-placed insurance from Balboa after QBE Insurance Corporation purchased Balboa's force-placed business in or around June 2011.

### THE NEW SERVICER (SPS)

25.     Defendant SELECT PORTFOLIO SERVICES, INC. (SPS)/(Domestic Corporation) Registered in California as a corporation and is the current servicer for the loans. SPS is one of the preferred servicers, designated as part of a settlement regarding an investor class action against Countrywide Bank of America, N.A.(BANA) and the alleged investor of Gary's three loans, CWALT Alternative Loan Trust Series 2007-A04. As part of one of the litigation settlement, BANA was required to no longer service any of the loans in the CWALT mortgage backed security pools due to BANA's sub-standard servicing.[3]

26.     Defendant SELECT PORTFOLIO SERVICES, INC., COLLECTION AGENCY (SPSCA) is a Utah corporation registered as a collection agency. It is not registered as a California Foreign Corporation. It is unknown if SPSCA conducts collection agency services relating to its mortgage servicing activities.

### DEFENDANTS DOES 1-30

27.     Gary is ignorant of the true names and capacities of the Doe Defendants, and therefore sues each of them by such fictitious business names.  The true names or capacities whether individual, corporate or otherwise, of Defendants Does 1 through

---

[3] See Preferred Servicer List and settlement agreement at http://www.cwrmbssettlement.com. Section 5. Servicing p.14

30, inclusive, are unknown to Gary, who, therefore, sues said Defendants by such fictitious names.

28.    Gary believes and alleges that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

29.    Each reference to Defendant and or Defendants herein shall also refer to Does l through 30, inclusive.  At all times herein mentioned, each of the Defendants was the agent, servant, partner aider and abettor, co-conspirator, subsidiary and/or joint venture of each of the remaining Defendants herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, subsidiary and joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted breaches of the following, including but not limited to:  the security instruments between Gary and Defendants; settlements, stipulated judgments, and consent orders which Gary should have benefited from but was unjustly, unfairly and unlawfully omitted.

30.    There exists, and at all times herein mentioned, there existed, a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendant, and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice. The injuries and damages to Gary were caused by the wrongful acts, omissions, and fraudulent representations of Defendants, all of which occurred within the State of California, County of Los Angeles.

31.     At all times herein mentioned, Defendants were each engaged in the business of, or were successors in interest to, entities engaged in the business of originating, managing, servicing, billing for, invoicing, charging, accounting, communicating, marketing and advertising of residential loans.

32.     At all times herein mentioned, Defendants were each authorized to do business within the State of California and did in fact supply the aforementioned residential loan products and services within the State of California.

33.     Gary is further informed and believes, and based thereon allege, that the acts and conduct alleged herein concerning each such Defendant was known to, authorized by and/or ratified by the other Defendants, and each of them.

### BANK OF AMERICA'S LIABILITY
### AS A SUCCESSOR-IN-INTEREST TO COUNTRYWIDE

34.     Defendant Bank of America Corporation is a diversified global financial services company and a bank holding company. Defendant Bank of America, N.A. is a national banking association. Defendant BAC Home Loans Servicing, L.P. was a servicing company that had formerly been known as Countrywide Home Loans Servicing, L.P., with its principal place of business in Calabasas, California.

35.     On July 1st, 2011, BAC Home Loans and Countrywide Home Loans merged into Bank of America, N.A. When BOA purchased Countrywide in 2008 for approximately 4.1 billion. It became the successor in interest to Countrywide. Based upon the steps taken to consummate this transaction, Bank of America became the successor-in-interest to Countrywide Financial because (a) there was continuity of ownership between Bank of America and Countrywide, (b) Countrywide ceased ordinary business soon after the transaction was consummated, (c) there was continuity of management, personnel, physical location, assets and general business operations between Bank of America and Countrywide, (d) Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Countrywide's

business, (e) Bank of America assumed Countrywide's mortgage repurchase and tort liabilities.

36.   This action is also brought against Countrywide Financial Corporation, a financial services company headquartered in Calabasas, California, and two of its subsidiaries, Countrywide Home Loans, Inc., and Countrywide Bank, FSB (collectively, with Countrywide Financial Corporation, "Countrywide"). On April 23, 2009, the Office of the Comptroller of the Currency approved Countrywide Bank, FSB's ("CWB") request to convert its charter back to that of a national bank as it was in 2007 and the request by Bank of America, N.A. to then immediately acquire CWB by merger. These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist. Bank of America, N.A. was the surviving institution resulting from this merger. Thus, Bank of America, N.A. is the successor in interest to CWB. Collectively the Defendants identified in this paragraph are referred to here as "BOA." The business of BOA and its subsidiaries and affiliates includes origination and servicing of mortgages.

37.   After the merger of Countrywide Home Loans and BAC Home Loans, in July 2011, Bank of America assumed the liabilities for those companies pursuant to the second FTC Consent Order which carried over into the national settlement between Bank of America Corp. The parties in that complaint that were also named were Bank of America Home Loans, Bank of America N.A., and Countrywide Home Loans. It is because of the information in the above paragraphs that we include the Countrywide Defendants as part of the Bank of America Defendants.

### FORCED PLACED INSURANCE ALLEGATIONS ARE NOT SUBJECT TO THE CALIFORNIA DEPARTMENT OF INSURANCE

38.   Regarding the Forced Placed Insurance Allegations: This action is not subject to the jurisdiction of the California Department of Insurance because (1) this action is not an action by an insured against their insurer, (2) the insurer is not a party to this action, (3) this action does not challenge the rates charged by the insurer to

BOA, (4) the Department of insurance cannot decide whether such premium charges are improperly passed onto borrowers by BOA under the form contracts, and (5) this action concerns solely the propriety of charges between a lender and its borrower.

## LENDING ACTIVITIES NOT IMPARIED

39.    The contract, tort, consumer and unfair unlawful and fraudulent business Practices are causes of action based in state causes of action which do not "impair" the lending activities or remedies of the national bank Defendants. [4]

## GARY REQUESTS EXPEDITED DISCOVERY TO DETERMINE KEY FACTS IN THE CASE

40.    Gary requests from the Court expedited discovery to determine the following facts:

a.    The identity of the parties regarding force place insurance companies and copies of the policies. The reasons are the following: (1) Gary did not receive copies of the policies or any information regarding the policies even though that information was requested from the BANA insurance department.  (2) The only information Gary did receive was policy numbers contained in the notices sent to potential class members of Hall, et al. v. Bank of America, N.A., et al., Case No. 12-cv-22700-FAM. BANA and BALBOA defendants have discovery that Gary was a potential class member and that his claims made in this case have merit.  [Please see EXHIBITS 30-36]     Gary was not provided by any the BANA or BALBOA Defendants copies of the force placed insurance policies;

b.    The investor of Gary's loans to support or challenge the authenticity of the deed of trust assignments;

---

[4] For state law preemption and financial institutions, general issues/national banks: Miller & Starr 4 Cal. Real Est. § 10:159 (3d ed.) *Preemption of state law-As applied to federally related financial institutions*; National bank subsidiaries and affiliates see: 12 U.S.C.A § 25b(b)(2),€(h), subsidiaries and affiliates of national banks denied the benefit of preemption of state consumer financial laws; C.F.R. §34.(b)(1)(2011); 12 C.F.R. §7.4007(c)(1), §7.4009(c)(2)(1);For United States Supreme Court Case: Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25,116 S. Ct. 1103,1109, 134 L.Ed. 2d 237 (1996); See also Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. , 519, 129 S.Ct. 2710, 2718-2723, 1741 L. Ed. 2d 464 (2009)

c.     The written agreements and /or any writing BANA may have in its possession regarding the 2012 repayment plans; According to the prior motions  to dismiss the original complaint filed July 15, 2014 in Los Angeles Superior  Court and then removed to Central District Federal Court August 15, 2014, BANA challenged whether a contract existed even though we provided a written document from BANA stating there was a mutual agreement and a cashier's check paid to BANA.

d.     According to the prior motions to dismiss the original complaint filed July 15, 2014 in Los Angeles Superior Court and then removed to Central District Federal Court August 15, 2014, Insurance Company Defendants challenged: [EXHIBITS 40, original complaint; Defendants Motions to Dismiss, EXHIBITS 42, 43 respectively]

i.     QBE challenged standing;

ii.    claimed Balboa did not issue polices;

iii.   BANA challenged whether a contract existed even though we provided a written document from BANA stating there was a mutual agreement;

41.    The Ninth Circuit has recognized that "discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub,* 342 F.3d at 1093. In *Laub,* the Ninth Circuit held that it was an abuse of discretion to deny discovery where "public documents offered by [plaintiff] suggest that there is at least an arguable claim that the [defendant challenging standing] plays a significant enough role" in the conduct at issue to state a claim. *Id.*

42.    A court may permit expedited discovery before the discovery conference upon a showing of good cause. Fed.Rules Civ.Proc.Rule 26(f), 28 U.S.C.A. Good cause exists for a court to permit expedited discovery before the discovery conference where the need for expedited discovery, in consideration of the administration of

justice, outweighs the prejudice to the responding party. Fed.Rules Civ.Proc.Rule 26(f), 28 U.S.C.A.In re Countrywide Fin. Corp. Derivative Litig., 542 F. Supp. 2d 1160 (C.D. Cal. 2008)

## GENERAL ALLEGATIONS

43.   This case arises from unfair business practices perpetrated by Defendants BANA, BALBOAS and Select Portfolio Servicing (SPS) that have resulted in untold millions of dollars in damages and attorney fees to Gary.

44.   Between 2007 and 2012, while BANA Defendants either allegedly owned or serviced Gary's loans, BANA Defendants settled civil suits and regulatory actions for unfair business practices committed against unsuspecting borrowers all across the United States, including but not limited to:

-Misrepresentation of loan statuses;

-Borrowers forced into foreclosure;

-Nefarious accounting practices including but not limited to misrepresentations of loan amounts owed;

-Unfair Assessment and Collection of Fees;

-Deceptive Servicing Claims;

-Robo-calling that harassed borrowers, some of which were not in default;

-Robo signing and robo notarization of loan assignments

-Borrowers that qualified for loan modification but the BANA Defendants deliberately lost, misplaced, purged loan modification applications; BANA provided incentives to employees revealed in whistleblower lawsuits filed by employees and government regulators; [5]

---

[5] Bank of America employee whistleblowers filed lawsuits exposing that the "bank told us to lie." See Deposition testimony in the following class action cases: 1:10-md-02193-RWZ, Declaration of Simone Gordon; Declaration of Theresa Terrelonge; Declaration of William E. Wilson, Jr.; US/Mackler v. Bank of America N.A. BAC Home Loans, 1:11-cv-03270-SLT-RLM, Complaint for False Claims Act; US/Lagow v. Countrwide et al, 1:09-cv-02040-RJD-JMA

-Unfair collection of payments;

-Initiating foreclosure actions or assessing fees in connection with actual or threatened foreclosure action prior to the review of Competent and Reliable Evidence demonstrating that the consumer is in default under the terms of the loan consummating foreclosure sales without having investigated non-frivolous disputes by Consumers;

 -Filing or caused to be filed in state and local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized as in "Robo-Notarized.;" and the lack of authenticity in some occurrences voided trustee sales.

-BANA employees were instructed to force borrowers into default, deny loan modifications based on arbitrary policies; meet quotas for defaults; received incentives for defaults, and loan modification denials.

45.     The majority of these cases involved borrowers behind on loan payments because of the financial crisis. But some of the cases also involved borrowers that were not behind on payments until BANA manipulated their accounting system to show a borrower was behind, or a borrower didn't pay hazard insurance or taxes.

46.     When a borrower was behind in payments, the BANA Defendants would engage in practices such as robo calling, an automated dialer campaign. Some of these robo calling campaigns resulted in borrowers receiving hundreds upon hundreds of phone calls.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## BANA DEFENDANTS ENTER INTO CONSENT ORDERS & SETTLEMENTS BECAUSE OF UNFAIR BUSINESS PRACTICES

*A great sense of injustice....Whole set of civil suits settled for pennies on the dollar with no admission of wrongdoing....it's very much akin to someone that robs a 7-11 and steals a $1000.00 and settles for $25.00 with no admission of wrongdoing....they'll be back at it again.*
**Phil Angelides Chair Financial Crisis Inquiry Commission[6]**

47.     There existed then and still exists today a symbiotic and quid pro quo relationship between BANA Defendants and the government regulatory agencies which filed complaints and entered into consent orders with the BANA Defendants.

48.     One only needs to look back from 2008 to the present to see this unique bond between BANA Defendants and Government agency regulators.  When those regulatory agencies filed civil suits against the BANA's, the BANA's  were back at it again, just as Mr. Angelides described.[7] In multiple consent orders, the BANA's admitted no wrongdoing, promised to refrain from unlawful business practices, paid large fines, were enjoined, but never stopped their unlawful business practices.

49.     More outrageous is how intensely the BANA's lobbied the regulatory agencies during the time the regulatory agencies filed complaints against them. According to BANA lobbying reports, the BANA's lobbied the Federal Trade Commission (FTC) in 2010 while a complaint and consent order was agreed to in 2010; The BANA's also lobbied the Office of the Comptroller Currency, (OCC) at a time a consent order was negotiated; There are also lobby reports for the Securities Exchange Commission, (SEC) and other regulatory agencies while consent orders were in effect.

---

[6] Frontline Interview: Phil Angelides, http://www.pbs.org/wgbh/pages/frontline/oral-history/financial-crisis/phil-angelides/; This is the edited transcript of an interview conducted by producer Jim Gilmore on Jan. 4, 2012.
[7] Frontline interview, Phil Angelides referenced in footnote 8.

50.     The Honorable Jed S. Rakoff Federal Judge for the Southern District of New York, said it best, in his January 9, 2014 essay "The Financial Crisis: Why Have No High Level Executives Been Prosecuted?" [8]when he described the 2009 settlement between the Securities Exchange Commission (S.E.C.) and Defendant, Bank of America:

51.     The settlement reached: *"suggests a rather cynical relationship between the parties: The S.E.C. gets to claim that it is exposing wrongdoing on the part of the Bank of America in a high-profile merger; the bank's management gets to claim that they have been coerced into an onerous settlement by overzealous regulators. And all that is done at the expenses not only of the shareholders, but also of the truth."*

52.     Judge Rakoff's opinion is so significant because it underscores the symbiotic and quid pro quo relationship between Defendants and the regulators. It also highlights a direct issue in this case:  Defendants, while under the authority of numerous federal and state civil and regulatory court orders, committed the same bad acts against Gary with impunity.

53.     The facts will show that the BANA's  used and continue to use profit-maximizing-schemes. At the core of these profit-maximizing schemes is the BANA mentality that they are untouchable: time and time again, throughout nationwide civil litigation, government actions, stipulations, consent orders, between the years 2008 to the present, no wrongdoing is ever admitted; yet the BANA's enter into consent orders detailing fraudulent business practices.

54.     On the minds of taxpayers, consumers, former Security Exchange Commission prosecutors, and the Department of Justice's own watchdog, even though there was enough evidence to send managers, officer, and directors of the BANA

---

[8] Rakoff, Jed S. (January 9, 2014) "The Financial Crisis: Why Have No High Level Executives Been Prosecuted?" The New York Review of Books; www.nybooks.com/articles/2014/jan/09/

companies to jail, there is a consensus that not enough effort to prosecute the individuals for the bad acts. Without accountability, the bad acts continued.[9] Furthermore, the main general criticism by government watchdogs and retiring regulators is the lack of accountability and oversight of not only the Defendants in this case, but the special unconditional treatment Wall Street received and continues to receive by the regulatory bodies. [10]

## EXAMPLES OF SETTLEMENTS & CONSENT ORDERS

## I.       California v. Countrywide Financial Inc., Countrywide Home Loans, Case # LC083076.

55.     California v. Countrywide Financial Inc., Countrywide Home Loans, Case # LC083076, filed October 6, 2008. The stipulation was entered into 10/20/2008. The term of the stipulated judgment was from 10/6/2008 through June 30, 2012. Defendants and Does 1-30 stipulated to the following: (1) enhanced home retention practices designed to keep borrowers in their homes; (2) reports to the State of California regarding numbers and types of workouts;  (3) loan modifications for

---

[9] See Security Exchange Commission James Kidney outgoing remarks regarding SEC enforcement claimed the SEC was "too tentative and fearful of Wall Street; The Department of Justice, DOJ watchdog's Inspector General's Report regarding the lack of enforcement by the DOJ regarding the financial crisis; Attorney General Eric Holder's comment during Senate Judiciary Committee: "I am concerned that the size of some of these institutions becomes so large that it does become difficult for us to prosecute them when we are hit with indications that if we do prosecute — if we do bring a criminal charge — it will have a negative impact on the national economy, perhaps even the world economy. I think that is a function of the fact that some of these institutions have become too large," Holder told the Senate Judiciary Committee "I think it has an inhibiting influence, impact on our ability to bring resolutions that I think would be more appropriate."
 Later in testimony clarifying his comment, Attorney General Holder explained during a May 15, 2013 hearing before the House Judiciary Committee, Representative John Conyers, Jr. (D - MI) asked Attorney General Eric Holder about prosecuting "too big to fail" banks:  "Let me make something real clear - right away. I made a statement I guess in a Senate hearing that I think has been misconstrued. I said it was difficult at times to bring cases against large financial institutions because of the potential consequences that they would have on the financial system but let me make it very clear that there is no bank, there's no institution, there's no individual who cannot be investigated and prosecuted by the United States Department of Justice. Yet not one yet has faced criminal prosecution.

[10] See outgoing retired Security Exchange Commission attorney April 8, 2014 James Kidney outgoing remarks regarding SEC enforcement claimed the SEC was "too tentative and fearful of Wall Street; The Department of Justice, DOJ watchdog's Inspector General's Report regarding the lack of enforcement by the DOJ regarding the financial crisis; Attorney General Eric Holder's comment during Senate Judiciary Committee: "I am concerned that the size of some of these institutions becomes so large that it does become difficult for us to prosecute them when we are hit with indications that if we do prosecute — if we do bring a criminal charge — it will have a negative impact on the national economy, perhaps even the world economy. I think that is a function of the fact that some of these institutions have become too large," Holder told the Senate Judiciary Committee "I think it has an inhibiting influence, impact on our ability to bring resolutions that I think would be more appropriate.

eligible borrowers: an eligible borrower was defined as a borrower with a qualifying first mortgage with a first payment date on or before December 31, 2007, secured by an owner occupied 1-4 unit residential property, is serviced by Countrywide Financial Servicer, and is a borrower in financial distress; a modified interest rate for the first five years of the loans at no more than 3.5%; reporting requirements were required by Defendants through June 30, 2010 to report eligible borrowers.

