SHINAAN S. KRAKOWSKY [SBN 100972]
HAYES F. MICHEL [SBN 141841]
Krakowsky Michel
1925 Century Park East, Suite 2050
Los Angeles, CA 90067
Tel: (310) 277-0262
Email: ssk@krakowskymichel.com
Email: hmichel@krakowskymichel.com


TERESA STRALEY SBN 248299
Teresa Straley Law
5556 South Centinela Avenue, Suite 8
Los Angeles, California 90066
Telephone:   (310) 339-8815
Email: Teresa@tstraleylaw.com

CHRISTOPHER P.  BLAXLAND SB# 188554
Law Offices of Christopher P. Blaxland
1334 Park View Avenue, Suite 100
Manhattan Beach, CA 90266
(310) 937-7270
Email: cpblaxland@earthlnk.net

Attorneys for Plaintiff
GARY CRAIG HADDOCK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CRAIG HADDOCK, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTRYWIDE BANK, N.A., COUNTRYWIDE HOME LOANS, INC; [Caption Continued On Following Page] COUNTRYWIDE FINANCIAL | CASE NO. 2:14-cv-06452-PSG-FFM <br> Honorable Philip S. Gutierrez <br><br> **THIRD AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1

CORPORATION; BANK OF AMERICA, )
N.A.; BAC HOME LOAN SERVICING, )
L.P.; THE BANK OF NEW YORK )
MELLON fka The Bank of New York as )
Trustee for the Holders of CWALT, INC., )
ALTERNATIVE LOAN TRUST 2007- )
OA4 Mortgage Pass-through Certificates, )
Series 2007-OA4; )
MERITPLAN INSURANCE COMPANY; )
NEWPORT INSURANCE COMPANY; )
BALBOA INSURANCE COMPANY; )
QBE FIRST INSURANCE AGENCY; )
SELECT PORTFOLIO SERVICING, )
INC. )

                    Defendants. )

THIRD AMENDED COMPLAINT

# I.

## NATURE OF THE ACTION

1.     This case arises from three loans that Plaintiff Gary Craig Haddock ("Plaintiff") refinanced with Countrywide Bank, each secured by real property. As this Third Amended Complaint ("TAC") makes clear, Plaintiff continued to make all of the payments required by the loans, and, at all relevant times carried contractually-sufficient insurance coverage on the three properties. Despite the fact that he was in full compliance with his obligations under the loan agreements, Plaintiff was wrongfully charged for the purchase of over twenty (20) force placed insurance ("FPI") policies and further charged for fees, penalties, interest and other miscellaneous charges resulting from these FPI purchases. The issuance of these unauthorized and wrongful FPI policies predictably resulted in loan account balances that increased exponentially, all three loans being placed in default, and each of the properties securing those loans being foreclosed upon.

2.     Plaintiff immediately tried to resolve the problem, but the lender defendants and their loan service companies misled Plaintiff with promises of proposed resolutions but instead never followed through with those promised resolutions. Rather, Plaintiff was forced to deal with a carousel of service representatives, constantly being required to deal with someone new who knew little or nothing about his concerns, and who requested him to resend his proof of prior

insurance over and over. Then, in the middle of what Plaintiff thought to be other potential resolutions, servicing of the three loans was transferred. The accounting inaccuracies, default statuses, misleading statements were also transferred with Plaintiff loans and continued with the new loan servicer.  During the entire time, despite knowing that the Plaintiff's loan account status was in dispute, the lender and loan service defendants furnished inaccurate account information to the credit reporting agencies, with disastrous results to Plaintiff. All other avenues of possible resolution having failed, Plaintiff has filed this action.

3.     Based on the conduct as described herein, Plaintiff asserts claims against Defendants for the following claims for relief: (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200); (4) Estoppel; (5) Unjust Enrichment/Restitution; (6) Accounting; (7) Real Estate Settlement Procedures Act (12 U.S.C. § 2601); (8) Fair Debt Collection Practices Act (15 U.S.C. § 1692a); (9) Cal. Civ. Code § 1785.35; (10) Fair Credit Reporting Act (15 U.S.C. §§ 1681n, 1681o).[1]

---

[1] Pursuant to this Court's Order dated June 2, 2016 [Doc. 172], the following revisions have been made in this TAC: (a) Balboa Insurance Company is no longer a defendant in the Fourth and Seventh Claims nor is it included as one of the "FPI Defendants"; (b) Bank of New York Mellon is no longer a defendant in the First and Second claims; (c) the Fifth, Ninth and Eleventh (§1785.25(f) only) Claims make explicit that they have been dismissed without leave to amend; and (d) **only** the Twelfth and Thirteenth Claims have been amended.  Other than these changes, no substantive revisions have been made in order to ensure that the TAC is as similar to the SAC as practicable.

## II.
## <u>JURISDICTION AND VENUE</u>

4.     This Court has jurisdiction under 28 U.S.C. § 1331 as the complaint contains claims arising under the laws of the United States. The Court also has supplemental jurisdiction over related claims pursuant to 28 U.S.C § 1367 (a). Venue is proper in this district under 28 U.S.C. § 1391 (b) because defendants regularly conduct business in this district and/or a substantial part of the events giving rise to the claims occurred in this district.

## III.
## <u>PLAINTIFF</u>

5.     Plaintiff GARY CRAIG HADDOCK ("Plaintiff") is, and at all times herein mentioned was, a resident of Los Angeles County, California, citizen of the State of California, and a "person" within the meaning of Cal. *Bus. & Prof. Code* § 17204. Plaintiff has owned the three properties relevant to this matter since the mid-1980's and refinanced the properties with Countrywide Bank in 2007.

## IV.
## <u>DEFENDANTS</u>

6.     For  organizational convenience, the Defendants are divided into three groups: The Bank of America Defendants, ("BOA Defendants"); The Force Placed

Insurance Defendants, ("FPI Defendants"); and the New Loan Servicing Company

defendant, Select Portfolio Servicing ("SPS").

## V.

## THE  BOA DEFENDANTS

7.     Defendant COUNTRYWIDE BANK, N.A. ("Countrywide Bank") is a

National Banking Association with its principal place of business in Calabasas,

California. Countrywide Bank refinanced Gary's existing loans pursuant to the three

Security Agreements dated February 12, 2007 at issue herein (collectively referred to

as the "Security Agreements"). [Exhibits 1, 2, 3]. On information and belief,

Countrywide Bank merged into Bank of America Home Loans, LP., effective on or

about April 27, 2009.[2]

8.     Defendant COUNTRYWIDE HOME LOANS, INC. ("Countrywide

HL"), believed to be a wholly-owned subsidiary of Countrywide Financial

Corporation, is a corporation organized under the laws of the State of New York with

its principal place of business in Calabasas, California. Countrywide HL was the

---

[2] Exhibit 1 is the Security Agreement for the property located at 13007 West
Washington Blvd., Culver City, CA 90066, a four unit building sometimes referred to
as a "four-plex" ("13001 Security Agreement"). Exhibit 2 is the Security Agreement
for the property located at 13001 West Washington Blvd., Culver City, CA 90066,
also a "four-plex" ("13007 Security Agreement"). Exhibit 3 is the Security Agreement
for the property located at 4424 Lindblade Drive, Los Angeles, CA 90066, a single
family residence ("4424 Security Agreement").

All Exhibits attached to this TAC are true and correct copies of the referenced
document, and all Exhibits are incorporated herein by reference.

original servicer of the Security Agreements. On information and belief, Countrywide HL originated and serviced residential home mortgage loans by itself or through its subsidiaries. After the merger with Bank of America on July 1, 2008,  Countrywide HL operated under the trade name "Bank of America Home Loans, LP."

9.      Defendant COUNTRYWIDE FINANCIAL CORPORATION ("Countrywide FC") is a corporation organized under the laws of the State of Delaware with its principal executive offices in Calabasas, California. On information and belief, Countrywide FC, by itself and through its subsidiaries, engaged in mortgage lending and other real estate finance-related businesses, including mortgage lending, securities dealing, and insurance underwriting.  Countrywide FC was the corporate parent of the two other Countrywide defendants named herein. (Countrywide Bank, Countrywide HL and Countrywide FC will occasionally be referred to herein as the "Countrywide Defendants"). On information and belief, Countrywide FC was merged into a subsidiary of Bank of America Corporation on July 1, 2008.

10.      Defendant BANK OF AMERICA, N.A. ("BOA") is a federally-insured financial institution and Bank of America's principal banking subsidiary. On information and belief, BOA participated in Bank of America's acquisition of substantially all of Countrywide FC through a series of transactions that commenced on July 1, 2008. Together with Bank of America Corporation, BOA is a successor-in-interest to the Countrywide Defendants.

11.     Defendant BAC HOME LOANS SERVICING, LP ("BOA Home Loans") (formerly known as Countrywide Home Loans Servicing, LP) is a limited partnership with its principal place of business in Calabasas, California. On information and belief, BACHLS services mortgage loans and provides mortgage services, including conducting foreclosures on mortgages, on behalf of holders of residential mortgages and mortgage loan asset-backed certificates.

12.     Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE HOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA4 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA4 ("BNYM"). Pursuant to the assignment documents recorded regarding the three subject properties at issue herein, the Security Agreements and underlying debt obligations were all purportedly assigned to BNYM. [Exhibits 4, 5, 6, 7].[3] However, the authenticity of these assignments is questionable.[4]

---

[3] Exhibit 4 is the purported assignment for the 13001 Washington property and is dated August 2, 2011 ("13001 Washington Assignment"); Exhibit 5 is the purported assignment for the 4424 Lindblade property and is dated August 11, 2011 ("4424 Lindblade Assignment"); Exhibits 6 and 7 are both purported assignments for the 13007 Washington property and they are dated November 4, 2011 and November 21, 2011, respectively. (These two Exhibits will occasionally be referred to as the "13007 Washington Assignments"). It is unclear why two separate purported assignments were necessary to be recorded for this property.

[4] By way of example, on or about September 21, 2012, Plaintiff received a "Debt Validation Notice" relating to the 13007 Washington Agreement which stated that the creditor to whom the debt was owed was "Bank of America, NA" (BOA herein) [Exhibit 8]. This directly conflicts with the two 13007 Washington Assignments

On information and belief, all four assignments described herein were robo-signed;

two of the four notaries are no longer active; and one of the inactive notaries served

time in California State Prison for felonies including embezzlement and forgery.[5]

13.   Defendants Countrywide Bank, Countrywide HL, Countrywide FC,

BOA, BOA Home Loans and BNYM will be collectively referred to herein as the

"BOA Defendants."

## VI.
## THE FPI DEFENDANTS

14.   Defendant MERITPLAN INSURANCE COMPANY ("Meritplan") is a

California corporation located in Irvine, CA. According to paragraphs 9, 10 and 11 of

the Declaration submitted by John Meadows dated March 24, 2015 in support of

Meritplan's Motion to Dismiss ("Meadows Declaration") [Doc. 118, ¶¶ 9-12],

Meritplan issued most of the force placed insurance policies under which the 13001

Washington, 13007 Washington, and 4424 Lindblade Drive properties were

wrongfully insured, ultimately resulting in Plaintiff's alleged default of the three

Security Agreements and the foreclosure of the three properties.

---

allegedly signed in November 2011 (almost one year earlier) purporting to transfer the
13007 Washington Agreement to the "Bank of New York Mellon" (BNYM herein).