**II.    Federal Trade Commission v. Countrywide Home Loans Inc., BAC Home Loans Servicing, LP. CV10 4193 RSWL SS.**

56.    Federal Trade Commission (FTC) v. Countrywide Home Loans Inc, BAC Home Loans Servicing, LP. CV10 4193 RSWL SS filed in United States District Court, Central District of California, June 7, 2010.

57.    According to the FTC allegations, Defendants were enjoined from:

- *Marking  up fees in violation of the mortgage contract because they exceed the actual cost of the services ;*

- *Charging default and foreclosure related fees which are not reasonable and appropriate to protect the noteholder's interest and rights under the security agreement.*

- *Misrepresenting expressly or by implication the status of the loan or amounts owed on the loan including but not limited to the amount of any monthly payment, fee claimed or assessed, escrow shortage or escrow deficiency;* see <u>EXHIBIT 41A.</u> Pp. 6-10 FTC Consent Judgment & Order, 6/15/2010

58.    The BANA's entered in to the Consent Judgment and Order on July 15, 2010 which prohibited them from committing the unlawful business practices, even though they did not admit to any wrongdoing. This consent order extended to all third party affiliates. See <u>EXHIBIT 41A</u>, of First Consent Order.

59.    However, the BANA's perhaps could not control their unlawful business practice impulses and violated the first consent order. Consequently, they were

required to enter into a second consent order, the Supplemental Consent Judgment and Order which showed that Defendants never stopped their unlawful business practice violations during June 17, 2010 through June 30 2011.

60.    The violations included:

*The FTC alleges that, during the period from June 17, 2010, through June 30, 2011, BAC   HomeLoans has violated the provisions of the Consent Order enumerated in Paragraph E, as follows:*

a.    BAC Home Loans misrepresented amounts owed on Loans in violation of Paragraphs I.A and VI of the Consent Order through the submission to courts, and service on consumers, of affidavits that contained Fees unsupported by Competent and Reliable Evidence;

b.    BAC Home Loans also misrepresented the status of Loans in violation of Paragraph I.A of the Consent Order by improperly completing foreclosure sales where a material change in the circumstances, such as a short-sale, loan modification, or bankruptcy, had occurred before the sale was completed;

c.    BAC Home Loans assessed and/or collected Fees for Default-Related Services that were not authorized and Clearly and Prominently disclosed by the Loan Instruments and/or not permitted by law in violation of Paragraph II of the Consent Order;

d.    BAC Home Loans assessed and/or collected title Fees that were not Clearly and Prominently disclosed on BAC Home Loans' Fee Schedule in violation of Paragraph V of the Consent Order;

e.    BAC Home Loans filed proofs of claim in Chapter 13 Bankruptcy action against consumers without attaching copies of the Loan Instruments in violation of Paragraph VII of the Consent Order; BAC Home Loans failed to provide all information reasonably required to administer redress, in violation of Paragraph XIV of the Consent Order, which required BAC Home Loans to provide

that information within 30 days of the Consent Order's    entry. See <u>EXHIBIT 41B</u>, page 1-4 Supplemental Consent Judgment and Order

61.    Specifically, on June 22, 2010, the Commission requested information from BAC Home Loans that would enable the Commission to determine the identities of consumers entitled to redress and the amounts necessary to compensate those consumers. BAC Home Loans did not provide complete and accurate information in response to that request until May 2011. See <u>EXHIBIT 41B</u>, Page 3-4 of the Supplemental Consent Judgment and Order.

## III.    GLOBAL SETTLEMENT DEPARTMENT OF JUSTICE
### U.S.v. Bank of America Corp CV 00361-JDB.

62.    It is accepted as a historical fact that the BANA Defendants were one of the major players in the financial meltdown. [11]

## BACKGROUND: THE SHELL NAME GAME

63.    Countrywide Home Loans merged with BAC Home Loans, and BAC Home Loans merged with Bank of America, N.A. in July 1,2011. As a result of the merger, the one Consent order that had any teeth to it entered into with the FTC, the Second Supplemental Consent Order was reduced to a spectacle of financial fines. The outgoing head of the FTC, Jon Leibowitz claimed the CWHL, BACHL settlement was one of the agencies greatest accomplishments:

> *"In 2011, as a result of one of the largest judgments imposed in an FTC settlement, the agency returned almost $108 million to more than 450,000 consumers – about 1 percent of all mortgage holders in the United States – who allegedly were overcharged or had their mortgage loans mishandled by Countrywide while they were in default or bankruptcy.  The company later settled charges that it illegally assessed more than $36 million of servicing fees against*

---

[11] Financial Crisis Task Force Conclusion and Findings

*struggling homeowners, and agreed to refund or reverse all of those charges."* [12]

64.     The FTC no longer could exercise jurisdiction over the Bank of America Defendants. However, Bank of America Corporation assumed liability as to the Supplemental Consent Judgment and Order. Most importantly, the FTC second consent order was linked to the Department of Justice Complaint and Consent order against Countrywide and Bank of America Defendants: [Complaint US v Bank of America, United States v. Bank of America Corporation, CV 12-00361 (D.D.C.)]

65.     The FTC second consent order stated that if the DOJ consent order was adopted by the court, then CWL and BACHL were required to comply with the government consent order.

## 2013 UNSEALED AFFIDAVITS FROM WHISTELBLOWER LAWSUITS AGAINST THE BANA'S

66.     In one lawsuit, BANA employees filed affidavits regarding the details of how BANA incentivized lying to borrowers and forcing borrowers into foreclosure.

67.     In 2013, Salon Magazine wrote an expose on BANA's practices:

Senior managers provided carrots and sticks for employees to lie to customers and push them into foreclosure. Simone Gordon described meetings where managers created quotas for lower-level employees, and a bonus system for reaching those quotas. Employees "who placed ten or more accounts into foreclosure in a given month received a $500 bonus," Gordon wrote. "Bank of America also gave employees gift cards to retail stores like Target or Bed Bath and Beyond as rewards for placing accounts into foreclosure." Employees were closely monitored, and those who didn't meet quotas, or who dared to give borrowers accurate information, were fired, as was anyone who "questioned the ethics … of declining loan modifications for false and fraudulent reasons," according to William Wilson.

Steven Cupples, a former underwriter at Bank of America, explained in his statement how the bank falsified records to Treasury to make it look like they granted more modifications. But Treasury never investigated. Meanwhile, the Justice Department joined with state Attorneys General and other federal regulators to essentially bless this conduct in a series of weak settlements that incorporated other bank crimes as well, like "robo-signing" and submitting false documents to courts.

---

[12] FTC February 1, 2013 : "FTC Chairman Leibowitz to Step Down This Month." Press Release announcing the head of the FTC, Jon Leibowitz to step down as head of the FTC in February 2013. http://www.ftc.gov/news-events/press-releases/2013/02/ftc-chairman-jon-leibowitz-step-down-month

They would have no shortage of evidence, in addition to the sworn affidavits. According to Theresa Terrelonge, most loan-level representatives conducted their business through email; in fact, various email communications have already been submitted under seal in the Massachusetts civil case. State Attorneys General or US Attorneys would have subpoena power to gather many more emails.

And they would have very specific targets: the ex-employees listed specific executives by name who authorized and directed the fraudulent process. "The delay and rejection programs were methodically carried out under the overall direction of Patrick Kerry, a Vice President who oversaw the entire eastern region's loan modification process," wrote William Wilson. Other executives mentioned by name include John Berens, Patricia Feltch and Rebecca Mairone (now at JPMorgan Chase, and already named in a separate financial fraud case). These are senior executives who, if this alleged conduct is true, should face criminal liability.

http://www.salon.com/2013/06/18/bank_of_america_whistleblowers_bombshell_we_were_told_to_lie/

Also see https://www.youtube.com/watch?v=dvsSCR3ZgL8

68.    The Salon article included seven affidavits by employees located at this site: http://www.salon.com/2013/06/18/check_out_the_full_bank_of_america_whistleblower_details_affidavits/.  Also see EXHIBIT 39 which contains the BANA employee affidavits.

69.    See also http://www.propublica.org/article/four-whistleblowers-who-sounded-the-alarm-on-banks-mor which details the four lawsuits settled as part of the GLOBAL NATIONWIDE $25Billion Settlement, which detailed how employees were directed by BANA superiors to lie and foreclose on borrowers between 2007 and 2012.

70.    In another case bought by the U.S. Justice Department, the BANA's were found liable for civil fraud for a loan mortgage program called "Hussle," a program which allowed unqualified borrowers to obtain home loans. BANA paid over $12 Billion to the U.S Department of Justice.

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A., et al.*, Case No. 2:14-cv-06452-PSG-FFM

**Manhattan U.S. Attorney Sues Bank Of America For Over $1 Billion For Multi-Year Mortgage Fraud Against Government Sponsored Entities Fannie Mae And Freddie Mac**

### FOR IMMEDIATE RELEASE

Wednesday, October 24, 2012

*After Collapse of Subprime Lending Market in 2007, Countrywide Started Alleged Fraudulent Mortgage Origination Program Called the "Hustle" Designed to Sell Defective Loans to Fannie Mae and Freddie Mac*

*Bank of America Continued the "Hustle" After Acquiring Countrywide in 2008*

http://www.justice.gov/usao/nys/pressreleases/October12/BankofAmericanSuit.php

71.     In 2014, BANA settled another U.S. government settlement regarding irregularities leading up to the financial crisis in the amount of $16-17 Billion:

According to the Wall Street Journal:

By
Andrew Grossman,
Christina Rexrode and
Dan Fitzpatrick
Updated Aug. 6, 2014 8:06 p.m. ET
196 COMMENTS
Bank of America Corp. and the Justice Department are closing in on a landmark deal in which the bank will pay $16 billion to $17 billion to resolve allegations of mortgage-related misconduct in the run-up to the financial crisis, according to people familiar with the matter. The bank has agreed to pay roughly $9 billion in cash to the federal government, states and other government entities, these people said, as part of an overall pact that could be finalized this month. Additional money would be aimed at consumer relief, such as reducing mortgage balances for struggling homeowners.
If finalized, the agreement would set a record for fines and damages in a civil settlement between the U.S. government and a company. It would eclipse a $13 billion deal struck less than nine months ago between the Justice Department and J.P. Morgan Chase & Co. over similar issues, alleging the banks knowingly sold investors shoddy mortgages.
Separately, Bank of America on Wednesday received approval from the Federal Reserve to raise its quarterly dividend to 5 cents from 1 cent.

http://www.wsj.com/articles/bank-of-america-near-16-billion-to-17-billion-settlement-1407355290

## THE BANA AND THE BALBOAS
## FORCE PLACED INSURANCE SCHEMES

72.    The force placed insurance scheme orchestrated between BANA and THE BALBOAS has been summarized in detail in several class action cases. [13] Two of the three cases have been litigated in the Central District. (Faili & Gustafson.)

73.    The above referenced cases claimed, as we claim in this First Amended Complaint, (and the original complaint EXHIBIT 40) that Defendants BANA and THE BALBOAS created a financial relationship which maximized profits at the expense of the borrowers. Profit maximization was the end and the means was through force placed insurance.

74.    BANA purchased master or "umbrella" insurance policies that covered the entire portfolio of mortgage loans.  In exchange, the Balboa/QBE Defendants obtained the exclusive right to force-place insurance on property securing a loan within the portfolio when the borrower's insurance lapsed or the lender determined the borrower's existing insurance is inadequate.

75.    The insurer supposedly monitored the lender's loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse was identified, Balboa/QBE allegedly would send a notice to the borrower that insurance will be "purchased" and  force-placed if the voluntary coverage is not continued.  If a lapse continued, the insurer notified the borrower that insurance was force-placed at his or her expense.

76.    No individualized underwriting ever took place for the force-placed coverage.  Rather, the BANA Defendants required, or permitted, the insurer to automatically place this coverage when a borrower's policy lapsed.

77.    Once coverage was forced on the property, BANA as lender or servicer charged the borrower for the insurance premiums and, through Balboa/QBE,

---

[13] See Hall v Bank of America No. 12 cv-22700-FAM US District Court Southern Florida; Faili v. BAC Home Loans Servicing, LP No. 8:13-cv1105-JLS; Gustafson v. BAC Home Loans Servicing, LP No. SACV 11-915-JST; Gustafson II, 2012 WL 7051318 & Gustafson III 2012 WL 7071488   27

1   automatically deducted the amount from the borrower's loan payments, escrow

2   account, or added it to the balance of the borrower's loan.

3       78.   BANA as lender or servicer then paid the premium to the insurer who

4   then kicked back a set percentage of the premium to BANA's affiliate as a

5   "commission."  The affiliate then shared a percentage of that payment with BANA as

6   lender or servicer.

7       79.   The money paid back to the BANA's affiliate is not given in exchange

8   for any services provided by the affiliate; it is simply grease pay to keep the force-

9   placed machine moving.

10      80.   In an attempt to mask the kickback as legitimate, the insurer sends a

11  disclosure to the borrower that the affiliate may receive a "commission" or

12  "compensation" for helping the lender to procure a force-placed policy.  In reality,

13  however, no work is ever done by the affiliate to procure insurance for that particular

14  borrower because the coverage comes through the master or umbrella policy already

15  in place.

16      81.   Under this highly profitable force-placed insurance scheme, BANA and

17  the BALBOA's are incentivized to purchase and force-place insurance policies with

18  inflated premiums on  borrowers' properties because the higher the cost of the

19  insurance policy, the higher the profits and kickbacks.

20      82.   On some occasions when a borrower did  not have an escrow account, the

21  lender created an escrow account with a negative balance and charged the borrower to

22  bring the balance to zero.

23      83.   QBE/Balboa also entered into agreements with the BANA Defendants

24  whereby the insurer provided servicing activities on the entire loan portfolio at below

25  cost.  The servicing costs were then added into the force-placed premiums which were

26  then passed on to the borrower.

27      84.   QBE/Balboa charged hyper-inflated premiums for force-placed

28  insurance.   However, because insurance-lapsed mortgaged property comprises only

1  1–2% of the lenders' total mortgage portfolio, the borrowers who paid these premiums

2  were unfairly burdened with the entire cost to service the entire loan portfolio.

3  85.   One can analogize these borrowers to pawns or worker bees in the hive

4  that after building the hive and delivering all the honey, the pawn bees die.

5  86.   Prior to June 2011, the BALBOA'S provided the BANA's with

6  subsidized mortgage portfolio monitoring and forced-placed insurance. When QBE

7  purchased Balboa, it agreed to continue to provide the BANA's Bank of America with

8  these services with the assistance of its affiliate QBE First.  QBE is now the exclusive

9  force-placed insurer for the BANA's.

### WHY DID THE BALBOA's SELL THE PROFITABLE FORCE PLACED INSURANCE BUSINESS?

13  87.   One may ask, why sell off a profitable business?

14  88.   Answer: The sell-off was a result of the New York State Financial

15  Services investigation of the force placed insurance unfair business practices and

16  conflicts of interests between the BANA's and the BALBOA's.

17  89.   In June 2011 BANA entered into an agreement between Bank of

18  America Corporation and QBE First, and  parent, QBE Holdings, Inc., which provided

19  for the sale of the property and casualty assets of Bank of America's previous force-

20  placed insurance providers, Balboa Insurance Company and its subsidiary, MeritPlan

21  Insurance Company, to QBE Holdings, Inc.

22  N.Y. Reaches Settlement With QBE Over 'Force-Placed' Insurance Business

23  April 18, 2013

24  New York officials announced this morning that a New York State Department of Financial Services (DFS) investigation produced an additional settlement with a major "force-placed" or "lender-placed" insurer, QBE…..The settlement with QBE, the nation's second-largest force-placed insurer, follows an earlier similar deal with the country's biggest force-placed insurer Assurant Inc. on March 21.

27  In June 2011, QBE acquired from Bank of America (BOA) the force-placed insurance business of a BOA subsidiary named Balboa Insurance. Balboa provided force-placed insurance on Countrywide and BOA-serviced mortgages (many of which were owned by

29

investors) during the period that Countrywide and BOA owned Balboa, as well as on mortgages for other servicers. Regulators said this arrangement was profitable for Countrywide and BOA because of the low loss ratios for force-placed hazard insurance.

See: http://www.insurancejournal.com/news/east/2013/04/18/288961.htm

90.   Also see the New York website with details of the restitution program for borrowers in New York that were victims of the force placed insurance scheme.

http://www.ny-balboafpirefund.com/FAQ.htm

91.   Also, see the nationwide settlement of force placed insurance:

Hall, et al. v. Bank of America, N.A., et al., Case No. 12-cv-22700-FAM United States District Court for the Southern District of Florida If you were charged by Bank of America or Countrywide Home Loans for a lender- placed hazard insurance policy issued between January 1, 2008 and February 3, 2014 for your residential property, and you paid all or a portion of the premiums for that policy to Bank of America or Countrywide at that time, you could receive a payment from a class action settlement. If you were charged by Bank of America or Countrywide Home Loans for a lender- placed hazard insurance policy issued Between January 1, 2008 and February 3, 2014 for your residential property, and you did not pay and still owe the premiums for that policy, you could receive a payment or a credit towards what you owe Bank of America.

**SPS RECEIVES SERVING OF BANA LOANS
AS PART OF THE AIG SETTLEMENT**

92.   As part of the settlement agreement in the large Residential Mortgage Backed Securities settlement, Bank of America agreed to outsource the servicing of thousands of loans because of BANA substandard servicing. SPS was named as one of the preferred servicers and took over the servicing of loans in December 2012 and January 2013. [Please see EXHIBIT 44 designating SPS as one of the preferred servicer.

This website (http://www.cwrmbssettlement.com) has been established to provide public access to information of interest to holders of Certificates or Notes in **530 Countrywide mortgage-securitization trusts** governed by Pooling and Servicing Agreements and Indentures and related Sales and Servicing Agreements (collectively, the "Governing Agreements"), and to other persons potentially interested in the trusts.

http://www.cwrmbssettlement.com

93.     A review of the documents on the website: http://www.cwrmbssettlement.com/index.php did not show provide actual assignments of the loans or dates when the loans were assigned.

## FACTUAL ALLEGATIONS

94.     A list of bulleted examples is provided throughout this complaint, showing numerous examples of unfair business practices and detailed in the section - Schemes 1-9.