[5] Should these assignments be invalid, the actions taken by BNYM and/or its loan
servicing entities relating to the Security Agreements would also be invalid, resulting
in additional potential liability. Plaintiff reserves his right to seek leave to amend
should any such additional claims be discovered.

15.     Defendant NEWPORT INSURANCE COMPANY ("Newport") is an Arizona corporation with corporate offices in Irvine, CA. According to paragraph 12 of the Meadows Declaration, Newport issued the balance of the force placed insurance policies under which the 4424 Lindblade Drive property was wrongfully insured, ultimately resulting in Plaintiff's alleged default of the 4424 Lindblade Agreement and the foreclosure on that property.

16.     Former Defendant BALBOA INSURANCE COMPANY ("Balboa") is a California corporation with its headquarters in Irvine, California and was formerly a subsidiary of Defendant Bank of America. Bank of America sold virtually all of its insurance assets and liabilities to QBE Insurance Group on June 2, 2011. The sale included long term distribution agreements with Bank of America in connection with the force placed insurance program. [BALBOA IS NO LONGER INCLUDED IN THE "FPI DEFENDANTS"].

17.     Defendant QBE FIRST INSURANCE AGENCY ("QBE First") is a Delaware Corporation with its headquarters in Atlanta Georgia. QBE First assumed servicing and administrative functions in connection with force placed insurance from Balboa after QBE Insurance Corporation purchased Balboa's force placed business in or around June 2011.

## VII.

## THE NEW LOAN SERVICING COMPANY

18.     Defendant SELECT PORTFOLIO SERVICES, INC. ("SPS") is a Utah Corporation registered to do business in California, and is the current servicer of the three Security Agreements.

19.     At all times herein mentioned, Defendants were each authorized to do business within the State of California and did in fact supply the aforementioned residential loan products and services within the State of California.

## VIII.
## THE ROLE OF EACH DEFENDANT

### A.     The BOA Defendants

20.     Countrywide Bank was the lender of the three loans reflected in the 13007 Security Agreement, the 13001 Security Agreement, and the 4424 Security Agreement. [Exhibits. 1, 2, 3].

21.     Countrywide HL was the original servicing company of the three above named Security Agreements.

22.      Countrywide FC, on information and belief, was the corporate parent of Countrywide Bank and Countrywide HL.

23.     BOA become the "Lender" under the three Security Agreements following its purchase of Countrywide FC.[6]

24.     BOA is also the successor in interest to Countrywide Bank. Based on information and belief, on April 23, 2009, the Office of the Comptroller of the Currency approved Countrywide Bank's request to convert its charter back to that of a national bank as it was in 2007, and the request by BOA to then immediately acquire Countrywide Bank by merger. These transactions were executed on April 27, 2009, as a result of which Countrywide Bank ceased to exist.

25.     BOA Home Loans is a BOA loan servicing entity. On information and belief, BOA Home Loans had formerly been known as Countrywide Home Loans Servicing, L.P. After the merger of BOA Home Loans and Countrywide HL in July 2011, BOA assumed the liabilities for those companies.

26.     BNYM purportedly became the "Lender" under the three Security Agreements pursuant to the 13001 Washington Assignment, the 13007 Washington Assignments, and the 4424 Lindblade Assignment. [Exhibits 4, 5, 6, 7].[7]

---

[6] On information and belief, when BOA purchased Countrywide FC in 2008 for approximately $4.1 billion, it became the successor in interest to Countrywide FC as (a) there was continuity of ownership between BOA and Countrywide FC; (b) Countrywide FC ceased ordinary business soon after the transaction was consummated; (c) there was continuity of management, personnel, physical location, assets and general business operations between BOA and Countrywide FC; (d) BOA assumed the liabilities ordinarily necessary for the uninterrupted continuation of Countrywide FC's business; and (e) BOA assumed Countrywide FC's mortgage repurchase and tort liabilities. [*See also*, Meadows Declaration; Doc. 118, ¶¶ 9-12].

**B.**     **The FPI Defendants**

27.     MERITPLAN and NEWPORT were the insurance entities responsible for issuing all twenty (20) or more of the forced place insurances policies on the three subject properties. In the case of the 13001 and 13007 Washington Blvd. four-plex properties, this included issuing separate policies for every one of the four units in each property, which was not required under the respective Security Agreements and was grossly excessive. [*See*, Meadows Decl.; Doc. 118, ¶¶ 9-12].

28.     BALBOA provided both insurance tracking services and force placed insurance policies to lenders, including BOA, nationwide. Balboa provided force placed insurance policies on real estate located throughout the United States, including California. As described below in more detail, the relationship between BOA and its former subsidiary, Balboa, was a non-competitive and exclusive relationship whereby both parties benefitted at the expense of the consumer by, among other things, forcing consumers to pay for (i) force placed insurance policies that were improperly backdated, and (ii) force placed insurance policies which included in the premium costs not attributable to the insurance but rather costs of servicing the loan. The

---

[7] While it is clear that all of the BOA Defendants were involved with the wrongful conduct alleged herein, because of the confusing and shifting corporate acquisitions, purported assignments, and over-lapping time periods, Plaintiff is precluded from further identifying which specific corporate defendants were liable for certain actions taken over particular periods of time. BOA Defendants know who did what and when, and Plaintiff should not be penalized by the opacity of BOA Defendants' corporate structure or the skill with which BOA Defendants manipulated their corporate actions.

artificially inflated price of the Balboa force-placed insurance policy did not represent

the actual cost of providing the insurance, but instead represented and encompassed

fees, commissions, "rebates" (or kickbacks) and other consideration for "faux"

services purportedly provided by BOA, BOA Home Loans, Balboa, and/or their

affiliates. [Balboa is no longer included in the "FPI Defendants"].

29.    QBE First assumed servicing and administrative functions in connection

with force placed insurance from Balboa after QBE Insurance Corporation purchased

Balboa's force-placed business from BOA in or around June 2011. This sale included

long term distribution agreements with Bank of America in connection with the force

placed insurance program which agreements facilitated the forced place insurance

backdating and kickback schemes described herein, in which QBE also participated.[8]

**C.    SPS**

30.    SPS was the successor to BOA and/or BOA Home Loans as the loan

servicing company of the three Security Agreements.

---

[8] Balboa was a defendant herein because, contrary to paragraph 4 of the Meadows
Declaration, there are documents reflecting its direct involvement with the issuance of
one or more FPI policies in this case. Similarly, QBE First is a defendant herein
because of its corporate affiliation with Meritplan and Newport, its central role in
certain of the force placed insurance kickback and backdating schemes that have been
investigated to date, and the conspicuous lack of any exculpatory statement relating to
QBE First in the Meadows Declaration. [*Compare,* Doc. 118, ¶¶ 4-8)].

# IX.

## THE SECURITY AGREEMENTS

31.     Each of the three Security Agreements entered into by Plaintiff is identical except for the loan number, the real property securing the loan, and the loan amount. [Exhibits 1, 2, 3].

32.     Uniform Covenant ¶ 5 "Property Insurance" provides in pertinent part:

Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards . . . for which Lender requires insurance. This insurance shall be maintained in the amounts . . . and for the periods that Lender requires . . . . The insurance carrier providing the insurance shall be chosen by borrower subject to Lender's right to disapprove Borrower's choice, which shall not be exercised unreasonably . . . .

If Borrower **fails to maintain** any of the coverages described above, Lender may obtain insurance coverage at Lender's option and Borrower's expense. Lender is under no obligation to purchase any type or amount of coverage . . . . Borrower acknowledges that the cost of the Insurance might significantly exceed the cost of insurance that Borrower could have obtained . . . .

THIRD AMENDED COMPLAINT

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies . . . . [Emphasis added].

33.     As can be seen, the "Lender," originally defined as Countrywide Bank [Definitions ¶ C], is only authorized to purchase force placed insurance in the event that the Borrower **fails to maintain** his own insurance. Absent such failure by the Borrower, the Lender cannot act.

34.     The Lender's ability to act is further limited by Universal Covenant ¶ 9 "Protection of Lender's Interest" which provides in pertinent part:

If (a) Borrower **fails to perform** the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for **whatever is reasonable or appropriate** to protect Lender's interest in the Property and rights under this Security Instrument . . . . [Emphasis added].

35.     Even in those instances when the Borrower has failed to perform as required (such as by maintaining the requisite insurance coverage), the method and manner by which the Lender obtains force placed insurance must be "reasonable or appropriate," in compliance with Paragraph 9. As alleged herein, the BOA Defendants' conduct in obtaining force placed insurance has been anything but reasonable or appropriate.[9]

---

[9] Specifically, nearly every California District Court that has considered the force placed insurance issue has allowed claims for relief alleging (i) Breach of Contract

# X.

## FORCE PLACED INSURANCE OVERVIEW

36.     Among other claims in this action, Plaintiff challenges the BOA Defendants' practice of purchasing forced place hazard insurance from the FPI Defendants and their affiliates pursuant to agreements that return a financial benefit to one or more of the BOA Defendants or their affiliates that is unrelated to any

---

(based on Security Agreements with operative provisions substantially similar or identical to those involved herein); (ii) Breach of the Implied Covenant of Good Faith and Fair Dealing; and (iii) Unfair Competition, based upon the force placed insurance "kickback" and "backdating" allegations, to proceed past the motion to dismiss stage. *See*, *Longest v. Green Tree Servicing LLC*, 74 F.Supp.3d 1289, 1297-1301, 1303-04 (C.D. Cal. 2015) (Motion to Dismiss denied as to these three claims); *Perryman v. Litton Loan Servicing*, LP, CV14-02261-JST, 2015 WL 4954674, at ** 10-12, 18 (C.D. Cal. Oct. 1, 2014) (Same); *Faili v. BAC Home Loans Servicing LP*, CV14-1105-JLS(ANx), 2014 WL 255704, at ** 7-10 (C.D. Cal. Jan. 23, 2014) (Motion to Dismiss denied applying substantially similar Florida and Texas law as to Breach of Contract claim, and Florida law as to Breach of Implied Covenant claim; Motion to Dismiss granted as to Breach of Implied Covenant claim under Texas law, because there is not, as a matter of law, a covenant of good faith and fair dealing in every contract; Motion to Dismiss granted as to California Unfair Competition claim because of choice of law clauses in both Security Instruments at issue); *Maloney v. Indymac Mortgage Services*, CV13-04781-DDP(AGRx), 2014 WL 6453777, at ** 4, 6, n.4, 8, n.6 (C.D. Cal. Nov. 17, 2014) (Motion to Dismiss as to these three claims denied with Court expressly rejecting application of "court created" filed rate doctrine); *Smith v. SunTrust Mortgage*, CV13-0739-AG(JPRx), 2013 WL 5305651, at ** 6, 7 (C.D. Cal. Sept. 16, 2013) (Motion to Dismiss denied as to Breach of Contract and Breach of Implied Covenant claims (applying Oregon law); Motion to Dismiss UCL claim granted because property located outside California); *Leghorn v. Well Fargo* Bank, N.A., 950 F.Supp.2d 1093, 1118-1121 (N.D. Cal. 2013) (Motion to Dismiss denied as to these three claims with Court expressly rejecting filed rate doctrine as to "kickback" and "backdating" allegations in UCL claim); and *Ellsworth v. U.S. Bank, N.A.*, 908 F.Supp.2d 1063, 1085-87, 1089-90 (N.D. Cal. 2012) (Motion to Dismiss denied as to these three claims).

contractual or other bona fide interest in protecting the lender's interest in the loan, and which results in unauthorized, unjustified, and unfairly inflated costs to the borrower for force placed insurance in violation of law.