## SCHEME 1: AUTO ROBOCALLING

95.     Imagine waking up every day:  going to the office. Instead of working on projects to increase business, productivity and create jobs, as Gary normally did, Gary re-lived the same repeated scenario dealing with Defendants including but not limited to:

The never-ending stream of robo-collection calls for his three loans:

Calls at home; 2 x twice per day; x 3 loans = 6 calls.

Calls at the office; 2 x twice per day; x 3 loans= 6 calls.

Calls on his cell phone. 2 x twice per day; x 3 loans = 6 calls.

96.     Most likely Gary received at least a <u>minimum</u> of EIGHTEEN CALLS PER   DAY.

## SCHEME 2: COINCIDENCE AND SYNERGY OF FACTS SUPPORT DELIBERATE AND WILLFULL OMMISIONS BY DEFENDANTS

*"Coincidence Is God's Way of Remaining Anonymous"* Albert Einstein

97.     There are three facts that coincided in 2011 that fit together to create a perfectly interesting coincidence, that when looked at reveals that on information and belief this was not a coincidence. Instead, on information and belief, it is alleged that this was a deliberate end-run by BANA Defendants to cover-up its actions and omit

31

Gary and most likely other borrowers from the redress required as part of the release from the FTC Supplemental Judgment and Consent Order, signed July 17, 2011.

Fact 1: BACHL did not provide the FTC with a list of eligible borrowers until sometime in May 2011; [EXHIBIT    ]

Fact 2:  the letter Gary received from BACHL regarding the servicing change  from BACHL to it's "parent company", BANA.  A letter dated July 1, 2011 from BACHL stated that our "records as of May 28, 2011"  show that your loan is serviced by BACHL and will transfer to our "parent company, Bank of America, N.A." A portion of the document ID on the July 1, 2011 letter is "2/28/2011 BANACOM1;" [EXHIBIT   ]

Fact 3: the date and timing of the letter.

## Synergy of Facts 1 and 2

98.    The coincidence is this: Gary's loan should have been provided to the FTC as part of the group of consumers that were entitled to redress, which BACHL provided to the FTC sometime in May 2011; We have an admission in a letter from BACHL regarding that BACHL reviewed its records as *of "May 28, 2011 our records show"* and the document ID on this letter dated *"2/28/2011 BANCOM1,"* all fit together around the time BACHL allegedly reported identities of consumers that required redress for the violations pursuant to the FTC complaint and Consent Judgment Order. However, Gary never received any notice of redress. Most likely, Gary is not the only borrower that BAHL omitted from eligible borrowers. [EXHIBIT ]

99.    Instead, Gary received a letter on July 1, 2011, which also coincidentally is one day after the June 30, 2011 end term for the FTC jurisdiction over BACHL. Also, coincidentally, July 1 is the date BACHL merged with BANA. More discovery will be necessary to determine why Gary's loan was omitted from the eligible borrowers that received redress. [EXHIBIT     ]

100.   Please keep in mind that it was the BANA Defendants that forced Gary into default and into foreclosure. Even so, he should have qualified for redress, but It appears from this "coincidence" that BANA did not fully disclose eligible borrowers to the FTC because BANA left out Gary.

101.   Defendants also provided the FTC pursuant to the "First Declaration required by the Supplemental Consent Judgment and Order :

*BAC Home Loans provided the FTC with a First Declaration, <u>sworn to under penalty of perjury,</u>on February 16, 2012 explaining those steps it undertook to comply with Paragraph I.D.*

*1. The First Declaration described in detail BAC Home Loans' process for thecompensation referenced in Paragraph I.D above, completed through February 1, 2012including, but not limited to:*

*a. The means used to identify borrowers eligible for a reversal or refund of Fees;*

*b. The means used to notify borrowers that they were entitled to a reversal or refund of Fees, including a sample copy of any notification sent to borrowers;*

*c. The number of loan accounts eligible to receive a reversal or refund of a Fee;*

See EXHIBIT 9, Supplemental Consent Judgment and Order page 7-9

## SCHEME 3: THE DEPARTMENT OF JUSTICE PRINCIPAL REDUCTION PROGRAM

102.   The threat of imminent foreclosure continued up through the time Gary was offered the Department of Justice settlement in May of 2012, but then within twenty-four hours of the offer letter, Gary was denied without a review of documents; See <u>EXHIBITS 8-14</u>.

103.   In order to escape BANA and be able to refinance the loans, Gary made numerous attempts at loan modifications, because BANA made him believe he had no reasonable alternative to foreclosure.  He provided modification documents repeatedly; Defendants lost the documents repeatedly or mixed up documents between accounts repeatedly.

## THE DEPARTMENT OF JUSTICE PRINCIPAL REDUCTION PROGRAM FOR THE 13007 WASHINGTON BOULEVARD

104.   The threat of imminent foreclosure continued up through the time Gary was offered the Department of Justice settlement in May of 2012, but then within twenty-four hours of the offer letter, Gary was denied without a review of documents; See EXHIBITS 8-14.

105.   In order to escape Bank of America Defendants and be able to refinance the loans, Gary made numerous attempts at loan modifications, because Bank of America Defendants made him believe he had no reasonable alternative to foreclosure.  He provided modification documents repeatedly; Defendants lost the documents repeatedly or mixed up documents between accounts repeatedly. This was a continual process where BANA would request documents then claim the documents were never received.

106.   It was only in June of 2013 that affidavits filed in whistleblower litigation by BANA employees were unsealed. [14]In those affidavits the BANA employees stated under oath that BANA employees were told to lie, were provided incentives by

---

[14] BANA employees: William Wilson, Jr., Simone Gordon, Theresa Terrelonge, Steven Cupples, Recorda Simon, Erika Brown: Whistleblowers filed lawsuits exposing that the "bank told us to lie." See Deposition testimony in the following class action cases: 1:10-md-02193-RWZ, Declaration of Simone Gordon; Declaration of Theresa Terrelonge; Declaration of William E. Wilson, Jr.; US/Mackler v. Bank of America N.A. BAC Home Loans, 1:11-cv-03270-SLT-RLM, Complaint for False Claims Act; US/Lagow v. Countrwide et al, 1:09-cv-02040-RJD-JMA Complaint for False Claims Act.

BANA higher-ups to purge loan modification. Given the information disclosed in those affidavits, BANA acted in a behavior pattern similar to the actions taken in Gary's modifications: repeated requests for documents, then claims the documents were never received; On the same day one letter requested documents and another letter denied the modification for failure to receive documents, even though modification documents had been sent on several occasions. letters requesting documents and then on the same day. [Please see EXHIBITS 39 for the affidavits by BANA employees].

107.   On May 26, 2012, a letter from BANA, (EXHIBIT 8)  addressed to Gary, which stated he qualified for the principal reduction program for 13007 Washington Boulevard. The letter was signed by Home Loan Team, Bank of America, N.A.

108.   Gary personally delivered the documents to the location specified in the letter: 17204 Hawthorne Boulevard, Torrance, CA 90504; A phone number (310) 793-4427 was also included below the bank address.  When Gary called back to follow up on the documents, the bank representative said she never received the modification package.

109.   Gary hand delivered those the documents again in August of 2012; Defendants lost the documents again; Defendants explained the loss of documents was because of the mass volume of Department of Justice modifications; Gary never suspected the document loss was deliberate as described by the BANA employee affidavits. The BANA Defendants will argue that th employees that filed the affidavits were not the ones at the same BANA branch that Gary delivered his modification documents to- however, the BANA employee affidavits claim the practice of intentionally purging modification documents was widespread at BANA.

## DEFENDANTS BANK OF AMERICA DOJ LETTERS

110. Gary received a series of letters regarding the Global Settlement Principal Reduction Program.

111. The first letter was received on May 26, 2012. See EXHIBIT 8.

"Important, you meet the criteria to apply for a new federal government modification program. Qualifying customers may reduce their monthly payment by an average of 35%. ..To apply for this modification, please make an appointment to meet with a home loan specialist at the Torrance customer  Assistance Center no later than June 25, 2012.

The letter was signed by the "Home Loan Team, Bank of America, N.A., Code DJ1"

112. Gary responded immediately, made an appointment and brought all of the requested financial information and documents included in this letter to the address listed on the May 26, 2012 letter: 17204 Hawthorne Blvd. Torrance, CA 90504.

113.  Gary did not hear back. Gary followed up, called the phone number listed on the May 26, 2012 letter: (310) 793-4427. Gary left numerous phone messages, resent the financial package to 17204 Hawthorne Blvd. Torrance, CA 90504, but there was no response. Gary redelivered the package to July or August 2012.

114. On October 5, 2012, Gary received a letter stating,

"Time is running out to accept this offer and avoid foreclosure. [Offer is prominently displayed in a text box on the upper right hand side of the letter] The letter went on to describe how the modification        program worked. Gary, once again sent all the documents overnight to the address listed. Letter "Final        Notice: Time is running out to accept this offer and avoid foreclosure, but it's not too late. Call us  immediately at 800 669-6650" [*in the top right text box, prominently displayed as an "offer"*

"Dear Gary Craig Haddock: we have been trying to reach you by mail and telephone to encourage you to apply for the new modification program recently   introduced by the U.S. Department of Justice and State Attorney Generals global settlement with major mortgage servicers including Bank of America, Qualifying customers could receive significant principal reduction, a reduced monthly payment and the loan would be brought up to date.
SEE <u>EXHIBIT 9</u>.

115.   BANA did not try to contact Gary. Gary had contacted BANA repeatedly to make sure BANA received the documents.

116.    October 6, 2012 Gary received two letters from Defendants:

    a.    Letter #1: The October 6, 2012 letter thanked Gary for "beginning the home loan modification process with us and for providing your financial information. We are now evaluating your loan for modification options. …If we are missing any documents needed to evaluate your loan, we will send a letter that identifies the documents….. See EXHIBIT 10.

    b.    Letter #2: The October 6, 2012 letter stated:  We have reviewed your home loan for eligibility…. "the loan was not 'eligible' for a modification because you did not complete and submit all the documents requested." See EXHIBIT 11

117.    Gary appealed this decision on October 10, 2012.

118.    The  Defendants responded with two letters.

    a.    October 16, 2012 thanked Gary for contacting defendant on October 10, 2012. Within 15 days from the date of the contact, Defendants would respond with a resolution or a status update. See EXHIBIT 12

    b.    October 23, 2012 Defendants wrote that they would need an additional time to review and would contact Gary every 15 days. See EXHIBIT 13.

119.    On November 27, 2012, Defendants sent Gary a servicer change letter effective December 16, 2012. See EXHIBIT 14.

120.    Defendant Bank of America did not follow through, did not try to honor the offer that Gary accepted so that he could be out of Defendants' financial grip, modify the loan and then refinance as quickly as possible.

121.    The new servicer, SPS, also denied Gary's Department of Justice modification without an appropriate review.

122.    Gary missed out on the Department of Justice Principal reduction program, although his loan was eligible. [15]

---

[15] More discovery will be necessary because it is unknown if the Defendants received credit for a principal reduction On Gary's loan and other borrowers similar to Gary, per complaints by attorney generals re compliance with the DOJ settlement.

## SCHEME 4: BANA, THE BALBOAS, AND QBE FORCED PLACED INSURANCE POLICIES (FPIP)

123.   The BANA's placed approximately at least twenty FPI policies on Gary's WA01 property, allegedly when Gary paid for insurance coverage and used its insurance affiliates, the BALBOA's and the QBE's to do it.

124.   On information and belief, it was BANA's practice to send three notices prior to forcing and charging for coverage. Because the system was automated, there should have been three letters sent to Gary prior to the forced policy coverage. As best as Gary recollects, no letters or any form of notice of FPI coverage was received by him.

125.   Bank of America Insurance Specialist Miguel Ortiz, (Employee Number 103242) located at the Chandler, Arizona call center provided the following information regarding the FPI policies. According to Mr. Ortiz, there were over TWENTY FPI policies placed on Gary's one property, a fourplex. Some of the coverage terms of the policies were backdated.

126.   Some of the coverage terms of the policies were backdated.

127.   Although Gary contacted Defendants when he realized his monthly payments were misapplied, and deducted for insurance coverage, Defendants turned a blind eye and deaf ear.

128.   Gary sent proof of coverage, copies of the policies that he maintained to no avail. Defendants claimed they were "researching" and while allegedly "researching" Defendants duplicated coverage.

129.   Defendants placed an FPI policy for each unit within WA01.

130.   In other recent litigated cases, Defendants are accused of allegations of FPI fraud which include allegations of kickbacks, FPI charges when borrowers had insurance policies in place, and FPI charges to borrowers at higher rates because the

companies used were third party subsidiaries of Defendants. [16] See EXHBIT 15 which illustrates the FPI kickback scheme.

131.   These performing or paying borrowers and paid insurance directly, did not use escrow accounts were suddenly and without notice forced into late payment, default and then foreclosure status because the monthly payment paid pursuant to the Security Agreement was misapplied fraudulently. Defendants misapplied the monthly payment while Defendants knew or had reason to know that adequate insurance covered the property.

132.   Defendants charged Gary for over Twenty Forced Place Insurance ("FPIP")  Policies for hazard insurance policies for one property, at a time when Defendants knew the following (a) through (e):

    a.  The properties were insured;

    b.  Defendants possessed proof of the policies showing insurance coverage for WA01 provided by Gary's insurance company as well as the BANA payment coupons that showed Gary paid for the insurance;

    c.  No escrow  account or escrow activity existed on the loans;

    d.  The property WA01 was a single building that contained FOUR  Units.

    e.  The THREE of the FOUR FIP policies for WA01 would have been extraneous and of no value if Gary's coverage lapsed or did not carry insurance.

133.   Gary sent proof of the insurance policies multiple times, but those policies were Disregarded and maybe disregarded because they were claimed "lost". The Defendant's insurance department representative argued with Gary that the properties required one FPI policy for each unit at WA01.

---

[16] See Market Watch "In the Battle Over Forced Insurance Homeowners Are Beating the Banks."; 2/19/2014
    The forced placed insurance fraud by Defendants is nationwide: *Gustafson v. Bank of America, N.A., et al. Farmer v. Bank of America, N.A., BAC Home Loan Servicing, L.P.*; *Holmes v. Bank of America, N.A., BAC Home Loans Servicing, L.P., and Illinois Union Insurance Company;*

134.   Despite numerous phone calls, faxes from Gary and from Gary's insurance company, the proof of policies, Defendants continued to enforce their incredulous claim that WA01 required individual FPI policies for units A, B, C and D.

135.   Finally, after over one year of overcharges for over twenty policies, Gary was not fully reimbursed for the costs, and/or any of the fees related to the overcharges. Moreover, the overcharges and fees related to the overcharges continue to be computed into the loan balance in default.

136.   The charges for over twenty insurance policies and fees forced Gary's loans into default status, and foreclosure status.

137.   The costs for over twenty policies and the fees associated with default/foreclosure services for WA 01 are presently included in the loan balances and continually furnished inaccurate loan balances and statuses based on inaccurate loan balances.

138.   Defendants also furnished inaccurate loan balance amounts, to the Defendant credit reporting agencies, month after month when Defendants knew or should have known Gary did not owe the balances.

139.   Even after BANA admitted they made errors, they only made partial refunds but the errors were not reported to the credit reporting agencies, regarding the force placed insurance which caused late payments and defaults to be reported to the agencies

140.   BANA currently continues the same inaccurate reporting on Gary's credit reports despite numerous disputes of the inaccuracies, numerous communications showing the errors and inaccuracies. The prolonged deliberate month after month inaccurate credit reporting has destroyed Gary's credit and is a significant impediment to the growth and success of Gary's business. The prolonged deliberate month after month inaccurate credit reporting has negatively impacted Gary's business reputation.

141.   Monthly inaccurate credit reporting has destroyed Gary's credit and is a significant impediment to the growth and success of Gary's business. The prolonged deliberate month after month inaccurate credit reporting has negatively impacted Gary's business reputation.

142.   Discovery is necessary because Gary did not receive copies of the twenty-one FPI policies or proof that the policies existed. Considering the Defendants' former employee-turned whistleblower that exposed the fraudulent FPI scheme, it is quite possible that the coverage and or the policies never existed. Requests for the policy information were promised by Defendants to Gary, but so far Gary has not received the FPI proof.

### PROPERTY TAX ANALYSIS VIA DEFENDANTS SUBSIDIARY WHICH ENABLED DEFENDANTS TO COLLECT MORE FEES

143.   Defendants BANA Charged Gary for property taxes when Defendants knew Gary was responsible for paying property taxes. Gary was not fully reimbursed for the costs, fees and the loans remained in late status. Defendants also furnished inaccurate loan information to the credit reporting agencies and never corrected the inaccurate information.

### SCHEME 5: NEFARIOUSLY "CREATIVE" ACCOUNTING OF BANA AND SPS

144.   Nefariously "Creative" Accounting including but not limited to:

a.   Payments paid, cashed but never applied or payments misapplied which illustrate Defendants misapplied business practices. For example Defendant BANA's letter in 2012 stated in EXHIBIT 16:

"Your monthly payment due on 4/1/2012 for your loan is $3696.23. We received a total of $421.13 to be applied to your loan; however, this amount does not represent a full monthly payment. We are unable to accept partial payments on your account. Since we have not received the remaining amount of $3275.10 needed to complete your total monthly payment, we are returning these funds to you in the enclosed check."

b. Hundreds of unexplained "miscellaneous postings" per each loan.

c. Inflated fees paid to third party subsidiaries.

d. Headers with undefinable acronyms that defendant Servicer SPS could not either understand, define, and did not follow up with explanations as requested.

See EXHIBIT 20 of The BANA Header accounting for the account history from March 2007 Through December 2012.

145.    By forcing Gary into loan default status and then foreclosure, Defendants trapped Gary into owing back payments of over two-hundred thousand dollars, even though Gary paid and continues to pay his loan payments on time.

146.    SPS Defendants refuse to apply loan payments paid pursuant to the deeds of trusts, (The "Agreements") and instead return Gary's loan payments he send every month.

147.    Defendants BANA and SPS showed, and continue to show, that they were not then and are not now interested in collecting payments according to the terms of the Agreements, but rather  wanted and want to own Gary's Properties.

148.    For example, pursuant to the Security Agreements for WA01, WA07, and Blade24 Defendants are entitled to payments; Gary receives rental income from two of the three properties; Gary sends the entire amount due pursuant to the note; Gary does not deduct for vacancies; Gary manages the properties and pays the loan amounts due; Gary collects rents from units A, B, C, and D from both buildings; Defendants claim Gary is in default, yet Defendants  have not enforced the Assignment of Rents.