37.    As a condition of each of the three Security Agreements, Plaintiff was required to obtain and maintain hazard insurance coverage on the secured property. [Exhibits 1, 2, 3; ¶ 5].

38.    Under the Security Agreements, if a borrower (Plaintiff herein) fails to maintain the requisite insurance policies or the policies have lapsed, the lender (BOA Defendants herein) is authorized to replace the missing or lapsed policies with more expensive policies, known as a force placed insurance policy ("FPI"). [Exhibits 1, 2, 3; ¶ 5]. The lender does this in conjunction with an insurance provider (FPI Defendants herein). In fact, QBE First and certain other QBE entities entered into an agreement with BOA that establishes that QBE (and previously Balboa), or its affiliated entities (such as Meritplan and Newport as in this case), provide these FPI policies to the BOA Defendants pursuant to an exclusive contract. However there is no authority to issue any FPI policy when the borrower has a compliant policy already in place, as was the case herein.

39.    In the event that the lender or other insurance tracker entity acting on the lender's behalf determines that there is a lapse in insurance coverage, an FPI policy is issued by insurance provider, and the lender forces the borrower to pay for the FPI

policies by diverting the borrower's mortgage payment and/or debiting the borrower's escrow account.

40.     The FPI policies almost always provide less coverage and cost substantially more than the borrower's original policy, with the additional expense being directly related to various incentives and lucrative financial benefits that are shared between (in this case) one or more of the BOA Defendants and (in this case) one or more of the FPI Defendants.[10]

41.     In some instances, borrowers are charged retroactively for coverage before the borrower is notified of the issuance of FPI policies.

42.     Further, such policies often provide unnecessary or duplicative coverage, because they are improperly backdated to collect premiums for time periods during which the borrower has absolutely no risk of loss.

43.     The premiums paid by, and/or assessed to Plaintiff also included amounts that are not attributable to the cost of providing FPI policies but, instead, constituted expenses associated with servicing all the loans serviced by BOA. For example, while loan servicers are compensated for tracking and monitoring loan portfolios as part of

---

[10] That being said, it is important to emphasize that in this action, Plaintiff **does not** challenge the rates of his FPI policies as excessive. Rather, Plaintiff challenges the BOA Defendants' **decision to purchase** force placed insurance from the FPI Defendants in exchange for receiving an unearned financial benefit (the "kickback" component), which benefit is directly linked to the BOA Defendants paying amounts for the FPI insurance that far exceeds comparable borrower purchased insurance and which policies are backdated to include time periods during which the borrower has no risk of loss (the "backdating" component).

their servicing agreements, many servicers have outsourced such portfolio monitoring and tracking services to FPI providers, such as FPI Defendants, at below market rates, effectively providing "kickbacks" to BOA and/or its affiliates in the form of subsidies paid by force placed insurance borrowers. The small percentage of borrowers, such as Plaintiff, who paid for FPI thus shouldered the costs of monitoring BOA's entire loan portfolio.

44.    Borrowers have no say in the selection of the carrier or the terms of the FPI policies. The terms and conditions, as well as the cost, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer. In fact, servicers like BOA, have no incentive to shop for the best rate, as they are motivated to use the insurance provider who offers them the best "commission", typically the highest price insurance, not the lowest.

45.    In bringing this action, Plaintiff does not challenge the rates filed by Meritplan, Newport, or any other insurer.  Nor does Plaintiff challenge the rates of his FPI policies as excessive. Rather, Plaintiff challenges the manner in which the BOA Defendants selected the FPI Defendants and their force placed insurance products, the manipulation of the force placed insurance process by the BOA Defendants, and the impermissible kickbacks that were included in the premiums that were added to the balance of Plaintiff's three mortgage loans. Plaintiff does not claim that he was charged an excessive rate, rather, he complains that the BOA Defendants acted unlawfully and in bad faith and motive when they selected the particular insurance

companies and their particular rates and coverage, when other more appropriate options were available.

46.     Thus, while Plaintiff does not challenge the BOA Defendants' general ability to force place insurance policies and to charge fees/premiums for the same, Plaintiff challenges the manner in which the BOA Defendants (in conjunction with the FPI Defendants), manipulated the force placed insurance process for their own financial gain, with bad motive, in breach of the BOA Defendants' contractual duties and in violation of statutory and common law.

47.     One of the issues in this case is whether the BOA Defendants and the FPI Defendants have been unjustly enriched by manipulating the force placed insurance process so as to obtain unearned kickbacks and breached the express and/or implied terms of the Security Agreements (including the implied covenant of good faith and fair dealing) by unreasonably, unconscionably, and unlawfully exercising their contractual discretion to manipulate the force placed insurance process so as to obtain financial benefit for themselves at Plaintiff's expense, and in turn, misrepresenting the true cost of insurance charged to Plaintiff and overcharging him beyond that amount permitted by the Security Agreements.

# XI.

## FORCE PLACED INSURANCE IN THIS MATTER

48.    The starting point is the wrongful issuance of over twenty (20) force placed insurance policies by the BOA Defendants (in conjunction with the FPI Defendants), upon the three subject properties, because Plaintiff already had the requisite insurance. The refusal of the BOA Defendants to promptly remove the FPI policies and return Plaintiff's loan balances to where they were prior to the wrongful issuance of the policies once Plaintiff provided information showing that he had at all times maintained the contractually required insurance, greatly compounded the problem. However, instead of removing these wrongfully issued and unnecessary FPI policies, the BOA Defendants continued to issue them with disastrous results to Plaintiff.

49.    Specifically, as a direct result of the wrongful issuance of the FPI policies, the BOA Defendants charged Plaintiff for the cost of the policies, as well as penalties, interest, late fees, and other miscellaneous charges which had the effect of significantly increasing the amount that Plaintiff was charged on a monthly basis.[11]

---

[11] The BOA Defendants did this by establishing an "escrow account" for each of the three Security Agreements where none had ever existed before, and creating a "negative amount" reflecting the additional amounts that Plaintiff purportedly owed as a result of the forced place insurance policies. Plaintiff was thereafter required to bring this negative amount up to zero. When his subsequent mortgage payments did not contain the amounts that the BOA Defendants believed to be owed, they either

50.     Despite Plaintiff's efforts to have the forced place insurance policies removed and amounts owed by him corrected, Plaintiff's justified refusal to pay these wrongfully increased amounts soon resulted in all three Security Agreements being place into default and notices of foreclosure being sent.

51.     The BOA Defendants (and SPS after it became the servicing company) also furnished inaccurate loan balance amounts to the credit reporting agencies month after month when they knew, or should have known, that Plaintiff did not owe the balances reported. Plaintiff's resulting reduced credit score made it impossible for Plaintiff to take advantage of lower interest rates and refinance his three loans or to obtain credit of any other kind at affordable interest rates, thus causing him, among other things, to miss out on numerous real estate related business opportunities.

52.     Not only was the issuance of the force placed insurance policies a breach of the three Security Agreements by the BOA Defendants, but the method by which the force placed insurance policies were issued, the timeframes selected for each policy, and the excessive numbers of policies issued, were all also breaches of the Security Agreements.

53.     Aside from being unnecessary and unauthorized because of existing coverage, the force placed insurance policies issued relating to the three subject properties were "backdated" in that they were not scheduled to commence on the date

rejected his payments completely (as with the 13001 and 13007 Washington properties); or applied the "underpayment" to the account, but continued to show the account in default (as with the 4424 Lindblade property).

that the purported gap in coverage was discovered. Rather, once the purported gap in coverage was discovered, the designated commencement date of that force placed insurance policy was a retroactive date prior to the "discovery" date, which had the obvious effect of raising the cost of each such force placed policy for which Plaintiff was charged. Moreover, the number of policies that were issued were clearly excessive, the most glaring example being those for the 13001 and 13007 Washington "fourplexes," for which a force placed policy was issued for each of the four units, as opposed to one policy for the building, as was the norm for the entire period that Plaintiff purchased insurance previously accepted by the BOA Defendants.

54.     The force placed insurance policies that were issued in this case were part of a more insidious course of conduct apart from the breaches of contract and implied covenant of good faith and fair dealing alleged herein. The issuance of these backdated force placed insurance policies was also part of a coordinated "kickback" scheme engaged in by and between the BOA Defendants and the FPI Defendants. Many recent cases filed in the California District Courts have successfully alleged substantially similar, if not identical, kickback and backdating schemes that have been allowed to proceed past the pleading stage.[12]

---

[12] *See*, fn. 9, *supra*. These class action cases address the force placed insurance issues raised herein. Plaintiff's case however, is even stronger because the BOA Defendants had no right to issue FPI policies in the first place, because there was no lapse in coverage.

55.     On information and belief, prior to its being acquired by BOA, Countrywide Bank purchased master or "umbrella" insurance policies that covered its entire portfolio of mortgage loans. In this case, the master policies were purchased from Meritplan and Newport.[13]

56.     In return, Meritplan and Newport obtained the exclusive right to issue force placed insurance on property securing a loan within the portfolio of Countrywide Bank (or BOA after its acquisition of Countrywide Bank), when the borrower's insurance lapsed or the lender determined the borrower's existing insurance is inadequate.

57.     No individualized underwriting ever took place for the force placed insurance. Rather, the BOA Defendants authorized Meritplan and Newport to automatically place master-policy coverage when a borrower's policy purportedly lapsed, as was done in this case. They also authorized Meritplan and Newport to backdate the insurance as alleged herein. However, as previously alleged, Plaintiff's insurance did not lapse.

58.     Once force placed insurance was issued on the Plaintiff's property, the applicable service company from among the BOA Defendants charged Plaintiff for the insurance premiums and added them to the balance of the Plaintiff's loan account and/or to his applicable escrow account.

---

[13] *See*, Meadows Declaration at ¶¶ 9-12 [Doc. 118].

59.     The applicable service company from among the BOA Defendants then paid the premium to the applicable FPI Defendant, who then "kicked back" a set percentage of the premium to the BOA Defendants or their affiliates as a "commission."  If payment was made to an affiliate, that affiliate then shared a percentage of the kickback payment with the BOA Defendants as lender or servicer.

60.     The money paid back to the BOA Defendants' affiliate was not given in return for any services provided by the affiliate; it was simply grease to keep the force placed insurance machine moving.

61.     Typically, in an attempt to mask the kickback as legitimate, the insurer sent a disclosure to the borrower that the affiliate may receive a "commission" or "compensation" for helping the lender to procure a force placed policy.  In reality, however, no work was ever done by the affiliate to procure insurance for that particular borrower because the coverage came through the master or umbrella policy already in place. It should be noted in the case of Plaintiff, no such disclosure was received.

62.     Under this highly profitable force placed insurance scheme, the BOA Defendants on the one hand were incentivized to purchase master policies, and the FPI Defendants on the other were incentivized to issue backdated or otherwise excessive force placed insurance policies with inflated premiums on Plaintiffs' properties, because the higher the cost of the insurance policy, the higher the profits and kickbacks. That is what happened in Plaintiff's case.

# XII.

## FACTUAL CHRONOLOGY

### A.   Background Information

63.    Plaintiff holds a graduate degree in physics from the University of California Los Angeles. At the time Plaintiff purchased the three subject properties in the mid-1980's, he was working as a project manager for satellite and space systems at Hughes Aircraft and TRW (now Northrup Grumman).