149.    Gary pays the loan amounts due; SPS Defendants refuse the payments, so that they can enforce their claim of default and would rather imminently foreclosure than receive funds, partly paid for by the rental units.  This is one rationale why Gary requests injunctive relief from this court.

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A, et al.*, Case No. 2:14-cv-06452-PSG-FFM

150.   SPS admitted that when they received the loan files, the documents were "mixed up."

151.   SPS has received payments and returned checks for the incorrect loans. Some checks are, currently missing in action, even though these checks were sent in 2013.  [Please see EXHIBIT 20]

## SCHEME 6: ECONOMICALLY COMPULSED REPAYMENT AGREEMENT FOR 13001 WASHINGTON BOULEVARD

152.   By 2012, Gary was desperate to bring his loans current. It seemed like the logical solution to bring an end to the continual financial nightmare Gary faced every day.

153.   In order to escape from Bank of America Defendants' financial grip, Gary needed to be able to refinance the loans for all three properties. Again, please keep in mind, but for Defendants' forced default and forced foreclosure, Gary would not have been in the unduly burdensome need to get away from the Defendants' labyrinth set up to force Gary to fail.

154.   In 2012, Gary entered into a repayment agreement to bring the loan for WA01 current. Gary had no choice. It was either pay the payments or lose his properties. Defendants filed notices of trustee sales which included inaccurate loan balances.[17] Gary was forced to make payment arrangements. Gary paid and Bank of America Defendants still demanded to take his properties away. Defendants disregarded the written payment agreement but took the money, and DID NOT reinstate the loan to current status, as promised. Instead, Defendants filed a Notice of Default and then a Notice of Trustee Sale.

<u>"Important Message About Your Loan." "We're Here To Help"</u>

---

[17] WA07 Notice of Default 11/21/2011; Trustee Sale Notice 2/29/2012; Rescission 3/20/2012; NOD 9/21/2012; WA01NOD 11/18/2011; WA01 Trustee Sale Notice of Rescission 2/21/2012; Trustee Sale Notice; NOD July 12, 2012; Trustee Sale Notice 10/11/2012;

155.   Please keep in mind, Gary did not owe the THIRTY-FIVE THOUSAND DOLLAR ($35,000.00) reinstatement balances, which were coincidentally the exact same reinstatement amounts for both loans. At this point, Gary desperately wanted to bring the loans current and escape from Bank of America Defendants.

156.   For the WA01 loan, Gary negotiated a sixth month repayment plan with a customer service representative named "Monica" and then a foreclosure representative named "Deanna." The contact number for Deanna began with an "805" area code.

157.   On information and belief, the terms for the WA01 reinstatement plan were negotiated with a customer service representative named "Brandon" on February 12, 2012 as follows:

> *(1)     Total to reinstate the loan $35,000.00*
>
> *(2)     Down payment to reinstate loan: $15,000.00, due on February 15, 2012*
>
> *(3)     Four monthly payments in the amount of: $5887.78 due on the fifteenth of March2012, April 2012, May 2012, and June 2012.*

158.   On February 14, 2014, Gary sent via Federal Express to,BANA, a $15,000.00 official bank check received by BANA on February 15, 2012. See EXHIBIT 6.

159.   Instead of honoring the payment agreement for WA01 and WA07, BANA disregarded the agreement and the $15,000.00 down payment for consideration of the repayment-reinstatement loan agreement. Instead, shortly after the receipt of the $15,000.00 down payment, Defendants filed a Notice of Default and then a Notice of Trustee Sale. Before the NOD and TS notices, BANA sent these three letters. SEE EXHIBIT 4.

160.   In a letter dated February 16, 2012, on Bank of America Home Loans letterhead from Bank of America, N.A., Defendants wrote:

> *"We recently received your payment in the amount of $3,712.53. This payment was less than the total amount needed to bring your loan up to date. However, we have applied the above referenced payment to your loan in accordance with your loan terms. The total amount due after we applied your payment is $11,047.71.*

*We previously sent you a 'notice Informing you of the amount needed to reinstate your loan. The acceleration date of February 17, 2011 provided on that notice remains in effect. If the amount due is not received by the specified due date, foreclosure proceedings may begin or continue."*

161.   On February 14, 2012, pursuant to the repayment-reinstatement plan between Gary and Bank of America, N.A., Gary overnighted via Federal Express[18] an official bank check in the amount of Fifteen Thousand Dollars, ($15,000.00), official check # 300059428 from One West Bank made out to Defendant Bank of America, N.A. See <u>EXHIBIT 6</u>

   a.   According to the February 16, 2012 letter, Gary paid $3,712.53.

   b.   According to the February 14, 2012 official bank check for $15,000.00, BANA received a total of $18,712.53 on or before February 15, 2012. BANA received three thousand nine hundred fifty-two dollars and twenty nine cents ($3952.29) over the amount required for the reinstatement-repayment plan, which please keep in mind, Gary did not owe in the first place.

   c.   But, the loan was neither reinstated nor was it considered current by BANA.

162.   In a letter dated May 18, 2012 defendant sent this letter: SEE EXHIBIT 7

*"On February 16, 2012, we mutually agreed to a Repayment Plan for your home loan. Our records indicate that as of February 15, 2012<u>, we have not received the required payment as we agreed.</u>  We have cancelled the Repayment Plan, effective February 16, 2012 because we did not receive the installment due on February 15, 2012"*

---

[18] Federal Express Tracking # 7932227106731

163.   If BANA mutually agreed to a repayment plan on February 16, 2012 and the repayment plan was "effective February 16, 2012, how could the required payment "as we agreed" installment be due on February 15, 2012.?  This was not a typo, because the dates were repeated.  BANA received and knew a payment was received in the amount of $15,000.00 paid by a certified cashier's check prior to the effective date. BANA also stated in its February 16, 2012 letter, only $11, 047.71 remained as the balance to reinstate the loan.

164.   BANA wrote the May 18, 2012 letter three months after the reinstatement-repayment plan agreement. The cashier's check was cashed, the funds were received.  BANA received an additional $3952.29. How could BANA claim in good faith that the Repayment Plan was cancelled, when (a) Gary did not owe the money, but made this payment per the Repayment Plan to bring the loan current so he could keep the loan current and immediately refinance the loan, to escape Defendants; (b) The Repayment Plan remained cancelled, despite the fact that the $15,000.00 was cashed, but not properly credited.

165.   To add more insult to injury, the May 18, 2012 letter stated, "What This Means To You.. You must pay all past due amounts and fees."….."What You Need To Do.. *Please send $27, 153.02 to Bank of America, N.A. to reinstate the Repayment Plan*…..Regardless of your situation, our goal is to help you establish an affordable payment plan to bring your loan up to date."

166.   Gary paid $15,000.00 he did not owe and was further away from being set free from BANA's predatory financial loop.

## SCHEME #7:ENTRAP THE BORROWER BY DESTROYING THE BORROWER'S CREDIT

167.   There is continual furnishing of inaccurate account information to the Credit Reporting Agencies, the CRA's; Although BANA and SPS have admitted the account errors, admitted misapplied payments, wrote letters which admitted Gary did

not need over twenty forced insurance policies, tax services, and did not have unpaid taxes, Defendant BANA and SPS continued to report inaccurate loan balances for 13001 Washington Boulevard, 13007 Washington Boulevard and 4424 Lindblade Drive.

(4.)  According to the reinstatement quotes for WA07 and WA01

a. The non-existent escrow accounts are included in the reinstatement calculations. Escrow accounts were never opened for these loans, yet escrow deficits accrued beginning sometime in 2010 and continued to accrue without explanation or justification.

168.   After admitting errors, BANA claimed they could not transfer funds out of an escrow account older than sixty days.

b. Inaccurate loan amounts reported to the credit reporting agencies which include the escrow account amounts.

However the reinstatement quote escrow disclaimer states*:*

"Even though foreclosure is imminent without the  payment, the escrow account has not been analyzed and may change after reinstatement.

c. The reinstatement quote states: *"total due may be incorrect,"* Although the total due used for foreclosure and reported to the credit reporting agencies, Defendants admit in the reinstatement quote that the total due reported to the credit reporting agencies is inaccurate.

(5.) The continual reporting of inaccurate loan balances and loan statuses were because of Defendants' unfair and unjust business practices which forced Gary into default and foreclosure.

(6.) The inaccurate credit reporting based on Defendants' fraudulent business practices has destroyed Gary's credit.

## SPS' CREDIT DISPUTE TACTICS & STRATEGY

169.   SPS Misrepresentation Facts regarding how SPS "handles" customer disputes regarding accounts and credit reporting which are manipulative because there

is no set time frame for how, when, who, or what can resolve the account disputes. SPS' dispute process provided to borrowers makes it impossible to resolve a justified disputable error in favor of the borrower. SPS' process is stacked against the borrower.

170.   One of the departments that deals with customer disputes regarding inaccurate information furnished to credit reporting agencies is the "Dispute Department" according to Charmae Allen.

171.   According to Ms. Allen, SPS does not report credit under any other name than SPS, yet on Mr. Haddock's Experian credit report, a company with SPS' post office box address reported negative account status- "Liquidation" status of all three of Mr. Haddock's properties. The name of the company was Loan Servicing Center.

172.   Ms, Allen also stated that a borrower cannot contact the Dispute Department directly. A borrower must wait until a representative from the Dispute Department contacts the borrower.

173.   Furthermore, the Dispute Department does not accept internal or external phone calls. Other SPS employees from other departments contact the Dispute Department by email or by fax.

174.   Thus, regarding the who, what, where elements that the heightened pleading standard require are not possible to meet when a Defendant's communication methods are so constrained and only the Defendant has access to the knowledge regarding the facts of communications.

175.   When Ms. Allen was asked why no disputes were notated on Mr. Haddock's credit reports, although all three loans were disputed regarding loan balances, amounts owed and that loans should not be in default-liquidation status when SPS accepted payments on those loans, Ms. Allen offered the following explanation:

176.   Before a dispute can be investigated or reported to a credit reporting agency, or in the reverse, before a dispute from a credit reporting agency can be

researched by SPS, the dispute from either the borrower and or the credit reporting agency must be assigned to a dispute representative in the Dispute Department. How long this process takes is not uniform or consistent- Ms. Allen's answer was, "it depends."

177.   The disputes are notated on the account, but that does not trigger any notice to the credit reporting agencies. The same is true when a credit reporting agency sends a dispute notice to SPS. The CRA dispute is notated on the account, but it is not opened at that moment. For borrower disputes, it takes at least seventy-two hours for documents to be imaged regarding disputes. There is also a lapse in the time from when SPS is notified from a CRA that a borrower is disputing an account because of the assignment process.

178.   The dispute must be open for thirty days in order for the dispute to be reported to the credit reporting agency, or the credit reporting agency is not notified that the borrower disputed the information furnished to the credit reporting agency.

179.   SPS reports to the CRA's n the first of every month. If a dispute is received on the first, or on the five to seven days prior to when SPS reports the account status, the account will not be reported as in dispute by SPS because of the internal assignment process.

180.   If SPS researches the dispute and closes the dispute sooner than the thirty day period, then the information is not reported to the CRA;

181.   The same is true when SPS received a dispute notice from the CRA; SPS simply reports that the dispute is resolved and the information furnished is validated;

182.   However, when SPS was contacted as a follow up on Mr. Haddock's dispute status, the dispute was not actually resolved within the thirty days;  SPS stated that they were still researching tells the dispute; Yet. SPS did not notify the CRA regarding the dispute status of the account.

183.   Gary alleges on information and belief that SPS manipulated its dispute system in order to continually furnish inaccurate credit loan information, while claiming that SPS researched the debt and the reasons for the dispute.

**OTHER SPS ACTIONS WHICH MAKE IT DIFFICULT FOR A BORROWER TO RESOLVE ACCOUNT DISPUTES AND THAT IS WHY WE NEED A FULL ACCOUNTING FROM SPS**

184.   Paperwork for all three loans is in chaos according to SPS phone representatives, which calls into question SPS's purported accuracy when SPS responds to Qualified Written Response requests.

185.   As an example to add insult to injury, SPS sent Gary a letter in April 2013 requesting a death certificate for WA01: 4/26/2013: "SPS, the mortgage servicer on the above referenced account received notification that one or more of the borrowers on this account is deceased."  There is no other name on this loan except Gary. [Please see EXHIBIT 21] SPS did not correct that Gary was in deceased status for this loan until close to the time the original complaint was filed in July 2014, over one year after SPS began servicing the loan.

186.   On numerous occasions, Gary has received calls for other borrowers, and SPS has left messages with the names of the other borrowers. In other messages, the phone representative cannot pronounce Gary's name. It's unclear who they are calling for.

- SPS provided accounting histories printed from its system which not only regurgitated BANA's accounting, but when Bank of America's asked to decipher the BANA Header, an SPS employee could not provide the meaning and/ or definitions of the acronyms. How then, can SPS claim Gary is not owed money on the principal balance of his loans.

- SPS continued to report the inaccurate credit reporting based on loan balances and loan status of foreclosure and "liquidation" based on inaccurate accounting from Bank of America, Countrywide.

SPS refused to stop the inaccurate credit reporting until the issues outlined in this case can be resolved.

- SPS continued to contact Gary directly even though he is represented by counsel.
- SPS continued to change relationship managers every couple of months, so it is unclear who is or who is not a relationship manager.
- SPS has failed to maintain contact regarding the loans as they are supposed to do.
- Gary has requested numerous meetings with SPS, has agreed to meet in Salt Lake City, Utah, but SPS claims phone meetings are mandatory.
- With the state of SPS's documents, it is unreasonable to expect Gary and his legal representative to review the account history over the phone, considering SPS's mishandling of Gary's loan paperwork.
- SPS received and then returned some of Gary's checks.
- More discovery will be necessary, including an independent audit of which checks have been received, returned and cashed.

187.   When SPS was contacted regarding one payment for WA01, which was cashed, SPS could not locate the payment and continued to report the loan to credit reporting agencies as in foreclosure, "Liquidation" status, even though a payment was accepted.

## SPS AND RESPA VIOLATIONS

188.   After SPS began servicing Gary's three loans in January 2013, Gary sent written correspondence regarding the status of the Department of Justice loan modification, and disputed the account balances on all three loans. In addition, Gary requested an accounting of the loans. Gary did not receive a response to the accounting request even though Gay as borrower included his name, account number, property address and the account request.

189.   Other written requests for accounting explanations and accounting disputes were sent to SPS throughout 2013 thru 2014: A partial list of the written requests is as follows:  January 2013; February 2013; March 2013; April 2013; May 30, 2013; July 2, 2013; July 16, 2013; August 30, 2013; November 6, 2013; November 12, 2013; December 13, 2013; June 30, 2014; July 5, 2014; July 7, 2014.

190.   All written requests included Gary's name as borrower, the account number, the property address and the specific request for information that requested corrected accounting, disputed loan amounts owed, misapplied payments by the prior servicer/lender, and the status and/or location of checks sent to SPS but ones that had not been returned by SPS. There were also repeated requests to SPS to stop furnishing negative credit information to the credit agencies, (Equifax, Experian, Transunion) while the accounts were in dispute.

191.   SPS repeatedly refused to stop furnishing negative credit information to the agencies.

192.   SPS' responses formed a pattern of non-compliance illustrated by the following examples:

    a.   In response to one of the requests for accounting and disputed loan amounts, SPS sent Gary a letter in In April 2013 and requested that he send a death certificate to SPS for the property. [Please see EXHIBIT 21]

    b.   Another response letter stated that the account request was NOT a qualified written response, so they were not required to respond.

    c.   Another letter stated they had already sent the information so they were not going to send it again.

## DEFENDANTS SHOULD BE ESTOPPED FROM ASSERTING THE AFFIRMATIVE DEFENSES OF STATUTE OF LIMITATIONS

193.   Gary is not dilatory in bringing this suit. Not only are Defendants some of the most persistent offenders of breaking the law as evidenced by references cited

throughout this complaint, showing that when Gary was plunged into default by force placed insurance and then the various schemes outlined in the factual allegations, Gary had no reason to know that these acts by the BANA's and BALBOA's were deliberate schemes to maximize profits. These facts were not revealed until lawsuits and government actions.

194.   Defendants are estopped from asserting that any of Plaintiff Haddock's claims are time-barred.  Defendants' continued deceptive, unfair, predatory, misrepresentations, fraudulent concealment, while at the same time Defendants' ability to enter into consent orders that do not require Defendants' to admit to wrongdoing, Plaintiff could not have discovered that the actions taken by Defendants which forced Plaintiff Haddock into default, were deliberate.

195.   Likewise, Defendants' failure and refusal to investigate or provide Plaintiff Haddock with accurate account history details prohibited Plaintiff Haddock to meaningfully exercise his accounting rights. Moreover, Defendants' continual behavior of losing documents sent by Plaintiff Haddock regarding account mistakes, requiring repeated resends of the exact information, while promising to investigate and correct the errors, gave Plaintiff Haddock a reason to rely on those promises, which are reve1aled as deliberate and false. Accordingly,

196.   These false and deliberate acts also denied Gary from his rights to challenge  and prevent Defendants' inaccurate  credit reporting of false loan information for the three loans Lindblade, Washington 01 and Washington 07, causing him undue economic and emotional duress, as well as substantial damage to his credit. Plaintiff reserves the right to present expert evidence regarding the emotional duress and the economic loss he continues to endure. . Plaintiff reserves the right to amend this complaint…….

197.   Shortly after the accounting and explanations were provided to Gary's representative, court documents were unsealed in several other class action with

allegations by former Defendants' Countrywide and Bank of America's employees outlined in affidavits filed in class action lawsuits with the government as the plaintiff.

198.   Gary is excused from earlier discovery because of the trust and confidence that developed between certain representatives of BANA assuring Gary that a resolution would be worked out at which point Gary would have mitigated his losses and refinanced the loans to the real properties, WA07, WA01 and BLADE24.

### DEFENDANTS SHOULD BE ESTOPPED FROM ASSERTING THE AFFIRMATIVE DEFENSES OF ABSOLUTE PRIVILEGE, QUALIFIED PRIVILEGE

199.   Defendants and their third party subsidiaries have direct knowledge of Defendants' wrongful acts because of numerous civil actions which provided for consent orders and stipulation enjoining and prohibiting Defendants from committing unfair and fraudulent business practices. Defendants and are supposed to follow all state laws, federal laws and orders.

200.   Defendants acts are unlawful and or are in reckless disregard of unfair business practices within the meaning of Business and Professions code section 17200 et seq.