64.    When the aerospace industry began to slow down, Plaintiff became a real estate broker, and holds certificates in commercial real estate, and commercial property management. Both certificates are distinguished by the National Association of Realtors.

65.    Plaintiff also holds five contractor licenses with the State of California Contractor Board, one general license and four specialty licenses. Since the 1990's Plaintiff has served as a Receiver in numerous cases pending in the Los Angeles Superior Court.

66.    Prior to refinancing the three loans with Countrywide Bank in 2007, the loans had been with BOA. Those loans were paid on time without any interruption or incident. As he had been doing prior to the refinancing, Plaintiff is responsible for directly paying for his hazard insurance and real estate taxes in connection with his current loan obligations as reflected in the three Security Agreements.

**B.      The Force Placed Insurance Deluge 2010 – 2012**

67.      Commencing sometime in 2010 and continuing to sometime in 2012, the BOA Defendants acting in conjunction with the FPI Defendants, issued force placed hazard insurance policies on each of Plaintiff's three properties (many of which were backdated), despite the fact that Plaintiff obtained and maintained his own hazard insurance during this time period for all three properties.

68.      Plaintiff does not know exactly how many FPI policies were purchased for his properties over these two years, but he reasonably believes the total number to easily exceed 20 policies. Based upon conversations and written communications that he had with representatives of BOA, he was told that a separate hazard FPI policy was issued for each of the four units of both the 13001 Washington and 13007 Washington "four-plexes." This was done despite the fact that Plaintiff only purchased one hazard policy for each of the buildings, and that this one policy per building was routinely accepted by the relevant servicing companies, both before the FPI policies deluge started in 2010 and ended in 2012.

69.      Plaintiff became aware that there appeared to be additional charges being made to his three loan account statements sometime in 2010. Believing these additional charges to be a mistake, he promptly contacted the BOA service company

identified on the account statement for the purpose of understanding what the additional charges were for and to resolve the issue.[14]

70.     When Plaintiff learned that the additional charges were for insurance coverage, he told the service representative that he already had insurance coverage and he agreed to send proof of coverage, which he promptly did. In the meantime, Plaintiff continued to make timely payments on his three loan accounts in the customary amounts. Plaintiff's reasonable expectation at the time was that the problem would be corrected, the insurance charges would be reversed and the problem would be resolved.

71.     Unfortunately, that did not happen. Instead, additional charges continued to appear on Plaintiff's loan account statements month after month. No matter how many times Plaintiff spoke with the service company and provided proof of coverage and copies of the policies, nothing was resolved. Instead, to the extent that Plaintiff was able to reach the same service representative to whom that he had previously spoke, or another representative that was able to locate his claim in the computer system, he was told that his duplicated coverage claims were being "researched."

72.     More often, Plaintiff would often have to talk to a different service representative who was unfamiliar with his claim, and start again from the beginning.

---

[14] Loan account ledgers prepared by BOA Defendants make clear that there were no payment problems until the FPI policies were commenced. However, from that time forward, Plaintiff's mortgage payments were wrongfully applied to make unauthorized payments against the newly created "escrow accounts," Plaintiff's loan balances grew exponentially, and negative reporting to credit agencies commenced.

THIRD AMENDED COMPLAINT

On at least one occasion when Plaintiff told a new representative that he already sent proof of insurance and copies of his policies, he was told that they could not be located and he would have to send them again. Plaintiff did so, but this did not make any difference as nothing was resolved.

73.    While Plaintiff did not know it at the time, this exasperating process would go on for over two years. All the while, additional force placed insurance charges kept appearing on Plaintiff's loan account statements, and payments were misapplied to pay for the FPI insurance, as well as late fees, penalties, interest and other miscellaneous charges. Moreover, Plaintiff's loan account statements now referenced an "escrow account" which had never existed before. And the total amount due on each of his loans was growing along with the negative value of his escrow account. All the while, Plaintiff continued to make his customary loan amount payments knowing that he had done nothing wrong and assuming that the problem would eventually be resolved. How could it not be? He actually had insurance. If only someone with sufficient authority would have agreed to review the proof of insurance he had provided and review his three loan accounts with him to make the necessary adjustments, this matter could have been easily resolved.

74.    But resolution of the dispute that would reverse the improper force place insurance costs and ancillary charges was apparently not what BOA Defendants wanted. In December 2011, having gotten nowhere on his own, Plaintiff tried another approach. Instead of continuing to deal with the loan service company, Plaintiff

contacted Janet Pulido, the Bank of America liaison with Remax Alliance Group, a realtor with whom Plaintiff was affiliated. That contact led to Plaintiff's writing Ms. Pulido a December 6, 2011 cover email and memorandum ("December 6 Memo") describing in detail what had occurred regarding the force placed insurance issue to date. While the December 6 Memo specifically addresses the 13001 and 13007 Washington properties, Plaintiff's experiences with regard to the 4424 Lindblade property are similar to those described therein. [Exhibit 9].[15]

75.     On January 3, 2012, Plaintiff wrote a follow-up cover email and memorandum to Ms. Pulido ("January 3 Memo") bringing her up to date on events since his December 6 Memo when he first asked for assistance. Plaintiff's frustration is palpable in this latest correspondence which contains a detailed summary of the manner in which BOA personnel interacted with Plaintiff; discusses the many ways that they avoided substantively addressing Plaintiff's concerns; and also includes a description of the systematic policies and procedures put in place by BOA Defendants that Plaintiff believes were implemented and enforced to avoid dispute resolution and preserve the status quo.

76.     Making matters worse, two Notices of Default had been sent to Plaintiff in November 2011 relating to the 13001 and 13007 Washington Security Agreements. In order to avoid the potential imminent foreclosure of these two properties, and having no tangible results from his communications with Ms. Pulido, Plaintiff

---

[15] Exhibit 9 is being filed without attachments.

believed that he had no choice but to try to work out a repayment plan or other loan modification with BOA.

### 1.    The 2012 Repayment Plan – 13001 Washington

77.    In or about late January 2012, Plaintiff had phone conversations with two BOA representatives regarding the reinstatement of the loan secured by the 13001 Washington property. The first was named Monica. The second was named Deanna whose phone number was (805) 577-3144. During these conversations, Plaintiff agreed to pay the $35,000 amount requested over six months to reinstate the loan.

78.    This reinstatement agreement ("Repayment Plan") was confirmed in a conversation that Plaintiff had with a third BOA representative named Brandon on February 12, 2012. The down payment amount of $15,000 was to be paid by February 15, 2012. The four monthly payments of $5,887.78 were to be paid on or before (i) March 15, 2012; (ii) April 15, 2012; (iii) April 15, 2102; and (iv) June 15, 2012, respectively.

79.    In reliance on these several conversations, on February 14, 2012, Plaintiff sent BOA a Bank Check in the amount $15,000. The check was sent via Federal Express for overnight delivery to an address requested by BOA because Federal Express does not deliver to a PO Box, such as BOA's standard mailing address. The check was received by BOA on February 15, 2012.

80.     However, instead of honoring the Repayment plan discussed with Plaintiff on the phone calls with the three BOA representatives, by letter dated February 16, 2012, BOA informed Plaintiff that the $15,000 payment "was less than the total amount needed to bring your loan up to date." Instead of using the money for the agreed upon purpose of reinstating Plaintiff's loan. the $15,000 payment was "applied . . . in accordance with your loan terms." In short, BOA acted as if their conversations with Plaintiff regarding the reinstatement of his 13001 Washington loan never occurred. [Exhibit 11].

81.     Worse, BOA Home Loans mailed Plaintiff another letter dated May 18, 2012 which confirmed that a "repayment agreement" had, in fact, been "mutually agreed to" regarding the 13001 Washington loan. However, the agreement was cancelled "because we did not receive the installment due on February 15, 2012." This, of course, was demonstrably false. None the less, BOA Defendants never honored the 13001 Washington loan Repayment Plan, and that loan, which should never have been in default in the first place, is still in default. [Exhibit 12].

82.     Plaintiff reasonably and foreseeably relied on the BOA Defendants' promises. Had Plaintiff known that the $15,000 payment intended to be the down payment on the Repayment Plan would not be used for that purpose as agreed, he would never have sent the $15,000 down payment, nor would he have spent substantial hours of time and energy discussing a resolution with the loan service representatives that the BOA Defendants never intended to honor.

## 2.   The 2012 DOJ Loan Modification Program

83.    On May 26, 2012, BOA sent a letter to Plaintiff informing him that he met the criteria to apply for a new federal government modification program ("May 26 Letter"). The program was the result of a settlement between the Department of Justice and BOA (among others). [Exhibit 13].

84.    In response, Plaintiff promptly made an appointment to meet with Abby Erazs, a BOA specialist, pursuant to the instructions set forth in the letter. Moreover, on the day of the meeting, Plaintiff brought with him all of the financial information and documents requested in the letter.

85.    Plaintiff reasonably expected to hear back from Ms. Erazs or someone else at BOA at some time shortly after the meeting. When he did not, Plaintiff followed up by calling the phone number listed in the May 26 Letter and leaving numerous phone messages. But he got no response. Next, Plaintiff re-sent the financial information package to the BOA "Customer Assistance Center" at which he had his meeting. Still there was no response. Plaintiff re-delivered the financial information again in either July or August 2012.

86.    In addition to repeatedly sending the requested financial information to the Customer Assistance Center, in or about July 2012, Plaintiff also sent the documents to Jose Molina, another BOA representative who was designated as Plaintiff's BOA contact person.

87.     Plaintiff did not receive any substantive response to his loan modification request until on or about Tuesday October 9, 2012. On that day, he received three letters from BOA, all dated (Saturday) October 6, 2012.[16]

88.     The first letter in logical sequence informed Plaintiff that BOA has "been trying to reach you by mail and telephone to encourage you to apply" for the DOJ modification program. Of course, this was demonstrably false. Plaintiff had already applied and provided BOA with all of the required documents numerous times. Moreover, it was Plaintiff who had tried, without success, to contact BOA and find out where things stood with his loan modification application. [Exhibit 14].

89.     The second letter in logical sequence thanked Plaintiff for "beginning the home loan modification process . . . and for providing your financial information." It further advised Plaintiff that if any documents were missing, BOA would contact him. [Exhibit 15].

90.     The third letter in logical sequence informed Plaintiff his loan was not eligible for a modification because he "did not complete and submit all the documents [BOA] requested." This, of course, was also demonstrably false as no additional documents were ever requested. [Exhibit 16].

91.     Plaintiff appealed BOA's decision on or about October 10, 2012.

---

[16] All three letter were sent by BOA to Plaintiff via Federal Express on (Monday) October 8, 2012. Plaintiff believes that he received these three letters all on the same day, (Tuesday) October 9, 2012.

THIRD AMENDED COMPLAINT

92.     BOA responded with a letter to Plaintiff dated October 16, 2012, informing him that his appeal was received and that he would hear back from BOA within 15 days from the date of his appeal. [Exhibit17].

93.     BOA responded again with a letter to Plaintiff dated October 23, 2012, informing him that BOA needed more time to review his appeal, and that BOA would continue to update Plaintiff every 15 days until it completed its review. That was the last time Plaintiff heard from BOA regarding his appeal. [Exhibit 18].[17]

94.     Plaintiff reasonably and foreseeably relied on the BOA Defendants' promises. Had Plaintiff known that the BOA Defendants had no intention to approve his DOJ Loan Modification application, he would not have taken the extensive efforts that he took to meet with BOA Defendants' personnel, complete the application, ensure that the documents were completed and properly delivered, provide additional copies of the documents, diligently follow up with BOA Defendants regarding the status of his application, and spend the other substantial hours of time and energy that he did, seeking approval of a DOJ Loan Modification application that the BOA Defendants never intended to approve.