201.   Defendants should be estopped from claiming defenses of absolute privilege and or qualified privilege.

### AUTHENTICITY OF THE SECURITY AGREEMENT ASSIGNMENTS

202.   The authenticity of the security agreement assignments which occurred in 2011 are relevant to the causes of action in this case:

    a. It raises the issue is the actual investor, owner of the debt the correct party to direct its servicer to furnish credit information or as in Gary's situation, inaccurate credit information to the credit reporting agencies;

b.  If the CWALT Alternative Loan Trust Series 2007 A04 is the correct "investor," the sheer volume of securitized loans are as one Congressman described "lost loans", with no particular party in charge of monitoring the loan activities. This problem of "lost loans" may be an explanation as to why Gary's loans have been neglected; there has not been a resolution to simple problems. It does not excuse the unfair business practices, but it does provide an explanation of how simple loan problems were never addressed as one would anticipate only to be exacerbated by poor investor oversight, unfair business practices by the master servicer and other Defendants.[19]

203.   The loans Countrywide originated are claimed to not have been assigned to the securitization pools according to deposition testimony during various civil cases. This potentially leaves limbo loans and unsecuritized pools and leads to fraudulent property transfers and recording practices of robosigning[20]

204.   Of the three loans, WA07 and WA01 are the extreme worst of the worse.

## THE AUTHENTICITY OF THE ASSIGNMENTS OF DEEDS OF TRUSTS IS BEING CHALLENGED

205.   The Assignments of the Deed of Trust recorded in regards to Gary's loans for WA07, WA01 and BLADE24 violate the 2007 pooling and servicing agreement for CWALT, Inc., Alternative Loan Trust 2007-A04, Mortgage Pass Through Certificate Series 2007-0A4. The assignments were executed in 2011. The cut-off date was 3/1/2007 and the closing date was 3/29/2007. See EXHIBIT 20.

---

[19] "Money, Power & Wall Street, Part 2" Frontline Aired 4/24/2012; http://video.pbs.org/video/2226666506/

[20] See Written Testimony of Adam J. Levitin, Associate Professor of Law, Georgetown University Law Center Before the Senate Committee on Banking, Housing, and Urban Affairs: "Problems in Mortgage Servicing From Modification to Foreclosure" November 16, 2010, 2:30pm.

206.   We are NOT asserting claims regarding whether Gary owes money for his loans. Gary PAYS for his loans. It is BANA and SPS that refuse his payments, misapply the payments.

207.   There is case law that does permit a borrower to challenge the authenticity of the assignments pertaining to a BUS. & PROF.C. § 17200 cause of action. *Barrionuevo v. Chase Bank, N.A.* (ND CA 2012) 885 F.Supp.2d 964: which citedthe following cases:   *Sacchi v. Mortgage Electronic Registration Systems, Inc.,* No. CV 11–1658 AHM (CWx), 2011 WL 2533029, at *9–10 (C.D.Cal. June 24, 2011); *Javaheri v. JPMorgan Chase Bank, N.A.,* CV 10–08185 ODW FFMX, 2011 WL 2173786, at *5–6 (C.D.Cal. June 2, 2011); *Ohlendorf v. Am. Home Mortg. Servicing,* 279 F.R.D. 575, 583 (E.D.Cal.2010); in *Castillo v. Skoba,* No. 10cv1838 BTM, 2010 WL 3986953, at *2 (S.D.Cal. Oct. 8, 2010); see also *Robinson v. Countrywide Home Loans, Inc.,* 199 Cal.App.4th 42, 46 Fn. 5, 130 Cal.Rptr.3d 811 (2011) ("a borrower who believes that the foreclosing entity lacks standing to do so" is not "without a remedy. The borrower can seek to enjoin the trustee's sale or to set the sale aside."); *Gomes v. Countrywide Home Loans, Inc.,* 192 Cal.App.4th 1149, 1156, 121 Cal.Rptr.3d 819 (2011) (upholding the dismissal of plaintiff's wrongful foreclosure action, but noting as "significant" the fact that cases cited by plaintiff permitting wrongful foreclosure action "identified a *specific factual basis* for alleging that the foreclosure was not initiated by the correct party. [plaintiff] has not asserted *any* factual basis to suspect that [defendant] lacks authority to proceed with the foreclosure.") (emphasis in original).see *Tamburi v. Suntrust Mortgage Inc.* (N.D. Cal. 2011) WL 6294472

208.   Gary requests leave to amend on this claim and requests that the Court rule on whether given the facts questioning the authenticity of the assignments, whether the Court would permit a **BUS. & PROF.C. § 17200 claim.**

209.   All three assignments of deeds of trust may not be authentic because all three were signed by known robosignors. In 2011, during litigation where robosigning

was revealed, there was an alleged shift in the location of Defendants' robosigning activities.

210.   All three assignments were executed in Ventura, California. More discovery will be necessary, but the facts will shows that thousands of assignments were recorded nationwide during this time frame.

## **WA07 ASSIGNMENT OF DEED OF TRUST:**

211.   There are two assignments recorded:

    a.   Assignment #1 is "Assignment of Deed of Trust" See <u>EXHIBIT 22</u>.

    b.   Assignment #2 is Corporation Assignment of Deed of Trust. See <u>EXHIBIT 23</u>.

212.   Assignment of Deed of Trust #1: Instrument #: 20111539458, Recorded on 11/14/11. The date of execution is 11/4/11. The Assignor is:  The Mortgage Electronic Registration Systems, Inc., (MERS) signed by known " robosignor" Bud Kamyabi, Assistant Secretary for MERS. The Assignee is: The Bank of New York Mellon FKA The Bank of New York As Trustee For the Certificate Holders of The CWALT, Inc., Alternative Loan Trust 2007-A04 Mortgage Pass Through Certificates Series 2007-A04.

213.   The notary is: Desiree Carson, Commission #1873667.  Ms. Carson was convicted for forgery, embezzlement and served time in California Women's Prison, Chino. Her prison Offender ID/CDCR#: WE6034. Ms. Carson was recently released to a halfway house for rehabilitation. Needless to say, Ms. Carson's notary commission was not renewed. More discovery will be necessary to reveal if Ms. Carson accepted financial incentives for notary services to notarize known robosignors. See EXHIBIT 24

214.   Corporation Assignment of Deed of Trust #2: Instrument #2011600499 Recorded 11/28/2011; Assignor: The Mortgage Electronic Registration Systems, Inc., (MERS) Signed by known robosignor Candice Reeves-Herzog, assistant secretary,

MERS on 11/21/2011.; Notary: Kenny Villavicencio Commission # 1900876, Commission expires 8/17/14

215.   More discovery will be necessary to understand why **two** assignments were necessary, but the assignments appear fraudulent.

## WA01 ASSIGNMENT OF DEED OF TRUST

216.   Assignment of Deed of Trust Instrument # 20111049271 Recorded 8/4/2011; Assignor: The Mortgage Electronic Registration Systems, Inc. Signed by known robosignor: Jane Martorana, Assistant Secretary, MERS Signed on: 8/2/2011; Notary: Lillian J. Ellison, Commissioner # 1925617, Expires 3/13/2015 See EXHIBIT 25.

## BLADE24 ASSIGNMENT OF DEED OF TRUST

217.   BLADE24 Assignment of Deed of Trust Instrument # 20111108891

Assignor: The Mortgage Electronic Registration Systems, Inc.; Signed by known robosignor: Chester Levings, Assistant Secretary, MERS.; Date Signed: 8/11/2011; Date Recorded: 8/17/2011 Notary: Marcellus Ellis Commission # 1869981, Expires 10/31/2013; See EXHIBIT 26.

218.   The notary Marcellus Ellis is not an active notary pursuant to the 2014 Active Notary List. SEE EXHIBIT 27.

219.   We have a discrepancy in the investor because of what appears to be robosigned and robo-notarized recorded documents regarding the assignments of the deeds of trusts, assigned over four years after the closing and cut-off dates of the CWALT Alternative Trust Series 2007-A04;  Therefore a discrepancy in the party authorized to furnish credit information to the credit reporting agencies is an issue that requires more discovery; All negative credit reporting should be stopped until the true investor, is identified and the assignments are authenticated.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION:

## BREACH OF CONTRACT (A)

**a.  BREACH OF SECURITY AGREEMENTS AGAINST DEFENDANTS COUNTRYWIDE, BANK OF AMERICA  AND DOES 1-30**

220.  Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

221.  On or about *February 12, 2007* Gary and defendant Countrywide entered into three security agreements for refinancing loans for the real properties WA07, WA01 and 4424 BLADE. Copies of the security agreements are attached, marked <u>EXHIBITS 1,2,3</u> respectively and are incorporated by reference.

222.  The relevant sections of the Security Instruments are incorporated by reference.

223.  Gary has performed and continues to perform all covenants, terms, conditions and obligations of the security instruments to be performed on its part, excepting those that have been waived, excused, or prevented by Defendants' actions or failures of performance.

224.  Gary was not in default when Defendants began committing violations of the covenants in the security agreements sometime on a date unknown to Gary, but within the four years preceding the filing of this Complaint. Gary is informed and believes and on that basis alleges that Defendants deliberately forced Gary into default and then foreclosure by willful deceptive acts in violation of the following covenants of the security agreements: Defendants misrepresented, did not account for and /or report the correct date when Gary's payments were received at the designated lender location pursuant to Universal Covenant Section 1, paragraph 2. which states in part:

*Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.*

225.  Defendants misrepresented to Gary the application of payments and failed to apply Gary's payments accurately. Instead, Defendants circumvented the Universal Covenant Section 1, paragraph 2 by placing TWENTY-ONE and/or more force placed insurance policies on Gary's three properties, even though Gary carried property insurance; Worse, Defendants backdated the policies. Universal Covenant Section 2., Application of Payments or Proceeds states:

*Except as otherwise described In this Section 2, all payments l) accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.*

226.  At the time Defendants committed these unfair acts, Defendants were under the jurisdiction of a consent order with the Federal Trade Commission to not commit unfair business practices for including but not limited to:

   a.  Misrepresentation of loan statuses,

   b.  Misrepresentation of Amounts Owed,

   c.  Unfair Assessment and Collection of Fees

   d.  Deceptive Servicing Claims

   e.  Unfair collection of payments,

   f.  Initiating foreclosure actions or assessing fees in connection with actual or threatened foreclosure action prior to the review of Competent and Reliable Evidence demonstrating that the consumer is in default under the terms of the loan consummating foreclosure sales without having investigated non-frivolous disputes by Consumers,

g.  Filing or caused to be filed in state and local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized,        including those not signed or affirmed in the presence of a notary, popularly known as     "robosigning,"

h.  Reporting inaccurate loan statuses and balances to credit reporting agencies and failing to correct a borrower's credit reports and

i.  Failing to provide all information reasonably required to administer redress, in    violation of numerous Consent Orders.

227.  Defendants deducted for escrow items pursuant to Section 3, Section 9, and Section  15 of the security instruments because Defendants placed over TWENTY insurance     policies on Gary's three properties deliberately, and backdated the policies.

228.  Based on Plaintiff's information and belief, Defendants waived Section 3 in writing, because escrow accounting had not been evidenced on any of Gary's payment coupons, and Defendants failed to provide any notice to Gary. REMEMBER, GARY was not in default and NOT late on his loan payments;  Defendants arbitrarily deducted from plaintiff's payments funds for over TWENTY insurance policies, taxes and other "miscellaneous fees" which FORCED Gary into default on three loans, when Gary had complied with all covenants and continues to comply by sending in payments. Defendants took that money and paid themselves and their third party subsidiaries inflated fees for insurance, tax services and default services.

Section 3. Funds Tor Escrow Items states in part:
    *Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish lo Lender receipts evidencing such payment within such lime period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow*

*items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.*

229.   No escrow account existed until Defendants re-routed Gary's payments, unbeknownst to Gary.

230.   Defendants collected and held funds for in violation of RESPA pursuant to Section 3, paragraphs 2 , 3 and 4 which state in part:

*Paragraph 2:*
*Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.*

*Paragraph 3:*
*Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.*

*Paragraph 4:*
*If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.*

231.   Defendants continued to hold the funds

232.   Over TWENTY force placed insurance policies violated the maximum amount a lender could require under RESPA. Defendants collected, held funds and paid for escrow items, when Defendants knew or should have known that Gary paid for the items Defendants deducted and /or re-routed Gary's loan payments, in violation of Section 4, Charges and Liens, paragraph 1 which states in part:

*Charges: Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold    payments or ground rents on the Property, if any, and Community Association Dues,       Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower    shall pay them in the manner provided in Section 3.*

233.   Although Gary obtained and maintained property insurance from the origination of the loans, Defendants charged for over TWENTY force placed insurance policies properties in violation of Section 5, "Property Insurance," which states in part:

*5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower. If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense...*

234.   Gary sent proof of property insurance on numerous occasions to Defendants but Defendants continued and continue now to charge Gary for forced insurance, further increasing the principal balance, fees and other miscellaneous amounts which are compounded into more interest and are inaccurately furnished and reported on Gary's credit reports.

235.   Defendants used deceptive and unfair business practices and charged for "loan charges" pursuant to section 14 when Gary was not in default. Gary did not default. It was Defendants fraud and misrepresentation that forced Gary into default and foreclosure.

236.   Defendants charged for over TWENTY force placed insurance policies Section 14 states:

*14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and   rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.*

237.   As a direct and proximate result of Defendants' violations of the covenants in the security instruments, Gary has and continues to suffer damages, including, but not limited to:

---

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A., et al.*, Case No. 2:14-cv-06452-PSG-FFM

a. The inflated amounts of the principal balance due to interest, fees and other  miscellaneous fees posted to Plaintiff's loan balances.

b. Damage to Plaintiff's credit due to Defendants inaccurate credit reporting based on Defendants' violations of the security instruments

c. Damages resulting from lost revenues and business reputation from Defendants' non-   performance of the covenants and conditions pursuant to the security instruments

d. Costs of plaintiff's time and actual costs to repeatedly identify Defendants' breaches without resolution.

e. Gary is trapped by Defendants' breaches and could not take advantage of low interest rates to refinance the loans, costing plaintiff in interest costs, fees.

238.   The exact amount of Gary's damages has not yet been determined, but is estimated to exceed the jurisdictional minimum of this Court and will be established according to proof at trial. Gary reserves the right to amend this cause of action.

## SECOND CAUSE OF ACTION BREACH OF CONTRACT (B)
## (REPAYMENT AGREEMENT)

**b. BREACH OF CONTRACT PURSUANT TO THE FEBRUARY 16, 2012 REPAYMENT AGREEMENT FOR WA01 AGAINST DEFENDANTS BANA AND DOES 1-30**

239.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

240.   Defendants have direct knowledge of Defendants' wrongful acts because of numerous civil actions which provided for consent orders and stipulation enjoining and prohibiting Defendants from committing unfair and fraudulent business practices. Defendants are supposed to follow all state laws, federal laws and orders.

241.   A written agreement was made by Defendants and Gary to enter into a repayment plan for the property WA01. Evidence of the agreement is attached as EXHIBIT 4. The written evidence includes the following documents:

Defendant's letters of :

February 16, 2012, [BAHL/BANA ID# 8_429PARREIN 13794 August 18, 2011];

March 16, 2012; and

May 18, 2012,[ BAHL/BANA ID# LMPCNL311788 February 7, 2010];

Cashier's Check dated February 14, 2012 sent to BANA;

FEDERAL EXPRESS CONFIRMATION Tracking Document confirming BANA sent the cashier's check. [EXHIBITS 4-7].

242.   Gary was not and should not have been in default/and or behind on his payments. Gary performed and made loan payments pursuant to the Security Agreements.

243.   Defendants knew Gary entered into the repayment plan as a way out, to get away from Defendants. Gary performed the repayment plan by paying the required down payment due on February 15, 2012, evidenced by Official Bank Check #300059428 drawn on One West Bank, in the amount of FIFTEEN THOUSAND DOLLARS, ($15,000.00) dated February 14, 2012.

244.   Gary sent the official bank check in the amount of $15,000.00 on February 15, 2012 evidenced by Federal Express Tracking Number: 793227106731. The address LADC Retail Payment Services, Bank of America, N.A. 1000 West Temple Street, Los Angeles, CA 90012.

245.   Defendants breached the terms of the agreement evidenced by their letter dated May 18, 2012, *"On February 16, 2012 we mutually agreed to a repayment plan for your      home. Our records indicate as of February 15, 2012 we have not received the required payment as we agreed. We have cancelled the repayment plan*

*effective February 16, 2012 because we have not received the installment due on February 15, 2012."*

246.   But Defendants admitted that they received a payment in a letter dated February 16, 2012, and stated that the outstanding balance was "$11, 047.71." The letter also refers to the amount was less than the amount needed to bring your loan up to date.

247.   Defendants also received the February 15, 2012 cashier's check as evicenceed by the Federal express confirmation receipt. Also, Defendants, cashed and applied the 15 payment on Gary's loans, but refused to honor the repayment plan.

248.   On information and belief, as already stated: For the loan WA01 Gary negotiated a sixth month repayment plan with a customer service representative named "Monica" and then a foreclosure representative named "Deanna." The contact number for Deanna began with an "805" area code.

249.   On information and belief, the terms for the WA01 reinstatement plan were negotiated with a customer service representative named "Brandon" on February 12, 2012 as follows:

> (4) *Total to reinstate the loan $35,000.00*
> (5) *Down payment to reinstate loan: $15,000.00, due on February 15, 2012*
> (6) *Four monthly payments in the amount of: $5887.78 due on the fifteenth of March 2012, April 2012, May 2012, and June 2012.*
> (7) *For WA01, Gary was to pay six payments of $5887.78 due on the fifteenth April 2012 through October 2012, as evidenced by the March 16, 2012 letter from Defendants.*

250.   Defendants injured Gary and continued to injure Gary including but not limited to the following ways:

a.   Defendants filed a Notice of Default and then a Notice of Trustee Sale further damaging Gary's credit with public records that were not based on credible evidence.

b.   Defendant did not reinstate either loan for WA01.

c.   Gary remained trapped in foreclosure.

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A, et al.*, Case No. 2:14-cv-06452-PSG-FFM

  d. Defendant did not allocate fee adjustments and instead charged Gary more fees by not reinstating the loans and compounded those fees into the loan amounts.

251. Gary was damaged.

252. The damage has accrued

253. More discovery is required to obtain BANA's written evidence of the repayment agreement in order to plead the allegations further.