---

[17] By letter dated November 27, 2012, BOA Home Loans informed Plaintiff that SPS would be the new loan service company for Plaintiff's loans effective December 16, 2012. After becoming the service company, SPS also denied Plaintiff's request for the DOJ loan modification without any justification. [Exhibit 19].

### 3.   The Wrongful Destruction Of Plaintiff's Credit

95.   Once the BOA Defendants made the decision to wrongfully issue force placed insurance policies on Plaintiff's already insured three properties, and Plaintiff's mortgage payments were wrongfully misapplied to cover the substantial costs of those policies, the loan service companies negatively reported the deficits created by the misapplication of funds to the three major credit reporting agencies (Equifax, Experian, and Transunion), as "missed payments" and/or other types of payment failures. This resulted in the destruction of Plaintiff's credit rating which effectively prevented him from obtaining credit on the terms and interest rates for which he was eligible prior to the downgrading, or any reasonable terms whatsoever, causing him extensive financial injury.

### C.   The Role Of SPS

96.   SPS became the loan service company in or about December 2012. It proved no more rational to deal with than BOA before them. Specifically, as with the purported dispute resolution policies of its predecessors, the SPS "Dispute Department" policy is a façade designed more to frustrate the customer into going away, than to resolving disputes. Additionally, SPS violated both Federal and State statutory regulations in regards to credit reporting and its non-responsiveness to qualified written requests by Plaintiff for information. Finally, because in his conversations with them, many of SPS' own service representatives have described

the accounting information upon which SPS has relied in its credit reporting of

Plaintiff's loan accounts as unintelligible, an accounting from SPS is warranted.

### 1.    SPS' Bad Faith "Dispute Department" Policy

97.    According to SPS representative Charmae Allen, the "Dispute

Department" handles customer disputes regarding inaccurate information furnished to

credit reporting agencies.[18]

98.    A Borrower cannot contact the Dispute Department directly. A Borrower

must wait until a representative from the Dispute Department contacts the Borrower.

99.    The Dispute Department does not accept internal or external phone calls.

Other SPS employees from other departments contact the Dispute Department by

email or by fax.

100.   Before a dispute can be investigated or reported to a credit reporting

agency, the dispute from the Borrower must be assigned to a dispute representative in

the Dispute Department. How long this process takes is not uniform or consistent -

Ms. Allen's answer was, "it depends." [19]

---

[18] All of the following information regarding the "Dispute Department" was provided by Ms. Allen.

[19] Ms. Allen offered this explanation when asked why no disputes were notated on Plaintiff's credit reports (issued by the three major credit reporting agencies), when all three of Plaintiff's loans were disputed.

101.   The Borrower's dispute must be open for thirty days in order for the dispute to be reported by SPS to the credit reporting agency. If it is open for less than 30 days, the credit reporting agency is not notified of the Borrower's dispute.

102.   SPS reports to the credit reporting agencies on the first of every month. If a Borrower's dispute is received by SPS on the first of the month, or on the five to seven days prior to when SPS reports the account status, the account in question will not be reported as in dispute by SPS because of the internal assignment process.

103.   If SPS researches the Borrower's dispute and closes the dispute before the expiration of the 30 day period, the dispute information is not reported to the credit reporting agencies.

104.   However, when SPS was contacted regarding Plaintiff's dispute status, SPS replied that it was still "researching" the dispute, despite the fact that the dispute had been pending for more than 30 days, in an apparent violation of its own purported dispute policy.

105.   If SPS had acted in accordance with its purported Dispute Department policy, it should have reported the disputed status of Plaintiff's three loans to the credit reporting agencies, but it did not.

106.   On information and belief, SPS has and continues to manipulate its Dispute Department policy, in order to delay or completely avoid reporting the existence of Borrower disputes such as Plaintiff's herein. By doing so, SPS furnishes

loan information to the credit reporting entities that it knows or has reason to suspect, is inaccurate.

## 2.    SPS' Non-Compliant Responses To Requests For Information

107.   Plaintiff sent several "qualified written requests" for information to SPS. The first written request was sent shortly after became the loan service company, and additional written requests were sent throughout 2013 and 2014.

108.   All written requests included (a) Plaintiff's name as borrower, (b) the relevant account number, (c) the relevant property address, and (d) the specific request for information involved in compliance with applicable law.

109.   The requested information sought by these written requests included those inquiring into (a) Plaintiff's DOJ loan modification application; (b) the incorrect accounting of Plaintiff's loans, (c) Plaintiff's disputed loan balances, (d) Plaintiff's misapplied loan payments, (e) the status of Plaintiff's loan payments which were not deposited by SPS nor returned to Plaintiff, and (f) Plaintiff's request for an accounting. Plaintiff also made repeated requests for SPS to stop furnishing wrongful negative credit information to the three major credit reporting agencies while Plaintiff's accounts were in dispute.

110.   SPS did not provide a response to the request for accounting. SPS also refused to stop furnishing wrongful negative credit information to the credit agencies.

111.   SPS' responses to Plaintiff's qualified written requests were typically non-compliant with its statutory obligations, as illustrated by the following examples.

112.   In its April 23, 2013 response to one of Plaintiff's requests for an accounting and for information regarding disputed loan amounts, SPS responded by asking Plaintiff to send a death certificate because SPS received notification "that one or more of the borrowers on this account (13001 Washington) were deceased." Of course, Plaintiff was the only borrower on the account and he was not deceased. Not only was this letter absurd, it was also non-compliant. [Exhibit 20].

113.   In another response, SPS asserted that Plaintiff's written request was not a "qualified written request" so that SPS was not required to respond. This too was a non-complaint response to a valid qualified written request.

114.   In yet another response, SPS asserted that it had already sent the information so they were not going to send it again. This response was also non-complaint as SPS did not previously send the information.

### 3.     The Need For An Accounting

115.   SPS is the loan service company, acting on behalf of and in the place of the "Lender" under the Security Agreements. [Exhibits 1, 2, 3]. At the time of the issuance of the FPI policies, it is believed that the Lender was BOA. There is also compelling evidence that BOA is still the "Lender" even now, notwithstanding the November 2011 assignments purporting to transfer the rights under the Security

Agreements to BNYM. [Exhibits 4, 5, 6, 7]. For example, the DOJ loan modification documents that were sent to Plaintiff referred to a settlement between the DOJ and BOA. And the BOA correspondence relating to the DOJ Loan Modification Program was sent was sent to Plaintiff between May and October 2012. [Exhibits 13-18].

116.    Equally compelling is that when asked for documents evidencing the charges and payments relating to the three loan accounts, SPS has provided Plaintiff with accounting ledgers prepared by BOA, strongly indicating that BOA is still the Lender.

117.    As to the accounting issue, when asked to explain the meaning of the acronyms for several of the 16 columns on the BOA ledger pages, SPS could not answer the question. If the loan service company cannot decipher the BOA accounting ledger, it is unfair to expect Plaintiff to be able to do so.

118.    More importantly, it is Plaintiff's theory of the case that, among other things, the BOA Defendants did not have any right to issue the FPI policies on Plaintiff's properties, or to add the late fees, penalties, interest and miscellaneous charges to his loan debt, or to misapply his mortgage payments to pay for the unauthorized FPI policies and their ancillary costs.

119.    Therefore, an accounting is required in order to make all of the necessary downward adjustments (amounts being removed from BOA's column and put back into Plaintiff's column), to the three loan accounts in order to determine the correct amounts due on the loans. This accounting should be imposed on both BOA as an

actual wrongdoer and preparer of the accounting ledgers, and on SPS as the proponent of the correctness of the accounting ledgers in its capacity of loan service company and surrogate of the Lender.

### D.   Facts Supporting Equitable Tolling

120.   Plaintiff's claims are timely. To the extent that any of Plaintiff's claims are deemed to have accrued outside the applicable statute of limitations, these claims are subject to equitable tolling and/or the tolling doctrines identified in *Aryeh v. Canon Business Solutions, Inc.,* 55 Cal.4[th] 1185, 1197-99 (2013). Specifically, the "continuing violation doctrine" and/or the "continuous accrual doctrine."

121.   The continuing violation doctrine is applicable in cases like this where the defendants have engaged in a pattern of reasonably frequent and similar acts which justifies treating the acts as an indivisible course of conduct in its entirety despite the conduct's having occurred partially outside and partially inside the limitations period.

122.   Similarly, the continuous accrual doctrine is applicable whenever there are recurring or continuous obligations with independent breaches of those obligations, as exist herein.

123.   Plaintiff's claims are also subject to equitable tolling because he could not, despite the exercise of due diligence, have discovered the underlying basis for his claims against Defendants. Defendants actively and knowingly concealed the basis for Plaintiff's claims by engaging in a scheme that was self-concealing by its very nature

and design. Any delay by Plaintiff in raising claims against Defendants was therefore

excusable.

124.   Specifically, Plaintiff did not know, nor could he know, that many

financial institutions and their service companies, in conjunction with insurance

agencies and insurance issuers, including the BOA Defendants and FPI Defendants

herein, would engage in the unlawful, systematic force placed insurance scheme

described herein for the purpose of generating illegitimate profits.[20]

125.   Due to the complex, undisclosed and self-concealing nature of

Defendants' force placed insurance scheme, Plaintiff did not possess sufficient

information or the requisite expertise to enable him to discover the true nature of

Defendants' scheme. Plaintiff had no basis upon which to investigate the validity of

any of Defendants' force placed insurance practices.

126.   Additionally, Defendants engaged in affirmative acts to conceal the facts

and circumstances giving rise to the claims asserted herein, such as the kickback and

backdating components of the force placed insurance purchase decisions.

127.   Additionally, information regarding Defendants' scheme has not been

publicly available. Financial institutions do not often report that they receive illegal

---

[20] BOA employees have testified under oath that they were instructed by their
supervisors to say that they lost documents and to ask for them to be sent again in
connection with borrower loan modification requests. Plaintiff experience similar
conduct by BOA loan service representatives in connection with his effort to resolve
the FPI issues, and with his own subsequent loan modification attempts.

kickbacks from insurance companies, or that they wrongfully backdate force placed insurance policies. Thus, even the most sophisticated borrowed could not obtain such information even if he wanted to do so absent filing a lawsuit.

128.   Finally, all Defendants should be estopped to assert that any of Plaintiff's claims are time barred given their wrongful conduct as alleged herein.

129.   Should Plaintiff's claims be determined to have accrued outside the relevant stature of limitations, the Court should excuse any delay given that Plaintiff did not and could not discover Defendants' wrongful conduct absent specialized knowledge or assistance of counsel. As such, it would be inequitable to apply the statute of limitations so as to preclude any of Plaintiff's claims.

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
(Against the BOA Defendants Excluding BNYM)

130.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

131.   Plaintiff and Countrywide Bank entered into the three Security Agreements at issue herein on or about February 12, 2007. Copies of the Security Agreements are attached as Exhibits 1, 2, 3 and are incorporated by reference.