254. Gary reserves the right to amend this cause of action.

255. WHEREFORE, said Plaintiffs pray for judgment against Defendants as hereinafter set forth.

### THIRD CAUSE OF ACTION
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST BANA AND DOES 1-30 AS TO BREACH OF CONTRACT A.**

256. Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

257. Every contract contains an implied covenant of good faith and fair dealing.

258. The two contracts are referenced in Exhibits, [1,2,3 and 4]

259. The security instruments for WA01,WA07 and BLADE24 contained an implied covenant of good faith and fair dealing, pursuant to which BANA was bound to perform its obligations in good faith and to deal fairly with Gary.

260. To the extent that the security agreements permitted BANA to unilaterally "force-place" insurance, BANA was obligated not to exercise its discretion capriciously or in bad faith (for its own financial gain for the purposes of maximizing profits at Gary'sexpense).

261. BANA breached its duties of good faith and fair dealing in at least the following respects, among others:

a.  Failing to make any effort whatsoever to check to see if Gary had insurance coverage;

b.  Failing to acknowledge Gary's existing insurance policies and, instead— for the sole purpose of maximizing its own profits— forcing him to pay for insurance policies from providers chosen by BANA. These policies needlessly came with substantially greater premiums, while providing less coverage than Gary's existing policies; Moreover, Gary had coverage and coverage was backdated to years when BANA's payment invoices showed that Gary was not only responsible for paying for hazard insurance, but had paid for the hazard insurance.

c.  Assessing excessive, unreasonable, and unnecessary force placed insurance policy premiums against Gary while misrepresenting the reason for the cost of the policies;

d.  Collecting a percentage of the force-placed premiums charged to Gary, thereby creating the incentive to seek the highest-priced premiums possible;

e.  Backdating force-placed insurance policies to cover time periods which have already passed and for which there was absolutely no risk of loss because Gary had coverage and BANA knew he had coverage;

f.  Procuring force-placed insurance policies to cover time periods during which the BANA was already covered pursuant to a Lender's Loss Payable Endorsement; and

g.  Failing to provide notice to Gary that force placed insurance was placed on his properties.

262.  As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Gary suffered damages.

## FOURTH CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS TO BREACH OF CONTRACT PART B – repayment agreement against BANA AND DOES 1-30

263.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

### A. BANA Abused Its Power Under The Repayment Plan

264.   On or about May 18, 2012 Gary and BANA agreed to a repayment plan designed to reinstate Gary's loan for the 13001 Washington property.

265.   While Gary disputed the loan amount that BANA claimed was owing on the aforesaid property, and BANA knew that fact, Gary nonetheless entered into the contract with BANA to repay the loan because he believed he had exhausted all other avenues for resolution.

266.   After entering into the agreement Gary made the payments required and BANA received and cashed the payments made. Then BANA claimed it had not received the payment from Gary and canceled the reinstatement of the loan three months after the payment had been received.

267.   In so doing BANA arbitrarily and without cause and in bad faith refused to  apply the payment as required by the agreement with the result that Gary did not receive the benefit of the agreement made with BANA. Such action was a breach of the implied covenant of good faith and fair dealing.

### B. Gary Suffered Loss As A Result Of BANA's Breach Of Its Duty of Care To Gary

268.   If BANA had reinstated the loan as agreed, then Gary could have refinanced the loan with another lender and thereby ceased to be entrapped by BANA. In addition his credit would have begun to be rehabilitated and he would have been able to achieve a fresh start. BANA knew that Gary entered into the agreement, and paid money he did not owe, with these intentions. As a result BANA had a duty to

1   Gary to ensure that it carried out its obligations under the agreement provided Gary
2   carried out his.

3   269.   Gary paid over $15,000.00 to reinstate the loan but BANA took the
4   payment and failed to reinstate the loan. Furthermore, based on the false claim that
5   Gary had not made the required payment, BANA purported to cancel the agreement.

6   270.   As a result of BANA's failure to reinstate Gary's loan Gary suffered
7   injury including default fees (including default rates of interest), inability to refinance
8   the loan with the result that he was unable to take advantage of the then prevailing low
9   interest rates. This damage to Gary was ongoing.

## FIFTH CAUSE OF ACTION

## ESTOPPEL AGAINST BANA & & DOES 1-30

12   271.   Gary re-alleges and incorporates all preceding paragraphs as though set
13   forth in full in this cause of action.

14   272.   Defendants by their statements and/or conduct, intentionally and
15   deliberately caused Gary to believe to be true that his loan account disputes would be
16   resolved, that his loans would be reinstated, that repayment agreements would be
17   honored and performed and Gary performed and took other actions, such as spending
18   so much time on the phone and in writing with Defendants, based on those beliefs.

19   273.   Defendants intended that Gary would act upon their statements and/or
20   conduct and Gary had a right to believe that Defendants so intended;

21   274.   Gary was ignorant of the true facts, such as Defendants deliberately

22   275.   Gary relied on the Defendants' statements and conduct.

23   276.   Defendants have direct knowledge of Defendants' wrongful acts because
24   of numerous civil actions which provided for consent orders and stipulation enjoining
25   and prohibiting Defendants from committing unfair and fraudulent business practices.
26   Defendants are supposed to follow all state laws, federal laws and orders.

27   277.   WHEREFORE, said Plaintiffs pray for judgment against Defendants as
28   hereinafter set forth.

**BUSINESS AND PROFESSIONS CODE § 17200 ET SEQ.CAUSES OF ACTION**

**SIXTH CAUSE OF ACTION**
**VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200 ET SEQ. AGAINST BANA AND DOES 1-30 REGARDING FORCE PLACED INSURANCE**

278.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

279.   On behalf of himself and the general public, Gary brings this claim pursuant to Business and Professions Code section 17200, et seq. for unfair business practices. The conduct of defendants as alleged in this complaint has been and continues to be unfair, unlawful and harmful to Gary and the general public. Gary seeks to enforce important rights affecting the public interest.

280.   Gary is a "person" within the meaning of Business & Professions Code section 17204 and therefore has standing to bring this cause of action for injunctive relief, restitution and other appropriate equitable relief.

281.   Business and Professions Code § 17200, et. seq. prohibits unlawful and unfair business practices and precludes a person or entity from engaging in unfair competition, defined as business practices which are unlawful, unfair or fraudulent. Section 17203 permits the court in an action based on allegations of unfair competition to issue injunctive, restitutionary or other equitable relief.

282.   Defendants' violation of Business and Professions Code section 17200 includes engaging in the following unlawful, unfair or fraudulent business acts and practices:

    a.   Imposing force-placed insurance that incorporates the payment of commissions to the benefit of defendants and to the detriment of the borrower;

    b.   Inflating premiums to fund commissions to the lender;

c. Imposing force-placed insurance for properties that carry insurance;

d. Charging borrowers for force-placed insurance at marked-up prices in excess of the cost of any additional insurance; and

e. Charging for services that are not reasonably necessary to protect the note holder's interest in the property.

f. Charging for policies that were duplicative, unnecessary and backdated.

283. The unlawful, unfair and fraudulent practices alleged above are continuing in nature and are widespread practices engaged in by defendants.

284. Gary as a member of the public suffered injury in fact and lost money or property as a result of defendants' acts.

285. Defendants' acts of unfair competition present a continuing threat to the public's livelihood, welfare and finances, and plaintiffs have no adequate remedy at law. Accordingly, unless defendants are permanently enjoined and restrained by order of the court, defendants will continue to commit acts of unfair competition and will continue to cause irreparable harm and injury to the public.

286. Gary respectfully requests that an injunction be issued against defendants to enjoin them from continuing to engage in the unlawful conduct alleged herein.

287. Gary respectfully requests that the court order any other and further equitable relief deemed necessary by the court, including restitutionary relief as a result of the unfair, unlawful and fraudulent practices alleged herein.

288. Gary respectfully requests an award of attorney fees upon prevailing in this request for injunctive relief.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200 ET SEQ. AGAINST THE BALBOA & QBE DEFENDANTS AND DOES 1-30

289. Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

290.   BALBOA & QBE have regularly conducted business throughout the State of California.

291.   QBE's lender placed program at issue here, follows from QBE's acquisition of Balboa's casualty and property insurance business from Bank of America Corporation. That acquisition involved "substantially all of the in-force property and casualty business.

292.   As part of the acquisition of Balboa by QBE, Defendants' BANA and QBE FIRST agreed to an exclusive arrangement for the provision of lender-placed insurance that would continue to be implemented and directed from California, using personnel, work-place assets and systems developed in California and were part of Balboa force-placed insurance operations. As such, with regard to the practices at issue in this lawsuit, QBE FIRST'S offices and operations in California are the nerve center of the challenged activity and therefore, the conduct alleged occurred in California. Because the challenged conduct emanates and is directed from California, California's unfair competition law applies to a class of borrowers, both within and outside of California, who have been harmed as a result. Moreover, California has a substantial interest in preventing fraudulent practices within the State which may have an effect both in California and throughout the rest of the country.

293.   California Business & Professions Code §§ 17200 *et seq.* prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

294.   The BALBOA Defendants engaged in unfair, unlawful or fraudulent business acts and practices in violation of California Business & Professions Code §§ 17200, *et seq.*, in that: (a) Defendants' practices and conduct are immoral, unethical, oppressive and substantially harmful to Plaintiff (b) the justification for Defendants' practices and conduct is outweighed by the gravity of the injury to Plaintiff; and (c) Defendants' practices constitute unfair, fraudulent, untrue or misleading actions in that such conduct is likely to deceive and, in fact, did deceive members of the public.

295.   The BALBOA Defendants' unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

    a.  Acting in concert to abusing their market position, the non-competitive nature of the market from lender-placed insurance and the superior economic power resulting from their aligned interests as provider and purchaser of force-placed insurance to take unfair advantage of consumers to whom the costs of the insurance were passed on;

    b.  Assessing excessive, unreasonable, and unnecessary insurance policy charges against Plaintiffs and misrepresenting the reason for the cost of the policies; BALBOA did this even when it was obvious that one structure did not require over twenty policies;

    c.  Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

    d.  Backdating force-placed insurance policies to cover time periods which have when the Plaintiff had hazard insurance and BALBOA had a way to check this regarding existing insurance;

    e.  Procuring force-placed insurance policies to cover time periods during which the mortgagee was already covered pursuant to a Lender's Loss Payable Endorsement;

    f.  Imposing unjustified, unauthorized and improper costs upon borrowers and thereby wrongfully depleting their funds, increasing their indebtedness and/or depleting their equity in their property; and

    g.  Engaging in other unfair and/or unlawful conduct as described in this Complaint.

296.   The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiff.

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A, et al.*, Case No. 2:14-cv-06452-PSG-FFM

297.   Gary as a member of the public suffered injury in fact and lost money or property as a result of Defendants' acts.

298.   By reason of the foregoing, Defendants should be required to pay damages in an amount to be proven at trial, disgorge their illicit profits and/or make restitution to Plaintiffs and the Class, and/or be enjoined from continuing in such practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

### EIGHT CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (VIOLATION OF **BUSINESS AND PROFESSIONAL CODE §§ 17200** *ET SEQ.*
### AGAINST BANA AND DOES 1-30

299.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

300.   Defendants BANA have regularly conducted business throughout the State of California.

301.   California Business & Professions Code §§ 17200 *et seq.* prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

302.   Defendants engaged in unfair, unlawful or fraudulent business acts and practices in violation of California Business & Professions Code §§ 17200, et seq., in that: (a) Defendants' conduct is unlawful in that it is in violation of misrepresentation, fraud, breach of contract and breach of the implied covenant of good faith and fair dealing; oppressive accounting practices; oppressive and abusive loan modification practices (b) Defendants' practices and conduct are immoral, unethical, oppressive and substantially harmful to Plaintiff; (c) the justification for Defendants' practices and conduct is outweighed by the gravity of the injury to Plaintiff; (d) Defendants' practices constitute unfair, fraudulent, untrue or misleading actions in that such conduct is likely to deceive and, in fact, did deceive members of the public.

303.   Defendants' unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

    a.   Misrepresenting to Gary that did not pay the amounts required for the repayment agreement even though he did;

    b.   Misrepresenting to Gary that he did and did not qualify for the Department of Justice Loan Modification program;

    c.   Violations of the covenant of good faith and fair dealing regarding the repayment agreement;

    d.   Violation of the covenant of good faith and fair dealing regarding the breach of Security Agreements;

    e.   Violation of various consent orders described in the complaint and committing acts against Gary that were prohibited; and

    f.   Engaging in other unfair and/or unlawful conduct as described in this Complaint.

    g.   Misrepresenting to Gary that his loan modification documents were not received when Defendant knew they possessed the documents;

    h.   Misrepresenting to Gary that they approved Gary paying the taxes;

    i.   The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Gary. Gary has suffered injuries in fact and has lost money or property as a result of BANA's conduct.

    j.   Continual misrepresentations that Gary was in default when he paid his loans on time and it was Defendants that plunged him into default;

    k.   Oppressive and inaccurate accounting practices;

304.   Gary as a member of the public suffered injury in fact and lost money or property as a result of defendants' acts.

305.   By reason of the foregoing, Defendants should be required to pay damages in an amount to be proven at trial, disgorge their illicit profits and/or make

restitution to the Gary, the general public, and/or be enjoined from continuing in such practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

### NINTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (VIOLATION OF BUSINESS AND PROFESSIONAL CODE §§ 17200 *ET SEQ.* AGAINST SPS AND DOES 1-30

306.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

307.   Defendants SPS have regularly conducted business throughout the State of California.

308.   California Business & Professions Code §§ 17200 *et seq.* prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

309.   Defendants engaged in unfair, unlawful or fraudulent business acts and practices in violation of California Business & Professions Code §§ 17200, et seq., in that: (a) Defendants' conduct is unlawful in that it is in violation of misrepresentation; (b) RESPA; (c) Defendants' practices and conduct are immoral, unethical, oppressive and substantially harmful to Plaintiff; (c) the justification for Defendants' practices and conduct is outweighed by the gravity of the injury to Plaintiff ;(d) Defendants' practices constitute unfair, fraudulent, untrue or misleading actions in that such conduct is likely to deceive and, in fact, did deceive members of the public.

310.   Defendants' unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

    a.   Misrepresentations regarding the account status of his loans;

    b.   Misrepresenting to Gary he did not qualify for the Department of Justice loan modification program after SPS became the new servicer;

    c.   Misrepresentations regarding the account dispute process;

d.  Misrepresentations regarding his loan statuses and credit;

e.  Violations of RESPA

f.  Engaging in other unfair and/or unlawful conduct as described in this Complaint.

g.  The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Gary. Gary has suffered injuries in fact and has lost money or property as a result of SPS's conduct.

311.  By reason of the foregoing, Defendants should be required to pay damages in an amount to be proven at trial, disgorge their illicit profits and/or make restitution to the Gary, the general public, and/or be enjoined from continuing in such practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

**TENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT/DISGORGEMENT**
**( AGAINST QBE, BALBOA and Does 1-30)**

312.  Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

313.  Gary did not enter into a contract with QBE or Balboa as a result of the imposition of force placed insurance. As a result of the absence of a contractual relationship between Gary and QBE and/or Balboa there is no adequate remedy at law to compensate Gary for the money improperly taken from him and retained by QBE and Balboa through the scheme described herein.

314.  QBE and Balboa have received a substantial benefit from Gary as a result of Gary being charged for forced place insurance. There is no commercially reasonable justification for the ill gotten gains afforded QBE and Balboa. Instead the

sole explanation for the financial gains achieved and maintained by QBE and Balboa at the expense of Gary is unjust profiteering at the expense of Gary.

315.   The reason Gary was required to pay the unreasonable amounts charged for unnecessary, backdated and/or duplicative force placed insurance is because of the scheme designed and perpetrated between Defendants described herein.

316.   These payments were accepted and retained by QBE and Balboa under circumstances such that it would be inequitable for QBE and Balboa the benefit without payment to Gary.

317.   As a result of QBE and Balboa's unjust enrichment, Gary has sustained damages in an amount to be determined at trial and seeks full disgorgement and restitution of QBE's and Balboa's enrichment, benefits and ill-gotten gains acquired as a result of the the unlawful or wrongful conduct alleged above.

Gary also seeks restitution and disgorgement of profits realized by QBE and  Ba as a result of their unfair, unlawful and deceptive practices.

318.   Defendants entered into an agreement where QBE and/or Balboa would provide force placed insurance policies to Gary

319.   Defendants entered into an agreement whereby QBE and/or Balboa would provide force placed insurance policies to borrowers including Gary, which policies were sold at prices far higher than the market rates for similar policies. QBE and Balboa knew that the prices for these policies were excessive.

320.   QBE and Balboa made substantial payments in illegal kickbacks, commissions and referral fees to BANA in order to exclusively provide force placed insurance policies to BANA borrowers including Gary.

321.   Gary individually, and on behalf of the public, seeks restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## FRAUD & MISREPRESENTATION CAUSES OF ACTION

## ELEVENTH CAUSE OF ACTION

## MISREPRESENTATION AGAINST BANA AND DOES 1-30

322.   Gary refers to all preceding paragraphs and incorporates them as if set forth in full in this cause of action.

## A. Misrepresentation Concerning the Repayment Agreement

323.   On or about January 2012 Gary was told by representatives of BANA that if he paid $15,000.00 as a down payment by February 16, 2012 followed by monthly payments of $5,000.00, the loan for 13001 Washington Blvd would be reinstated.

324.   The customer service representatives who negotiated the repayment agreement with him were Monica, Deanna (who had an area code 805 telephone number) and Brandon.

325.   In May 2012 Gary received a letter from BANA dated May 18, 2012 which stated in part:

"*On February 16, 2012 we mutually agreed to a repayment plan for your home loan. Our records indicate that as of February 15, 2012 we have not received the required payment as agreed.*"

326.   Then the letter repeated the Dates:

"*We have cancelled the repayment plan effective February 16, 2012 because we did not receive the installment due on February 15, 2012.*"

327.   The letter was not signed but at the bottom of the letter the following words appear:

"*This communication is from Bank of America, N.A. the servicer of your home loan.*"

328.   This letter was false since BANA received the payment required by the repayment plan on the day it was due, in the form of a cashier's check which was delivered to BANA by Federal Express and then cashed by BANA.

329.   BANA did not admit its error and instead simply disregarded the repayment agreement.

330.   BANA knew the statements in the letter were false and were made to induce Gary to pay additional funds to BANA which he did in reliance on the terms of the repayment agreement.

331.   As a result of his reliance on the false representations Gary's loan was not reinstated and he incurred late fees, default fees and service fees. Furthermore a notice of default was filed July 21, 2012 and a notice of trustee's sale on October 11, 2012. In addition Gary was deprived of the opportunity to refinance the loan at the low interest rates then on offer.