132.   Plaintiff has performed and continues to perform all covenants, terms, conditions and obligations of the three Security Instruments excepting those that have been waived, excused, or prevented by the BOA Defendants' actions or failures of

performance. This includes Plaintiff's obligation to obtain and maintain the requisite insurance policies for the three real properties at issue herein.

133.   The BOA Defendants have breached the Security Agreements in, among others, the following ways:

a.   They have violated the express provisions of Universal Covenant, ¶ 5 by purchasing and/or authorizing the issuance of over twenty total (20) force placed insurance policies on the three subject properties, despite the fact that Plaintiff has not "fail[ed] to maintain" the required coverage;

b.   They have violated the express provisions of Universal Covenant, ¶ 9 because the "reasonable and appropriate" limitation imposed by that paragraph on Lender action does not authorize the BOA Defendants to profit from the purchase and/or the authorization of the issuance of force placed insurance policies, or to arrange for kickbacks, commissions, or other unearned compensation for itself and/or its affiliates to which they would otherwise not be entitled in connection with force placed insurance;

c.   They have further violated the express provisions of Paragraph 9 because that provision does not authorize the BOA Defendants to purchase or authorize the issuance of backdated force placed insurance policies for periods of time that have already expired and for which there is no risk of loss, or to charge Plaintiff for such backdated insurance;

d.      They have further breached the express provisions of the Security Agreements by, among other things, (i) charging Plaintiff for force placed insurance policies for periods of time that had already expired, in whole or in part; and (ii) arranging for kickbacks, commissions, or other compensation for themselves and/or their affiliates;

e.      They have wrongfully charged Plaintiff for the purported costs of the FPI policies, and added penalties, interest, late fees, and numerous other wrongful charges to Plaintiff's three existing mortgages, thus substantially raising the amount purportedly owed by Plaintiff under the three mortgages;

f.      They have wrongfully refused to accept and/or have misapplied payments made by Plaintiff on the three existing mortgages in violation of Universal Covenant, ¶ 2, thus further substantially raising the amount purportedly owed by Plaintiff under the three mortgages; and

g.      They have wrongfully declared all three mortgages to be in default and have issued notices of foreclosure on all three properties, thus invoking the provisions of Universal Covenant, ¶ 22.

134.   These breaches were willful and not the result of mistake or inadvertence. The BOA Defendants knowingly engaged in these breaches to the detriment of Plaintiff, and know that their conduct was unlawful.

135.   As a direct and proximate result of the BOA Defendants' breaches of the Security Agreements, Plaintiff has and continues to suffer damages, including, but not limited to:

a.      The inflated amounts of the principal balance due Force placed insurance charges, interest, penalties, late fees, and other miscellaneous fees posted to Plaintiff's loan balances;

b.      Damage to Plaintiff's credit due to inaccurate credit reporting;

c.      Damages resulting from lost profits and missed business opportunities resulting from Plaintiff's inability to obtain credit and take advantage of historically low interest rates; and

d.      The economic value of Plaintiff's lost time and damage to his business resulting from his substantial and ultimately wasted efforts working with BOA Defendants' representatives to resolves this matter;

136.   The exact amount of Plaintiff's damages has not yet been determined, but is estimated to be no less than $5,000,000, subject to proof at trial.

137.   Plaintiff is also entitled to a recovery of attorneys' fees and costs from the BOA Defendants as provided by (i) Cal. Code Civ. Proc. §1717 and the reciprocal attorneys' fees provision of Universal Covenant, ¶ 22, (ii) Cal. Code of Civ. Proc. 1021.5, and (iii) other applicable law.

## SECOND CLAIM FOR RELIEF

## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

(Against the BOA Defendants Excluding BNYM)

138.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

139.   Every contract contains an implied covenant of good faith and fair dealing. BOA Defendants owed Plaintiff a duty of good faith and fair dealing by virtue of the contractual relationship between them created by the three Security Agreements. [Exhibits 1, 2, 3].

140.   To the extent that the Security Agreements permitted the BOA Defendants to unilaterally issue force placed insurance, the BOA Defendants were obligated not to exercise this discretion capriciously or in bad faith (for their own financial gain for the purposes of maximizing profits at Plaintiff's expense).

141.   BOA Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

a.     Improperly exercising their purported discretion to issue force placed insurance on Plaintiff's properties without first making any effort to determine whether Plaintiff already had insurance;

b.     Improperly exercising their purported discretion to issue force placed insurance on Plaintiff's properties by failing and refusing to remove the force

placed insurance or credit Plaintiff's loan accounts for all charges assessed in connection therewith, upon being provided by Plaintiff with proof of insurance;

c.     Improperly exercising their purported discretion to issue force placed insurance on Plaintiff's properties by establishing a dispute resolution process requiring Plaintiff to speak with several different loan service representatives and provide numerous copies of his proof of insurance, only to have to continuously start the process again with someone else, thus making it virtually impossible for Plaintiff to resolve the dispute;

d.     Improperly exercising their purported discretion to issue force placed insurance on Plaintiff's properties by charging Plaintiff for backdated force placed insurance policies for periods of time that had already expired and/or for which there was no longer any risk of loss;

e.     Improperly exercising their purported discretion to issue force placed insurance on Plaintiff's properties by arranging for kickbacks, commissions or other compensation for themselves and/or their affiliates in connection with the issuance of the force placed insurance policies; and

f.     Improperly exercising their purported discretion to issue force placed insurance on Plaintiff's properties by failing to provide notice to Plaintiff that the policies were placed.

142.   BOA Defendants willfully engaged in the forgoing conduct in bad faith, for the purpose of (i) unfairly and unconscionably maximizing revenue from Plaintiff;

(ii) generating commissions, kickbacks, or other compensation for BOA Defendants; (iii) forcing Plaintiff to procure unnecessary and unauthorized insurance; and (iv) gaining unwarranted contractual and legal advantages.

143.   The foregoing breaches of the implied covenant of good faith and fair dealing were willful and not the result of mistake or inadvertence. BOA Defendants knowingly engaged in this conduct to the detriment of Plaintiff, knew that their conduct was unfair and unlawful, and engaged in this conduct in bad faith.

144.   As a direct and proximate result of the BOA Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount not yet determined, but which is estimated to be no less than $5,000,000, subject to proof at trial.

## THIRD CLAIM FOR RELIEF
## CALIFORNIA UNFAIR COMPETITION LAW
(California Business & Professions Code § 17200 *et seq.*)
(Against the BOA Defendants )

145.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

146.   California's Unfair Competition Law ("UCL") prohibits unlawful and unfair business practices and precludes a person or entity from engaging in unfair competition, defined as business practices which are unlawful, unfair or fraudulent.

147.   Plaintiff has standing to bring a UCL claim because (i) he has suffered a loss of money or property sufficient to qualify as injury in fact; and (ii) this economic injury was caused by the unfair business practices alleged herein. Specifically, as the result of the force placed insurance policies unlawfully issued by BOA Defendants, an as yet undetermined sum of money (which increases by the day) has been added to Plaintiff's three loan accounts representing the cost of the policies, interest, penalties, late fees, and miscellaneous charges wrongfully assessed against Plaintiff by BOA Defendants. Moreover, as all of the loan accounts are secured by Plaintiff's three real properties, Plaintiff's equity in those properties decreases as each loan account increases.

148.   BOA Defendants' violation of the UCL includes engaging in the following unlawful, unfair and/or fraudulent business acts and practices:

a.      Manipulating the force placed insurance process;

b.      Failing to make any effort to determine whether Plaintiff already had insurance before exercising the purported discretion to issue force placed insurance policies under the Security Agreements;

c.      Failing to remove the force placed insurance policies and credit Plaintiff's loan accounts for all charges assessed in connection with their issuance immediately upon being provided with proof of Plaintiff's existing insurance policies;

d.      Charging for FPI policies that were duplicative, unnecessary and backdated.

e.      Requiring Plaintiff to speak with several different loan service representatives and provide numerous copies of his proof of insurance, only to have to start the process again with someone else, thus making it virtually impossible for Plaintiff to resolve the dispute;

f.      Charging Plaintiff for back dated force placed insurance policies for periods of time that had already expired and/or for which there was no longer any rick of loss;

g.      Arranging for kickbacks or so-called "commissions" to be paid to the BOA Defendants or their affiliates in connection with the force placed insurance which "commissions" were not earned or justified in any other legitimate manner;

h.      Negotiating and confirming a "repayment plan" with Plaintiff regarding the 13001 Washington Security Agreement, receiving timely payment in the agreed amount and then "cancelling the agreement" while falsely claiming that the Plaintiff did not make timely payment;

i.      Inviting Plaintiff to participate in the DOJ Loan Modification Program, acknowledging receipt of the requisite application documents, failing to respond to Plaintiff's numerous attempts to learn the status of his application, writing to Plaintiff and falsely claiming that he did not respond to them, and then falsely informing Plaintiff that his loan was no longer eligible for the DOJ program because he did not provide the requested documents;

j.      BOA Defendants' false statements that Plaintiff was in default on his three loan accounts when it was BOA Defendant's wrongful actions that put his accounts in default; and

k.      BOA Defendants' oppressive and inaccurate accounting practices.

149.   The unlawful, unfair and/or fraudulent business practices alleged above are continuing in nature and are widespread practices engaged in by BOA Defendants.

150.   These business practices are inconsistent with and contrary to the statutory, regulatory and judicial authority cited herein, as well as other legal authority.

151.   BOA Defendants systematically engaged in these business practices to the detriment of Plaintiff.

152.   The harm caused by these business practices vastly outweighs any legitimate utility they could possibly have.

153.   Plaintiff is entitled to restitution and injunctive relief as a result of BOA Defendants' violations of the UCL.

154.   As a result of BOA Defendants' violations of the UCL, Plaintiff is also entitled to a recovery of attorneys' fees and costs as provided by Cal. Code Civ. Proc. § 1021.5 and other applicable law.

## FOURTH CLAIM FOR RELIEF

## CALIFORNIA UNFAIR COMPETITION LAW

(California Business & Professions Code § 17200 *et seq.*)

(Against FPI Defendants Excluding Balboa )

155.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

156.   California's Unfair Competition Law ("UCL") prohibits unlawful and unfair business practices and precludes a person or entity from engaging in unfair competition, defined as business practices which are unlawful, unfair or fraudulent.

157.   Plaintiff has standing to bring a UCL claim because (i) he has suffered a loss of money or property sufficient to qualify as injury in fact; and (ii) this economic injury was caused by the unfair business practices alleged herein. Specifically, as the result of the force placed insurance policies unlawfully issued by BOA Defendants in conjunction with the FPI Defendants, an as yet undetermined sum of money (which increases by the day) has been added to Plaintiff's three loan accounts representing the cost of the policies, interest, penalties, late fees, and miscellaneous charges wrongfully assessed against Plaintiff by BOA Defendants. Moreover, as all of the loan accounts are secured by Plaintiff's three real properties, Plaintiff's equity in those properties decreases as each loan account increases. An as yet undetermined amount of the charges assessed against Plaintiff's loan accounts was paid to FPI Defendants as part of the forced placed insurance kickback and backdating scheme alleged herein.

158.   FPI Defendants' violation of the UCL includes engaging in the following unlawful, unfair and/or fraudulent business acts and practices:

a.   Manipulating the force placed insurance process;

b.   Assisting BOA Defendants in procuring backdated force placed insurance issued on Plaintiff's three properties; and

c.   Accepting kickbacks or so-called "commissions" in connection with force placed insurance issued on Plaintiff's three properties; and

d.   Passing back a portion of these kickbacks or so-called commissions to BOA Defendants.