**B. MISREPRESENTATION CONCERNING THE DEPARTMENT OF JUSTICE LOAN MODIFICATION PROGRAM**

332.   BANA made representations in its letters and customer service statements between May and October 2012 concerning the Department of Justice Loan Modification program for Gary's 13007 Washington Boulevard property. [SEE EXHIBITS 8-14]

333.   The first letter was received on May 26, 2012. See <u>EXHIBIT 8</u>.

"Important, you meet the criteria to apply for a new federal government modification program. Qualifying customers may reduce their monthly payment by an average of 35%. ..To apply for this modification, please make an appointment to meet with a home loan specialist at the Torrance customer Assistance Center no later than June 25, 2012.

334.   The letter was signed by the "Home Loan Team, Bank of America, N.A., Code DJ1"

335.   Gary responded immediately, made an appointment and brought all of the requested financial information and documents included in this letter to the address listed on the May 26, 2012 letter: 17204 Hawthorne Blvd. Torrance, CA 90504.

336.   Gary did not hear back. Gary followed up, called the phone number listed on the May 26, 2012 letter: (310) 793-4427. Gary left numerous phone messages, resent the financial package to 17204 Hawthorne Blvd. Torrance, CA 90504, but there was no response. Gary redelivered the package to July or August 2012.

337.   On October 5, 2012, Gary received a letter stating,

 "Time is running out to accept this offer and avoid foreclosure. [Offer is prominently displayed in a text box on the upper right hand side of the letter] The letter went on to describe how the modification        program worked. Gary, once again sent all the documents overnight to the address listed. Letter "Final        Notice: Time is running out to accept this offer and avoid foreclosure, but it's not too late. Call us immediately at 800 669-6650" [*in the top right text box, prominently displayed as an "offer"*

 "Dear Gary Craig Haddock: we have been trying to reach you by mail and telephone to encourage you to apply for the new modification program recently   introduced by the U.S. Department of Justice and State Attorney Generals global settlement with major mortgage servicers including Bank of America, Qualifying customers could receive significant principal reduction, a reduced monthly payment and the loan would be brought up to date.
SEE <u>EXHIBIT 9</u>.

338.   BANA did not try to contact Gary. Gary had contacted BANA repeatedly to make sure BANA received the documents.

339.   October 6, 2012 Gary received two letters from Defendants:

a. <u>Letter #1</u>: The October 6, 2012 letter thanked Gary for "beginning the
   home loan modification process with us and for providing your financial
   information. We are now evaluating your loan for modification options.
   …If we are missing any documents needed to evaluate your loan, we will

send a letter that identifies the documents….. See <u>EXHIBIT 10</u>. This letter admits by BANA that BANA did receive the modification package,

   b. <u>Letter #2</u>: The October 6, 2012 letter stated:  We have reviewed your home loan for eligibility…. "the loan was not 'eligible' for a modification because you did not complete and submit all the documents requested." See <u>EXHIBIT 11</u>

340.   Gary appealed this decision on October 10, 2012.

341.   BANA responded with two letters.

   a. October 16, 2012 thanked Gary for contacting defendant on October 10, 2012. Within 15 days from the date of the contact, Defendants would respond with a resolution or a status update. See <u>EXHIBIT 12</u>

   b. October 23, 2012 Defendants wrote that they would need an additional time to review and would contact Gary every 15 days. See <u>EXHIBIT 13</u>.

342.   On November 27, 2012, Defendants sent Gary a servicer change letter effective December 16, 2012. See <u>EXHIBIT 14</u>.

343.   The representations made were untrue as evidenced by BANA's letters and verbal statements: claims that the loan modification documents were never received when BANA did receive the documents; letters that requested documents and letters that denied the modification sent on the same day to Gary; letter requested more documents and a claim that Gary had more time to provide documents he had submitted numerous times.

344.   BANA made the representations without any belief that the representations were true evidenced by the BANA customer service representatives and the letters sent to Gary.

345.   The customer service claims and the letters intended to induce Gary's reliance as the statements were made that Gary qualified for the

1  principal reduction program and to send in documents to take advantage of the

2  program.

3      346.   Gary was not aware that BANA's statements were false as BANA

4  had promised loan modifications in the past and had continually lost

5  documents. Gary had provided more documents over and over again until

6  BANA acknowledged receipt of the documents. Gary relied on BANA's claims

7  that he qualified for a principal reduction program and to provide documents for

8  that program.

9      347.   As a result of the reliance on the statements by BANA Gary

10 suffered damage because Gary's loan was never submitted for the principal

11 reduction program. Moreover, Gary could have become current on the loan

12 because the principal reduction program would have forgiven all the late fees,

13 default fees, force placed insurance fees. It would have allowed Gary to

14 refinance the loan with another lender that did not sell its loans on the

15 securitized market.

16     348.   WHEREFORE Plaintiff prays for judgment against BANA and

17 Does 1-30 as hereinafter set forth.

18

19             **TWELTH CAUSE OF ACTION**

20         **MISREPRESENTATION AGAINST SPS**

21     349.   SPS Misrepresentation Facts regarding how SPS handles customer

22 disputes regarding accounts and credit reporting

23     350.   One of the departments that deals with customer disputes regarding

24 inaccurate information furnished to credit reporting agencies is the "Dispute

25 Department" according to Charmae Allen.

26     351.   According to Ms. Allen, SPS does not report credit under any other name

27 than SPS, yet on Mr. Haddock's Experian credit report, a company with SPS' post

28

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A., et al.*, Case No. 2:14-cv-06452-PSG-FFM

office box address reported negative account status- "Liquidation" status of all three of Mr. Haddock's properties. The name of the company was Loan Servicing Center.

352.   Ms, Allen also stated that a borrower cannot contact the Dispute Department directly. A borrower must wait until a representative from the Dispute Department contacts the borrower.

353.   Furthermore, the Dispute Department does not accept internal or external phone calls. Other SPS employees from other departments contact the Dispute Department by email or by fax.

354.   Thus, regarding the who, what, where elements that the heightened pleading standard require are not possible to meet when a Defendant's communication methods are so constrained and only the Defendant has access to the knowledge regarding the facts of communications.

355.   When Ms. Allen w asked why no disputes were notated on Mr. Haddock's credit reports, although all three loans were disputed regarding loan balances, amounts owed and that loans should not be in default-liquidation status when SPS accepted payments on those loans, Ms. Allen offered the following explanation:

356.   Before a dispute can be investigated or reported to a credit reporting agency, or in the reverse, before a dispute from a credit reporting agency can be researched by SPS, the dispute from either the borrower and or the credit reporting agency must be assigned to a dispute representative in the Dispute Department. How long this process takes is not uniform or consistent- Ms. Allen's answer was, "it depends."

357.   The disputes are notated on the account, but that does not trigger any notice to the credit reporting agencies. The same is true when a credit reporting agency sends a dispute notice to SPS. The CRA dispute is notated on the account, but it is not opened at that moment. For borrower disputes, it takes at least seventy-two hours for documents to be imaged regarding disputes. There is also a lapse in the time

from when SPS is notified from a CRA that a borrower is disputing an account because of the assignment process.

358.   The dispute must be open for thirty days in order for the dispute to be reported to the credit reporting agency, or the credit reporting agency is not notified that the borrower disputed the information furnished to the credit reporting agency.

359.   SPS reports to the CRA's n the first of every month. If a dispute is received on the first, or on the five to seven days prior to when SPS reports the account status, the account will not be reported as in dispute by SPS because of the internal assignment process.

360.   If SPS researches the dispute and closes the dispute sooner than the thirty day period, then the information is not reported to the CRA;

361.   The same is true when SPS received a dispute notice from the CRA; SPS simply reports that the dispute is resolved and the information furnished is validated;

362.   However, when SPS was contacted as a follow up on Mr. Haddock's dispute status, the dispute was not actually resolved within the thirty days;  SPS stated that they were still researching tells the dispute; Yet. SPS did not notify the CRA regarding the dispute status of the account.

363.   Gary alleges on information and belief that SPS manipulated its dispute system in order to continually furnish inaccurate credit loan information, while claiming that SPS researched the debt and the reasons for the dispute.

364.   SPS stated misrepresentation regarding the accounts were disputed, there was no reason for the disputed and then closed the account dispute;

365.   SPS offered a dispute resolution that SPS knew would fail;

366.   SPS knew that these statements were false because SPS knew its dispute process as rigged against the borrower being able to dispute the accounts;

367.   SPS manipulated the timing of the dispute process so that accounts disputed by the borrower would never reach a resolution that could be favorable to the borrower;

368.   SPS made statements that Gary relied upon regarding SPS would research and perform the dispute process;

369.   Gary could not have known that the dispute process was rigged because of among other things how SPS timed the dispute process and the reporting of accounts;

370.   Gary was damaged because of inaccurate information reported to the credit agencies, damage to his business, his credit score, interest rates, and impounded loan balances.

### THIRTEENTH CAUSE OF ACTION

### ACCOUNTING AND FOR AN INDEPENDENT THIRD PARTY AUDIT AGAINST BANA, SPS AND DOES 1-30

371.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

372.   Upon information and belief, Defendants owe Gary money for credits for misapplied or non- applied payments, interest, penalties, original loan transfer balances and other fees added to plaintiff's loans.

373.   Pursuant to the Operative Agreements, policies and procedures of state, federal regulations, Gary disputed in writing and by calling Defendants regarding misapplied payments, non-reversals, miscellaneous postings, interest rate charges not disclosed to Gary when the loan originated.

374.   Gary sent numerous written disputes to Defendants Countrywide, Bank of America, ReconTrust and SPS.

375.   The written disputes sent by Gary to Defendants Countrywide, Bank of America, ReconTrust and SPS were sent by fax or were sent by overnight delivery.

376.   Defendants provided the fax numbers and the addresses in order to conduct a review of Gary's account disputes.

377.   Gary faxed and overnight delivery correspondence regarding Gary's account disputes contained copies of payments made for each loan, evidence that the Defendants cashed the checks, written details identifying the correct loan numbers, and dates of the non-applied and misapplied payments.

378.   When Gary phoned Defendants Countrywide, Bank of America and SPS to follow up on the faxed and overnight delivery correspondence, Gary received the following responses:

a. Defendants did not receive the documents even though Gary possessed the fax confirmation and/or the overnight delivery confirmation.

b. Defendants could not locate the documents.

c. Defendants received the documents but some of the documents were missing.

d. Defendants claimed the account was in review but no further response was received.

e. Defendants assigned an account specialist to Gary's account. When Gary called to follow up according to when the account specialist suggested, a new account was assigned to Gary's account. The new account specialist was uninformed regarding the disputed account information, or did not possess the documentation.

f. Gary was required to repeat the process over and over again-recopy, resend and re-explain with no resolution.

g. This repeated process took an enormous amount of Gary's time and caused tremendous frustration and duress to Gary.

379.   The disputed account information is too numerous to detail within this complaint but will be provided at trial.

380.   The following are a few of the numerous account inaccuracies and discrepancies which remain unresolved or unexplained:

• One itemized account history provided by Defendants Countrywide and Bank of America lists over ninety-three "miscellaneous" postings.

• Each account itemization provided by Defendants Countrywide and Bank of America contain multiple types of postings, deficits to escrow accounts without explanation.

1. On other occasions, Gary paid under duress

2. Defendants received cashier's checks to cure the alleged defaulted payments Defendants claimed Gary owed. Although Gary did not owe the amounts demanded, and disputed the default status of his loans, Gary sent the money because he was worn out from Defendant's process. Gary desperately wanted his payment and loan status to be reported accurately to the CRA's. After Defendants received the total amount, the account continued to remain in default status.

8. Gary disputed loan balance transfers repeatedly which Defendants never cured nor did Defendants acknowledge.

10. In 2013, Defendants SPS did not respond or investigate the inaccurate loan amounts when SPS received a Qualified Written Response demand. SPS claimed the demand for information was vague.

13. A letter sent by Gary in 2011 to Defendants Countrywide and Bank of America was replied to by Defendants SPS-TWO YEARS LATER- in January of 2013,. The response repeated the inaccurate accounting Gary disputed in 2011.

381. Gary requested and continues to requests an explanation, but Defendants have not complied.

382. Instead, Defendants continue to send Gary the same document which includes errors, discrepancies, unexplained postings and reasons for default status.

383. Defendants were obligated to provide to Gary accurate statements but have not complied with repeated requests.

384. Defendants recorded notices of default, notices of trustee sales, debt verifications containing inaccurate amounts. SEE EXHIBIT 27.

385. Defendants continue to demand inaccurate amounts and threaten trustee sales if Gary does not pay the inaccurate amounts.

386. Defendants continue to report incorrect default amounts to credit reporting agencies, damaging Gary's credit repeatedly.

387.   Therefore, an accounting is required to determine the accurate loan amounts.

388.   Gary seeks and independent third party audit of Defendants' books regarding Gary's loans.

389.   WHEREFORE, said Plaintiffs pray for judgment against Defendants as hereinafter set forth.

## FOURTEENTH CAUSE OF ACTION
## VIOLATION OF RESPA 12 UNITED STATES CODE
## § 2601, et seq. AGAINST SPS AND DOES 1-30

390. Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

391. Gary's loans for 13001Washington Blvd., 13007 Washington Blvd and 4424 Lindblade Drive are federally related mortgage loans within the meaning of RESPA, 12 United States Code § 2601, et seq.,(RESPA).

392. RESPA regulates the real estate settlement process and the servicing of mortgage loans.

393. Defendant SPS is a mortgage servicer, regulated by RESPA, and services Gary's loans for 13001 and 13007 Washington Boulevard, 4424 Lindblade Drive.

394. Section 2601   requires a servicer to respond to a qualified written response within 60 days.

395. Pursuant to 12 U.S.C. § 2605(e)(1)(A), SPS was supposed to send notification within 5-days that SPS received the qualified written request.

396. After SPS began servicing Gary's three loans in January 2013, Gary sent written correspondence regarding the servicing of the loans and disputed the account balances on the loans. In addition, Gary requested an accounting of the loans. Gary did not receive an acknowledgement or a response to the accounting request even though Gary as borrower included his name, account number, property address.

397. The written servicing requests were sent to SPS throughout 2013 thru 2014: A partial list of the written requests is as follows:  January 2013; February 2013; March 2013; April 2013; May 30, 2013; July 2, 2013; July 16, 2013; August 30, 2013; November 6, 2013; November 12, 2013; December 13, 2013; June 30, 2014; July 5, 2014; July 7, 2014.

398. All written requests included Gary's name as borrower, the account number, the property address and sought information regarding the servicing of the loan:         requested corrected accounting and along with a reasonable reason for the request, disputed loan amounts owed along with a reasonable reason for the dispute, disputed misapplied payments by the current servicer and requested the status and/or location of checks sent to SPS but ones that had not been returned by SPS.

399. SPS' acknowledgment responses were inconsistent: Sometime SPS responded with an acknowledgement of the written response and other times SPS did not; When SPS did acknowledge the written request it was not always in 5-days of the request.

400. SPS did not respond within the 60-day period as required. Instead, SPS' responses formed a pattern of non-compliance. The following examples are not a complete list:

- In response to one of the requests for accounting and disputed loan amounts, in April 2013 SPS sent Gary a request for a certified copy of a death certificate because SPS claimed a deceased person's name appeared on the loans. However, one can see by the Security agreements, only Gary's name appeared on the loans. At no time was any other party, person, entity added to the loans. However, the April 26, 2013 letter stated: *"Select Portfoloi Servicing, Inc., (SPS)…… received notification that one or more of the borrowers on this account is deceased."* [EXHIBIT        ]

- Up through 2014, just prior to the filing of the original complaint, SPS thought Gary was deceased; After speaking to Gary on numerous occasions in 2013 and 2014, SPS continued to categorize Gary as a deceased borrower;

- When written Qualified written responses were requested, SPS refused to answer because they did not believe the correspondence met the criteria of a qualified written response, even though the letter had been written in accordance with the Consumer Financial Protection Bureau guidelines and also followed the guidelines set forth in the 9th Circuit case, Medrano v. Flagstar Bank, No. 11-55412;

- In other instances, no response was received and/or the response contained information sent previously and left out the requested servicing information repeatedly;

- Sometimes SPS sent accounting information which contained unexplained miscellaneous fees and deductions. When follow up requests were made to SPS to identify the nature of the fees, SPS did not respond.

401.   Damage: As a direct and proximate result of SPS' conduct, Gary has suffered *actual* pecuniary damages that include, but are not limited to, the over calculation and overpayment of interest on Gary's loans, the costs of repairing Gary's credit, the reduction and/or elimination of Gary's credit limits, and attorneys' fees and costs, in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

## VIOLATION OF RESPA 12 U.S.C. § 2601§ 6(e)(3) by SPS AND DOES 1-30

402.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

403.   Gary's loans for 13001 Washington Blvd., 13007 Washington Blvd and 4424 Lindblade Drive are federally related mortgage loans within the meaning of RESPA, 12 United States Code § 2601, et seq.,(RESPA).

404.   RESPA regulates the real estate settlement process and the servicing of mortgage loans.

405.   Defendant SPS is a mortgage servicer, regulated by RESPA, and services Gary's loans for 13001 and 13007 Washington Boulevard, 4424 Lindblade Drive.

Section 2601 6 (e) 3 of RESPA states in part: During the 60-day period after the qualified written request is made, RESPA expressly protects the borrower from reports by the servicer to a consumer reporting agency. The relevant provision states as follows: *"During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency...."* (12 U.S.C. § 2605(e)(3).)

406.   SPS furnished adverse account information to the credit reporting agencies during the 60-day period while a qualified written response was pending.

Furthermore, repeated requests were made to SPS to refrain from furnishing negative credit information to the credit agencies, (Equifax, Experian, Transunion) while the accounts were in dispute during the 60-day period.

407.   SPS repeatedly refused to stop furnishing negative credit information to the agencies during the 60-day time period while written servicing requests were pending:  The written servicing requests were sent to SPS throughout 2013 thru 2014: A partial list of the written requests is as follows:  January 2013; February 2013; March 2013; April 2013; May 30, 2013; July 2, 2013; July 16, 2013; August 30, 2013; November 6, 2013; November 12, 2013; December 13, 2013; June 30, 2014; July 5, 2014; July 7, 2014.

408.   All written requests included Gary's name as borrower, the account number, the property address and sought information regarding the servicing of the loan:  requested corrected accounting and along with a reasonable reason for the request, disputed loan amounts owed along with a reasonable reason for the dispute,

disputed misapplied payments by the current servicer and requested the status and/or location of checks sent to SPS but ones that had not been returned by SPS.