159.   The unlawful, unfair and/or fraudulent business practices alleged above are continuing in nature and are widespread practices engaged in by FPI Defendants.

160.   These business practices are inconsistent with and contrary to the statutory, regulatory and judicial authority cited herein, as well as other legal authority.

161.   FPI Defendants systematically engaged in these business practices to the detriment of Plaintiff.

162.   The harm caused by these business practices vastly outweighs any legitimate utility they could possibly have.

163.   Plaintiff is entitled to restitution and injunctive relief as a result of FPI Defendants' violations of the UCL.

164.   As a result of FPI Defendants' violations of the UCL, Plaintiff is also entitled to a recovery of attorneys' fees and costs as provided by Cal. Code Civ. Proc. § 1021.5 and other applicable law.

**FIFTH CLAIM FOR RELIEF**

**CALIFORNIA UNFAIR COMPETITION LAW**

(California Business & Professions Code § 17200 *et seq.*)

(Against SPS)

165.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

166.   California's Unfair Competition Law ("UCL") prohibits unlawful and unfair business practices and precludes a person or entity from engaging in unfair competition, defined as business practices which are unlawful, unfair or fraudulent.

167.   Plaintiff has standing to bring a UCL claim because (i) he has suffered a loss of money or property sufficient to qualify as injury in fact; and (ii) this economic injury was caused by the unfair business practices alleged herein. Specifically, as the result of the force placed insurance policies unlawfully issued by BOA Defendants in conjunction with the FPI Defendants, an as yet undetermined sum of money (which increases by the day) has been added to Plaintiff's three loan accounts representing the cost of the policies, interest, penalties, late fees, and miscellaneous charges wrongfully assessed against Plaintiff by BOA Defendants. Moreover, as all of the loan accounts are secured by Plaintiff's three real properties, Plaintiff's equity in those properties

decreases as each loan account increases. SPS is the loan service company, acting on behalf of and in the place of the "Lender" under the Security Agreements. It has adopted as accurate the BOA accounting ledger which contains all of the incorrect information regarding Plaintiff's three loan accounts, and has wrongfully reported that incorrect information to the credit reporting agencies, further damaging Plaintiff.

168.    SPS' violation of the UCL includes engaging in the following unlawful, unfair and/or fraudulent business acts and practices:

  a.    Violations of RESPA [12 U.S.C. §§ 2601 *et seq.*];

  b.    Violations of the Fair Debt Collection Practices Act [15 U.S.C. § 1692a;

  c.    Violations of Cal. Civ. Code § 1785.25;

  d.     Violations of the Fair Credit Reporting Act [15 U.S.C. §§ 1681 *et seq.*]; and

  e.    The unfair and deceptive policies and practices of the SPS "Dispute Department.

169.    The unlawful, unfair and/or fraudulent business practices alleged above are continuing in nature and are widespread practices engaged in by SPS.

170.    These business practices are inconsistent with and contrary to the statutory, regulatory and judicial authority cited herein, as well as other legal authority.

171.   SPS systematically engaged in these business practices to the detriment of Plaintiff.

172.   The harm caused by these business practices vastly outweighs any legitimate utility they could possibly have.

173.   Plaintiff is entitled to restitution and injunctive relief as a result of SPS' violations of the UCL.

174.   As a result of SPS' violations of the UCL, Plaintiff is also entitled to a recovery of attorneys' fees and costs as provided by Cal. Code Civ. Proc. § 1021.5 and other applicable law.

## SIXTH CLAIM FOR RELIEF

### (Estoppel)

(BOA Defendants)

[DISMISSED WITHOUT LEAVE TO AMEND]

175.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

176.   BOA Defendants by the statements and/or conduct of their authorized loan service representatives with whom Plaintiff communicated, intentionally and deliberately caused Plaintiff to believe the following was true:

a.      That the 13001 Washington Property Repayment Plan would be honored and performed. Instead the Repayment Plan was "cancelled" for a demonstrably false reason; and

   b.   That Plaintiff's DOJ Loan Modification Program application for which Plaintiff qualified, would be accepted. Instead it, too, was rejected for a demonstrably false reason.

177.   Plaintiff reasonably relied on the statements and conduct of BOA Defendants' authorized loan service representatives in connection with the Repayment Plan and DOJ Loan Modification Program, and was damaged thereby as alleged herein.

178.   BOA Defendants should therefore be estopped to deny the existence of the Repayment Plan or the damages flowing from their refusal to honor it.

179.   BOA Defendants should also therefore be estopped to deny that Plaintiff's DOJ Loan Modification Program application was acceptable, or the damages flowing from their rejection of his application.

180.   As a direct and proximate result BOA Defendants' actions as alleged herein, Plaintiff has suffered damages in an amount not yet determined, subject to proof at trial.

### SEVENTH CLAIM FOR RELIEF
**(Unjust Enrichment/Restitution)**
(Against FPI Defendants Excluding Balboa)

181.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

182.   Because Plaintiff does not have any contractual relationship with the FPI Defendants, there is no adequate remedy at law to compensate Plaintiff for the involuntary and unlawful force placed insurance payments charged to his three loan accounts by the BOA Defendants, portions of which were paid to and retained by each of the FPI Defendants in connection with the force placed insurance kickback and backdating schemes described herein.

183.   As a result of these involuntary and unlawful force placed insurance payments, FPI Defendants have received a substantial benefit from Plaintiff for which he seeks restitution. There is no reasonable justification for allowing FPI Defendants to maintain these coerced force placed insurance payments.

184.   Moreover, these payments were accepted and retained by FPI Defendants under circumstances such that it would be inequitable for any of them to retain the benefit, as they each participated in the force placed insurance kickback and backdating schemes described herein.

185.   As a result of the unjust enrichment alleged herein, Plaintiff is entitled to restitution in the full amount of the benefits acquired by FPI Defendants, subject to proof at trial.

# EIGHTH CLAIM FOR RELIEF

## (Accounting)

(Against BOA Defendants and SPS)

186.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

187.   Plaintiff's theory of the case is, among other things, that the BOA Defendants did not have any right to issue the FPI policies on Plaintiff's properties, or to add the late fees, penalties, interest and/or miscellaneous charges to his loan debt, or to misapply his mortgage payments to pay for the unauthorized FPI policies and their ancillary costs.

188.   If Plaintiff prevails, an accounting is required in order to make all of the necessary downward adjustments (amounts being removed from BOA's column and put back into Plaintiff's column), to the three loan accounts in order to determine the correct amounts due on the loans.

189.   This accounting should not only be imposed on the BOA Defendants as an actual wrongdoer and preparer of the accounting ledgers, but also on SPS as the proponent of the correctness of the accounting ledgers in its capacity as loan service company and surrogate of the Lender. Indeed, SPS has relied upon and defended the accuracy of BOA's ledgers to credit reporting agencies, thus further damaging Plaintiff.

190.   Based upon (i) the current relationship between Plaintiff and SPS (borrower and loan service company); and (ii) the need to perform an accounting on the BOA ledger in order to determine the amounts to be credited back to Plaintiff, the elements necessary for an accounting to be ordered, are present.

191.   For all of the above reasons, Plaintiff requests that BOA Defendants and SPS Defendants be ordered to provide an accounting.

## NINTH CLAIM FOR RELIEF
### REAL ESTATE SETTLEMENT PROCEDURES ACT
### (12 U.S.C § 2601)
(Against SPS)

[DISMISSED WITHOUT LEAVE TO AMEND]

192.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

193.   Plaintiff's loans for 13001Washington Boulevard, 13007 Washington Boulevard and 4424 Lindblade Drive are federally related mortgage loans within the meaning of the Real Estate Settlement Procedures Act codified at 12 U.S.C. §§ 2601 *et seq*. ("RESPA").

194.   Moreover, at all times Plaintiff and BOA Defendants treated these three loans as being subject to RESPA notwithstanding that the Washington Blvd. properties would be rental properties. This is evidenced by the following:

195.   The three Security Agreements [Exhibits 1, 2, 3] expressly provide that they are subject to the provisions of RESPA. Definition (Q) states in pertinent part:

As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" **even if the Loan does not qualify as a "federally related mortgage loan"** under RESPA. (*See also*, Universal Covenant 3 referencing RESPA). [Emphasis added].

196.   The two Washington Security Agreements [Exhibits 1, 2] each contain a "Family Rider" which provides for the "Assignment of Rents" relating to those two properties, further evidencing the parties' intention that RESPA would apply notwithstanding the potential involvement of rental properties.

197.   In addition to the Security Agreement, from time to time Plaintiff has received other documents from BOA Defendants that make specific reference to RESPA and others that state that the loans were "residential" and not "commercial." [*See*, Exhibit 19 (November 27. 2012 letter referencing Plaintiff's Respa rights)]

198.   As to the 4424 Lindblade property (a single family residence), Plaintiff has at some times relevant hereto resided at the Lindblade property, and at all times relevant hereto he has maintained a room at the Lindblade property for his personal use and enjoyment should he ever want to reside there.

199.   RESPA regulates the real estate settlement process and the servicing of mortgage loans.

200.   Defendant SPS is a mortgage loan servicer, regulated by RESPA, and services Plaintiff's loans for 13001 and 13007 Washington Boulevard, and 4424 Lindblade Drive.

201.   RESPA Section 2605(e) sets for the duties of a loan servicer to respond to inquiries from a borrower, as follows:

a.   Section 2605(e)(1)(B) sets forth the definition of a "qualified written request," the receipt of which triggers certain obligations of the loan servicer to the borrower;

b.   Section 2605(e)(1)(A) requires the loan servicer to send, within 5 days of receipt, a notification to the borrower that the servicer has received the borrower's qualified written request;

c.   Section 2605(e)(2)(A)(B)(C) requires the loan servicer to follow a detailed statutory regimen in the course of responding to the borrower's "qualified written request." The loan servicer must provide his response within no more than 30 days from the date of receipt (weekends and holiday excluded). The loan server may have an additional 15 days if it notifies the borrower of the extension and the reasons for the delay.

d.   Section 2605(e)(3) prohibits the loan servicer from providing any information regarding any overdue payment owed by the borrower, to any consumer reporting agency, during the 60 day period beginning on the date of receipt by the loan

servicer of a qualified written request relating to a dispute regarding the borrower's payments.

202.   After SPS began servicing Plaintiff's three loans in or about December 2012, Plaintiff sent several "qualified written requests" within the meaning of Section 2605(e)(1)(B) regarding the servicing of the loans and disputing the account balances on the loans. In addition, Plaintiff requested an accounting of the loans. Plaintiff did not receive an acknowledgement or a response from SPS to his request for an accounting even though he included his name, account number, property address and otherwise complied with RESPA.

203.   Plaintiff's qualified written requests were sent to SPS during 2013 and 2014: A partial list is as follows:  January 2013; February 2013; March 2013; April 2013; May 30, 2013; July 2, 2013; July 16, 2013; August 30, 2013; November 6, 2013; November 12, 2013; December 13, 2013; June 30, 2014; July 5, 2014; July 7, 2014.

204.   SPS routinely did not send timely notifications to Plaintiff of its receipt of the qualified written requests.

205.   SPS routinely also did not respond to the qualified written requests within the 45 day period as required. Moreover, even when SPS did reply, its, responses were non-compliant, and they formed a "pattern of non-compliance," as previously alleged herein.