409.   SPS failed to make appropriate corrections to Gary's account, including the crediting of any late charges or penalties.

410.   In one letter, SPS claimed they notified the credit reporting agencies, but it was the agencies that failed to make the corrections but SPS did not provide proof of that claim.

411.   Damage: As a direct and proximate result of SPS' conduct, Gary has suffered *actual* pecuniary damages that include, but are not limited to, the over calculation and overpayment of interest on Gary's loans, the costs of repairing Gary's credit, the reduction and/or elimination of Gary's credit limits, and attorneys' fees and costs, in an amount to be proven at trial.

## FRAUD CAUSES OF ACTION

## SIXTEENTH CAUSE OF ACTION

## FRAUD AGAINST BANA REGARDING FORCE PLACED INSURANCE AND DOES 1-30

412.   Gary refers to all preceding paragraphs and incorporates them as if set forth in full in this cause of action.

413.   BANA's Bank of America Insurance Specialist Miguel Ortiz, (Employee Number 103242) located at the Chandler, Arizona call center provided the following information regarding the FPI policies. According to Mr. Ortiz, there were over TWENTY FPI policies placed on Gary's one property, a fourplex. Some of the coverage terms of the policies were backdated.

414.   Beginning in 2010 through December 2011, Gary's made his loan payments in accordance with the security agreements.

415.   Those loan payments were not applied to his loans but instead diverted as payments for hazard insurance policies.

416.   Gary did not understand why his loan payments were not applied to his monthly payment.

417.   Gary called the BANA customer service which informed him that his loan payments were being used to pay for insurance policies.

418.   Gary explained that   represented to Gary that he was required to pay for force-placed hazard insurance, not withstanding that Gary already had such insurance currently in place on his three properties.

419.   These false representations were continual throughout the time period between 2010 and 2012.

420.   Gary never received any written or oral notice of the existence of force placed insurance. He only discovered its existence when he noticed that his loan payment invoices reflected deductions for insurance. When he inquired as to the reasons for the deductions, he was told for the first time that it was for hazard insurance which was required because his insurance had lapsed. BOA's continued to deduct for these unnecessary policies month after month.

421.   BANA knew that they had no reasonable basis for making these misrepresentations and material omissions and intended to induce Gary to rely upon them.

422.   BOA's knew, for example, that because there was only one structure for each of the Washington properties, the multiple forced-place insurance policies for each of the four units, over twenty policies- provided no coverage. As another example, they knew that Gary was responsible for paying for the hazard insurance, which is why no escrow account was created for Gary's loans, yet without notice, an escrow account was created for purposes of deducting Gary's loan payments for force placed policies that were not needed. A further example, they knew Gary carried hazard insurance because Gary sent proof to the insurance department numerous times, which BOA's claimed they lost or never received.

423.   The force placed policies were duplicative, unnecessary and backdated.

424.   As a direct and proximate result of BOA's intentional and material misrepresentations and omissions, Gary suffered damages in the form of premiums paid against his will, and he will continue to suffer such damages for so long as the deducted loan amounts appear on his loan balances.

425.   The BOA's created a force placed insurance scheme in conjunction with Balboa, a wholly owned third party subsidiary of BOA and then its successor in interest, QBE to increase its profits by charging its borrowers for unnecessary, duplicative and backdated hazard insurance thereby extracting additional fees and other charges on these captive borrowers.

426.   These schemes were exposed in the New York Financial Services 2011 consent order regarding, "In the Matter of Balboa Insurance Company, Meritplan [see exhibit ===] which Gary did not learn about until 2013 when the New York Financial Affairs Department released a press release regarding the final settlement between Defendants.

427.   BANA's conduct described herein was calculated to cause injury to Gary and/or was despicable conduct carried out with a willful and conscious disregard of his rights. Said conduct subjected Gary to cruel and unjust hardship in conscious disregard of his rights and/or was an intentional misrepresentation, deceit or concealment of material facts known to defendants with the intention to deprive Gary of property, legal rights or to otherwise cause injury. Said conduct thus constitutes malice, oppression or fraud under California Civil Code section 3294, thereby entitling Gary to punitive damages in an amount appropriate to punish or set an example of defendants.

## SEVENTEENTH CAUSE OF ACTION

## CONSPIRACY TO DEFRAUD AGAINST THE BANA AND THE BALBOAS AND DOES 1-30

428.   Gary refers to all preceding paragraphs and incorporates them as if set forth in full in this cause of action.

429.   Defendants forged an alliance for the purpose of force-placing insurance that extracted excessive revenue from borrowers such as Gary.

430.   Defendants conspired to create a scheme to impose force-placed insurance on the captive borrowers of the BOA's.  Defendants determined the terms and conditions for the force-placed insurance without taking into account the interests of borrowers such as Gary. These terms and conditions incorporated the payment of commissions to the benefit of Defendants at the expense of consumers such as Gary. BOA's commissions were funded by overpriced premiums, a percentage of which was not paid to cover actual risk. The overpriced commissions were paid to BOA's insurance companies, the Balboas,, the Insurance defendants,  that knew or should have known that the policies they issued were excessive , unnecessary and unenforceable. The policies were duplicative, unnecessary and backdated.

431.   Gary was damaged by the wrongful acts of defendants pursuant to the conspiracy, as he was forced to pay for excessive, unnecessary and unenforceable force-placed insurance policies.

432.   Defendants' conduct described herein was intended to cause injury to Gary and/or was despicable conduct carried out with a willful and conscious disregard of his rights. Said conduct subjected Gary to cruel and unjust hardship in conscious disregard of his rights and/or was an intentional misrepresentation, deceit or concealment of material facts known to defendants with the intention to deprive Gary of property, legal rights or to otherwise cause injury. Said conduct thus constitutes malice, oppression or fraud under California Civil Code section 3294, thereby entitling Gary to punitive damages in an amount appropriate to punish or set an example of defendants.

433.   Gary did not know Defendants were engaged in deliberate activities to maximize their profits. Gary only became aware of this when the New York Financial Services Department and Governor Cuomo released a press statement regarding the

settlement between Defendants and the State of New York. [Please see EXHIBIT     ]

434.   Thus, Gary pleads the delayed discovery doctrine for this cause of action.

## EIGHTEENTH CAUSE OF ACTION

## FAIR DEBT COLLECTION PRACTICES ACT AGAINST SPS SERVICER AND SPS COLLECTION AGENCY AND DOES 1-30

435.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

436.   SPS is a debt collector pursuant to the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C.A. § 1692a(6), (6)(F).

437.   As a mortgage servicer SPS  "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." § 1692a(6).

438.   SPS also is in the business of debt collection and has a separate corporation as a collection agency, Select Portfolio Servicing, Collection Agency;

439.   SPS also collects debts in the name of Loan Servicing Center which was the name that appeared on Gary's Equifax credit report.

440.   SPS did not originate this debt.

441.   SPS is not a creditor under § 1692a(4); SPS was not assigned the debt but instead received the servicing as part of a settlement in class action litigation against the former servicer, Bank of America, N.A.

442.   SPS began servicing Gary's three loans when the loans were alleged to be in default.

443.   At the time took over the servicing of Gary's loans, all 3 loans were in default status.

444.   [we dispute the authenticity of assignments recorded in 2011, which allowed the prior servicer Bank of America, N.A. to record notices of default and trustee sale notices, but for the sake of this claim, we will plead that the loans for all

purposes without waiving our right to challenge the authenticity of the recorded documents] ;

445.   SPS has made false and misleading statements regarding Gary's loans, namely:

a.   claiming Gary's loans were late, by claiming to Gary that he owed loan amounts he did not owe and by sending notices that the loans were in default when the loans should not have been in default.

b.   Sometime, SPS received and accepted payments and therefore the loans should not have been late and SPS should have refrained from debt collection practices.

c.   SPS knew by the communications from Gary that the loans were in such dispute that it should have refrained from collection practices until an appropriate accounting could have been completed;

d.   SPS in its collection and acceptance of payments from Gary for the 13001 and 13007 Washington property loans receives the payments, processes the payments and in numerous instances did not return the payments for over twenty days, and sometimes longer. {Plaintiff is in the process of compiling a list of payments sent to SPS which will include dates of when payments were returned later]

e.    SPS misrepresented to Gary SPS status of Gary's disputes regarding loan balances and continued to send Gary notices that Gary's loan was in default.

f.   SPS misrepresented to Gary that SPS would research the disputed loan amount and furnish accurate information to the CRA's., but so far Gary has not obtained any information regarding the research.

g.   SPS continued to furnish disputed loan information to the CRA's while the loans were in dispute;

h.  SPS continued to furnish disputed loan information to the CRA's in violation of RESPA's 60- day period while loan accounts are in dispute

## NINETEENTH CAUSE OF ACTION
### (Violation of Cal. Civ. Code § 1785.25)AGAINST SPS AND DOES 1-30

446.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

447.   Cal. Civ. Code prohibits any person from furnishing information to a credit reporting bureau that such person knows or should know is incomplete or inaccurate.

448.   Defendants SPS and Does 1 through 30 willfully and intentionally violated Cal. Civ. Code § 1785.25 by providing incomplete and inaccurate information concerning Gary to various consumer credit reporting agencies.

449.   Gary is entitled to relief for said defendants' misconduct under Cal. Civ. Code § 1785.31, including actual damages, court costs, loss of wages, attorneys' fees, pain and suffering, punitive damages, and injunctive relief.

450.   As a direct result of said defendants' breach, Gary has been injured in his business and reputation. Plaintiff's damages are not yet ascertained but are believed to exceed the sum of $4,000,000.00

451.   Gary has also suffered pain and suffering in the amount of $150,000.00.

452.   Gary  is also entitled to an award of statutory punitive damages in the amount of $5,000.00 for each violation committed by defendants BANA and Does 1 through 30.

## TWENTIETH CAUSE OF ACTION
### (Violation of 15 U.S.C. § 1681n) AGAINST SPS AND DOES 1-30

453.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

454.   Defendants SPS and Does 1 through 30 are furnishers of credit information subject to the Fair Credit Reporting Act ("'FCRA''), 15 U.S.C. §§ 1681 *et seq.*

455.   The FCRA requires that each of these defendants accurately report credit information about consumers to credit reporting agencies, report the existence of any dispute about any allegedly delinquent charges, and promptly verify and correct any contested information provided by them to a credit reporting bureau.

456.   Said defendants have willfully failed to comply with the requirements of the FRCA with regard to the furnishing of information about plaintiff in violation of 15 U.S.C. § 1681n. On information and belief, BANA has consistently reported plaintiff's account as being seriously delinquent without noting that the validity of the debt is disputed. Such false and misleading reporting of the alleged debt has occurred from in or about February 2013 through the present time.

457.   The doctrine of accrual and equitable tolling should apply to this cause of action.

458.   Gary is entitled to recover actual damages of $1,000, punitive damages, costs of suit, and reasonable attorneys' fees.

### TWENTYFIRST CAUSE OF ACTION
### (Violation of 15 U.S.C. § 1681o) AGAINST SPS AND DOES 1-30

459.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

460.   Defendants SPS and Does 1 through 30  are furnishers of credit information subject to the Fair Credit Reporting Act ("'FCRA''), 15 U.S.C. §§ 1681 *et seq.*

461.   The FCRA requires that these defendants accurately report credit information about consumers to credit reporting agencies, report the existence of any

dispute about any allegedly delinquent charges, and promptly verify and correct any contested information provided by them to a credit reporting bureau.

462.   On information and belief, such defendants have negligently failed to comply with the requirements of the FRCA with regard to the furnishing of information about plaintiff in violation of 15 U.S.C. § 1681o. On information and belief, BANA has consistently reported plaintiff's account as being seriously delinquent without noting that the validity of the debt is disputed. Such false and misleading reporting of the alleged debt has occurred from in or about February 2013 through the present time.

463.   The doctrine of accrual and equitable tolling should apply to this cause of action.

464.   Gary is entitled to recover actual damages, costs of suit, and reasonable attorneys'

## TWENTYSECOND CAUSE OF ACTION
## (Violation of Cal. Civ. Code § 1785.25) AGAINST BANA AND DOES 1-30

465.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

466.   Cal. Civ. Code prohibits any person from furnishing information to a credit reporting bureau that such person knows or should know is incomplete or inaccurate.

467.   Defendants BANA, (Bank of America N.A.  and Does 1 through 30 willfully and intentionally violated Cal. Civ. Code § 1785.25 by providing incomplete and inaccurate information concerning Gary to various consumer credit reporting agencies.

468.   Gary is entitled to relief for said defendants' misconduct under Cal. Civ. Code § 1785.31, including actual damages, court costs, loss of wages, attorneys' fees, pain and suffering, punitive damages, and injunctive relief.

469.   As a direct result of said defendants' breach, Gary has been injured in his business and reputation. Plaintiff's damages are not yet ascertained but are believed to exceed the sum of $4,000,000.00

470.   Gary has also suffered pain and suffering in the amount of $150,000.00.

471.   Gary  is also entitled to an award of statutory punitive damages in the amount of $5,000.00 for each violation committed by defendants BANA and Does 1 through 30.


**TWENTTHIRD CAUSE OF ACTION**
**(Violation of 15 U.S.C. § 1681n) AGAINST BANA AND DOES 1-30**

472.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

473.   Defendants BANA and Does 1 through 30 are furnishers of credit information subject to the Fair Credit Reporting Act (""FCRA''), 15 U.S.C. §§ 1681 *et seq.*

474.   The FCRA requires that each of these defendants accurately report credit information about consumers to credit reporting agencies, report the existence of any dispute about any allegedly delinquent charges, and promptly verify and correct any contested information provided by them to a credit reporting bureau.

475.   Said defendants have willfully failed to comply with the requirements of the FRCA with regard to the furnishing of information about plaintiff in violation of 15 U.S.C. § 1681n. On information and belief, BANA has consistently reported plaintiff's account as being seriously delinquent without noting that the validity of the debt is disputed. Such false and misleading reporting of the alleged debt has occurred from in or about August 2010 through the present time.

476.   The doctrine of accrual and equitable tolling should apply to this cause of action.

477.   Gary is entitled to recover actual damages of $1,000, punitive damages, costs of suit, and reasonable attorneys' fees.

## TWENTYFOURTH CAUSE OF ACTION
### (Violation of 15 U.S.C. § 1681o) AGAINST BANA AND DOES 1-30

478.   Gary re-alleges and incorporates all preceding paragraphs as though set forth in full in this cause of action.

479.   Defendants BANA and Does 1 through 30  are furnishers of credit information subject to the Fair Credit Reporting Act (""FCRA''), 15 U.S.C. §§ 1681 *et seq.*

480.   The FCRA requires that these defendants accurately report credit information about consumers to credit reporting agencies, report the existence of any dispute about any allegedly delinquent charges, and promptly verify and correct any contested information provided by them to a credit reporting bureau.

481.   On information and belief, such defendants have negligently failed to comply with the requirements of the FRCA with regard to the furnishing of information about plaintiff in violation of 15 U.S.C. § 1681o. On information and belief, BANA has consistently reported plaintiff's account as being seriously delinquent without noting that the validity of the debt is disputed. Such false and misleading reporting of the alleged debt has occurred from in or about August 2010 through the present time.

482.   The doctrine of accrual and equitable tolling should apply to this cause of action.

483.   Gary is entitled to recover actual damages, costs of suit, and reasonable attorneys'

## TWENTY-FIFTH CAUSE OF ACTION VIOLATION OF CIVIL CODE § 2955.5 AGAINST BANA AND DOES 1-30

484. Gary refers to all preceding paragraphs and incorporates them as if set forth in full in this cause of action.

485. As a condition for maintaining his loan, Gary was forced to pay for hazard insurance in an amount exceeding the replacement value of improvements made on his property.

486. BANA failed to disclose to Gary, in writing, the provisions of Civil Code § 2955.5.

487. Gary has been harmed by being made to pay premiums on force-placed hazard insurance that insures a nonexistent risk.

488. Gary is still paying for the amount exceeding the replacement value of improvements because some of the amounts he was charged are still on his loan amounts and have not been refunded.

489. Gary is entitled to injunctive relief, damages for his harm and reasonable attorney fees in asserting this cause of action.

/ / /

/ / /

/ / /

/ / /

/ / /

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiff prays for judgment as follows:

3      1.     For general and special damages according to proof at trial;

4      2.     For past and future general damages, according to proof;

5      3.     For past and future loss of earnings according to proof;

6      4.     For prejudgment interest on all damage- as is allowed In the laws of the
7 State of California;

8      5.     For punitive and exemplary damages against defendant BANA,
9 BALBOA AND SPS DEFENDANTS AND DOES 1-30 and Inclusive, according to
10 proof at trial;

11      6.     For attorney's fees where authorized by statute or law;

12      7.     For costs of suit;

13      8.     For past and future costs of suit incurred herein;

14      9.     For civil penalties and such other penalties per each separate violation as
15 authorized by statute;

16      10.    For such other and further relief as the Court may deem just and proper,
17 including prejudgment interest;

18      11.    Plaintiff demands an individual trial by jury on all issues which may be
19 tried by a jury;

20      12.    For injunctive relief; Gary requests immediate injunctive relief to stop all
21 inaccurate accounting, credit furnishing and credit reporting of his loans. As a result
22 of Defendants' conduct, Gary faces the likelihood of substantial and immediate,
23 irreparable harm. Gary's remedies at law are insufficient to protect him from current
24 and or future harm. Accordingly, Gary seeks an injunction requiring each of
25 Defendants to permanently cease and desist the dissemination of credit information
26 that is inaccurate or obsolete. Gary requests injunctive relief to prevent Defendants
27 from furnishing inaccurate loan, payment and credit history to the credit reporting
28 agencies and demands an independent third party audit examining Defendant's

1   records.

2       13.    For preservation of ALL documents.

3       14.    To add causes of actions and or amend causes of action due to

4   Defendants' concealment of facts.

5       15.    For expedited discovery.

6

7

8   DATED: February 2, 2015          Respectfully submitted,

9                                    LAW OFFICES OF

10                                   CHRISTOPHER P. BLAXLAND

11                                   By: */s/ Christopher P. Blaxland*

12                                   Christopher P. Blaxland

13                                   Attorney For Plaintiff Gary Craig Haddock

14

15  DATED:  February 2, 2015         TERESA STRALEY LAW

16                                   By: */s/ Teresa Straley Silverlight*

17                                   Teresa Straley Silverlight

                                     Attorney For Plaintiff Gary Craig Haddock
18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT
*Gary Craig Haddock v. Countrywide Bank, N.A, et al.*, Case No. 2:14-cv-06452-PSG-FFM