206.   SPS routinely also violated the Section 2605(e)(3) by providing information about allegedly overdue payments to credit reporting agencies during the 60 day period following SPS' receipt of Plaintiff's qualified written requests relating to a dispute about his payments.

207.   Plaintiff made repeated requests to SPS to refrain from furnishing negative credit information to the credit agencies while the accounts were in dispute during the 60-day period. But SPS repeatedly refused to stop furnishing negative credit information to the agencies during the 60-day period.

208.   As a direct and proximate result of SPS' RESPA violations as alleged herein, Plaintiff has suffered actual damages in an amount not yet determined, subject to proof at trial. Plaintiff is also entitled to statutory damages as well as attorneys' fees and costs, as provided by Section 2605(f)(1) and (3).

## TENTH CLAIM FOR RELIEF

### FAIR DEBT COLLECTION PRACTICES ACT

### (15 U.S.C. § 1692a)

(Against SPS)

209.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

210.   SPS is a "debt collector" pursuant to the provisions of the Fair Debt Collection Practices Act, codified at 15 U.S.C. § 1692a ("FDCPA").

211.    As a mortgage servicer, SPS "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Section 1692a(6).

212.    SPS also is in the business of debt collection. and has a separate corporation as a collection agency, Select Portfolio Servicing, Collection Agency;

213.    SPS also collects debts in the name of Loan Servicing Center which was the name that appeared on Plaintiff's Equifax credit report.

214.    SPS did not originate this debt.

215.    SPS is not a creditor under Section1692a(4).

216.    SPS was not assigned the debt but instead received the servicing as part of a settlement in class action litigation against the former servicer, Bank of America, N.A.

217.    SPS began servicing Plaintiff's three loans when the loans were alleged to be in default.

218.    At the time SPS took over the servicing of Plaintiff's loans, all three loans were in default status.

219.    Plaintiff disputes the authenticity of assignments recorded in 2011, which allowed the prior servicer Bank of America, N.A. to record notices of default and trustee sale notices, but for the sake of this claim, Plaintiff will plead that the loans for all purposes without waiving his right to challenge the authenticity of the recorded documents;

220.   SPS has made false and misleading statements regarding Plaintiff's loans, namely:

    a.  Claiming Plaintiff's loans were late, by claiming to Plaintiff that he owed loan amounts he did not owe and by sending notices that the loans were in default when the loans in fact were not in default;

    b.  Sometimes, SPS received and accepted payments and therefore the loans could not have been late and SPS should have refrained from debt collection practices.

    c.  SPS knew by the communications from Plaintiff that the loans were in such dispute that it should have refrained from collection practices until an appropriate accounting could have been completed;

    d.  SPS in its collection and acceptance of payments from Plaintiff for the 13001 and 13007 Washington property loans receives the payments, processes the payments and in numerous instances did not return the payments for over twenty days, and sometimes longer. [Plaintiff is in the process of compiling a list of payments sent to SPS which will include dates of when payments were returned later].

    e.  SPS misrepresented to Plaintiff the status of Gary's disputes regarding loan balances and continued to send Plaintiff notices that Plaintiff's loans were in default.

f.   SPS misrepresented to Plaintiff that SPS would research the disputed

loan amount and furnish accurate information to the CRA's (Credit

Reporting Agencies), but so far Plaintiff has not obtained any

information regarding the research.

g.   SPS continued to furnish disputed loan information to the CRA's while

the loans were in dispute;

h.   SPS continued to furnish disputed loan information to the CRA's in

violation of RESPA's 60- day period while loan accounts were in

dispute.

## ELEVENTH CLAIM FOR RELIEF
### (Cal. Civ. Code § 1785.25)
(Against SPS)

[DISMISSED WITHOUT LEAVE TO AMEND AS TO §1785.25(f) ONLY]

221.   Plaintiff re-alleges and incorporates all preceding paragraphs as though

set forth in full in this claim for relief.

222.   Cal. Civ. Code § 1785.25(a) prohibits any person from furnishing

information on a specific transaction to any "consumer credit reporting agency"

("CCRA") that such person knows or should know is incomplete or inaccurate.

223.   Cal. Civ. Code § 1785.25(f) further requires any person who provides

information to a CCRA, to take detailed steps to investigate a dispute regarding that

information, within 30 days of receiving notice of a dispute noticed pursuant to Cal.

Civ. Code § 1785.16 with regard to the completeness or accuracy of any information provided to a CCRA.

224.   As alleged in detail herein, SPS has willfully and intentionally violated Section 1785.25(a) by providing incomplete and inaccurate information concerning Plaintiff to various consumer credit reporting agencies.

225.   On information and belief, SPS has also willfully and intentionally violated Section 1785.25(f) by failing to complete its investigation in a timely fashion.

226.   As a direct and proximate result of SPS' violations as alleged herein, Plaintiff is entitled to his actual damages in an amount not yet ascertained, subject to proof at trial.  Plaintiff is also entitled to statutory damages, including punitive damages, as well as attorneys' fees and costs, as provided by Section 1785.31.

# TWELFTH CLAIM FOR RELIEF
## FAIR CREDIT REPORTING ACT
### (15 U.S.C. § 1681n)
(Against SPS)

227.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

228.   SPS is a furnisher of credit information subject to the Fair Credit Reporting Act codified at 15 U.S.C. §§ 1681 *et seq*. ("FCRA").

229.   Section 1681s-2 of the FCRA requires that furnishers of credit accurately report credit information about consumers to credit reporting agencies, report the existence of any dispute about any allegedly delinquent charges, and promptly verify and correct any contested information provided by them to a credit reporting bureau.

229A.  Commencing in or about February 2013 and continuing until at least April 2014, Lexington Law, a credit repair organization retained by Plaintiff, submitted approximately 18 notices of disputed information to credit reporting agencies regarding all three loans serviced by SPS. Approximately 12 such notices were sent to Transunion and 6 such notices were sent to Equifax. Approximately 10 disputes were submitted regarding the 13001 Washington loan, 7 disputes were submitted regarding the 13007 Washington loan, and 9 disputes were submitted regarding the Lindblade loan. Approximately 13 such notices were submitted between February 11, 2013 and December 15, 2013, and 5 such notices were submitted between January 29, 2014 and April 18, 2014.

230.   Based on the foregoing, Plaintiff alleges on information and belief that SPS has received a "Notice of Dispute" from one or more credit reporting agencies relating to the above referenced notices of dispute, and it has failed to respond as required by law.  SPS has willfully failed to comply with the requirements of the FRCA with regard to the furnishing of information about Plaintiff in violation of 15 U.S.C. § 1681n.

231.   On information and belief, SPS has consistently reported Plaintiff's account as being seriously delinquent without noting that the validity of the debt is disputed. Such false and misleading reporting of the alleged debt has occurred from in or about December 2012 through the present time.

232.   As a direct and proximate result of SPS' violations as alleged herein, Plaintiff has been damaged as set forth in Paragraph 95. These damages include, but are not limited to, the inability to obtain credit in order to expand Plaintiff's business as he wanted to do. Moreover, Plaintiff spent substantial time personally communicating with SPS between approximately December 2012 and April 2013 regarding the disputed loan amounts, misapplied payments and the accounting issue, which damaged him financially, as it was time he could not spend running his business. Additionally, Plaintiff has been forced to incur expenses to pay Lexington Law for its services as set forth above. Plaintiff is therefore entitled to recover actual damages subject to proof, statutory damages, including punitive damages, as well as attorneys' fees and costs, as provided by Section 1681n.

### THIRTEENTH CLAIM FOR RELIEF
### FAIR CREDIT REPORTING ACT
### (15 U.S.C. § 1681o)
(Against SPS)

233.   Plaintiff re-alleges and incorporates all preceding paragraphs as though set forth in full in this claim for relief.

234.   SPS is a furnisher of credit information subject to the Fair Credit Reporting Act codified at 15 U.S.C. §§ 1681 *et seq*. ("FCRA").

235.   Section 1681s-2 of the FCRA requires that furnishers of credit accurately report credit information about consumers to credit reporting agencies, report the existence of any dispute about any allegedly delinquent charges, and promptly verify and correct any contested information provided by them to a credit reporting bureau.

235A.  Commencing in or about February 2013 and continuing until at least April 2014, Lexington Law, a credit repair organization retained by Plaintiff, submitted approximately 18 notices of disputed information to credit reporting agencies regarding all three loans serviced by SPS. Approximately 12 such notices were sent to Transunion and 6 such notices were sent to Equifax. Approximately 10 disputes were submitted regarding the 13001 Washington loan, 7 disputes were submitted regarding the 13007 Washington loan, and 9 disputes were submitted regarding the Lindblade loan. Approximately 13 such notices were submitted between February 11, 2013 and December 15, 2013, and 5 such notices were submitted between January 29, 2014 and April 18, 2014.

236.   Based on the foregoing, Plaintiff alleges on information and belief that SPS has received a "Notice of Dispute" from one or more credit reporting agencies relating to the above referenced notices of dispute, and it has failed to respond as required by law. SPS has negligently failed to comply with the requirements of the

FRCA with regard to the furnishing of information about Plaintiff in violation of 15 U.S.C. § 1681o.

237.   On information and belief, SPS has consistently reported Plaintiff's account as being seriously delinquent without noting that the validity of the debt is disputed. Such false and misleading reporting of the alleged debt has occurred from in or about December 2102 through the present time.

238.   As a direct and proximate result of SPS' violations as alleged herein, Plaintiff has been damaged as set forth in Paragraph 95. These damages include, but are not limited to, the inability to obtain credit in order to expand Plaintiff's business as he wanted to do. Moreover, Plaintiff spent substantial time personally communicating with SPS between approximately December 2012 and April 2013 regarding the disputed loan amounts, misapplied payments and the accounting issue, which damaged him financially, as it was time he could not spend running his business. Additionally, Plaintiff has been forced to incur expenses to pay Lexington Law for its services as set forth above. Plaintiff is therefore entitled to recover actual damages in an amount not yet ascertained, subject to proof at trial, as well as attorneys' fees and costs, as provided by Section 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For general and special damages according to proof at trial;

2.      For past and future general damages, according to proof;

3.      For past and future loss of earnings according to proof;

4.      For prejudgment interest on all damages, as is allowed by law;

5.      For punitive and exemplary damages against BOA Defendants, FPI Defendants and SPS, as may be authorized by law;

6.      For Restitution pursuant to Cal. Bus. & Prof. Code § 17200;

7.      For injunctive relief pursuant to Cal. Bus. & Prof. Code § 17200;

8.      For statutory damages as provided by law;

9.      For attorney's fees as authorized by Cal. Code Civ. Proc. §§ 1717 and 1021.5, as well and any other applicable statute or other law;

10.     For costs of suit herein; and

11.     For such other and further relief as the Court may deem just and proper.


DATED:  June 23, 2016                    Respectfully Submitted,

                                         By: /s/ Shinaan S. Krakowsky
                                         Shinaan S. Krakowsky
                                         Hayes F. Michel
                                         Attorneys For Plaintiff Gary Craig Haddock

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands an individual trial by jury on all issues which may be tried by a jury.


DATED:  June 23, 2016                    Respectfully Submitted,

                                         By: /s/ Shinaan S. Krakowsky
                                         Shinaan S. Krakowsky
                                         Hayes F. Michel
                                         Attorneys For Plaintiff Gary Craig Haddock

THIRD AMENDED COMPLAINT